# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LYNN BUCK, ALMA ROSA SILVA-BANUELOS,
CAMILLE CHAVEZ, DENIS DOYON, LORI EATON,
LUCY GILSTER (by her next best friend, JENNIE LUSK),
BRIAN HANEY, ALICIA KISNER (by her next best
friend, LISA KISNER), LISA KISNER, MICHAEL KISNER,
LANE LECKMAN, MARIA SANTELLI, SUSAN SCHUURMAN,
CHRISTINA MAYA TRAFTON, CURTIS TRAFTON, and
NICK WECHSELBERGER,

      Plaintiffs,

vs.                                                    Civ. No. 04-1000 JP/DJS

CITY OF ALBUQUERQUE; MAYOR MARTIN CHAVEZ,
in his individual capacity; DEPUTY CHIEF OF POLICE RAY
SCHULTZ, in his individual capacity; CAPTAIN JOHN
GONZALES, in his official and individual capacity,
ALBUQUERQUE POLICE OFFICERS RAYMOND DeFRATES,
MICHAEL FISHER, JAMES LEROY FOX, NICHOLAS GONZALES,
ALLEN S. HANCOCK, SGT. STEVEN HILL, CHARLES LOPEZ,
DANIEL S. MAGETTERI, JAMES MONTOYA, SGT. SHAWN
O'CONNELL, PABLO A. PADILLA, and JAMES PERDUE, in
their individual capacities,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Defendants[1] City of Albuquerque ("City"), Mayor Martin Chavez, Ray Schultz, Raymond

DeFrates, Michael Fisher, James Leroy Fox, Nicholas Gonzales, Allen S. Hancock, Steven Hill,

Charles Lopez, Daniel S. Magetteri, James Montoya, Shawn O'Connell, Pablo A. Padilla, and

James Perdue filed a Motion for Partial Summary Judgment No. II: Dismissal of Plaintiffs' § 1983

Wrongful Seizure and Arrest, Excessive Force, First Amendment, Retaliatory Prosecution,

---

[1] Defendants Nick Bakas and Gilbert Gallegos are no longer parties to this motion, having been dismissed from the case by this Court's July 7, 2006 Order (Doc. No. 172).

Malicious Prosecution and State Law False Imprisonment, Battery, and Malicious Abuse of

Process Claims (Doc. No. 108) ("Defendants' MPSJ No. II").  Defendant John Gonzales filed a

separate Motion for Summary Judgment (Doc. No. 113) ("Defendant Gonzales' MSJ").  Plaintiffs

filed a Motion for Partial Summary Judgment No. I: Summary Judgment for Plaintiff Camille

Chavez on her Claims of § 1983 Excessive Use of Force, First Amendment, and State Law

Battery (Doc. No. 128) ("Plaintiffs' MPSJ").  Having considered the briefs and the evidence in

the record, the Court concludes that both Defendants' MPSJ No. II and Defendant Gonzales'

MSJ should be granted in part and denied in part as consistent with this opinion, and that

Plaintiffs' MPSJ should be denied in full.


## I.     INTRODUCTION

This case arises out of a March 20, 2003 political demonstration which was organized to

protest the invasion of Iraq.  The sixteen plaintiffs attended the anti-war demonstration which

began at the University of New Mexico ("UNM") Bookstore in Albuquerque, New Mexico.

They allege that their federal constitutional and state law rights were violated in the course of the

Albuquerque Police Department's ("APD") response to the protest.  Defendants Deputy Chief of

Police Ray Schultz, Officer Raymond DeFrates, Officer Michael Fisher, Officer James Leroy Fox,

Officer Nicholas Gonzales, Officer Allen S. Hancock, Sgt. Steven Hill, Officer Charles Lopez,

Officer Daniel Mageterri, Officer James Montoya, Sgt. Shawn O'Connell, Officer Pablo Padilla,

Officer James Perdue (collectively, "Defendant Officers") and Defendant Captain John Gonzales

("Defendant Gonzales") were part of the APD's response to the anti-war protest.

In their First Amended Complaint, Plaintiffs assert the following claims:

2

Count I:        Plaintiffs Alma Rosa Silva-Banuelos, Michael Kisner, and Denis Doyon's claims for False Imprisonment against the Defendant Officers and the City;

Count II:       All named Plaintiffs' claims for Battery against Defendant Officers and the City;

Count III:      Plaintiffs Silva-Banuelos, Michael Kisner, and Doyon's claims for Malicious Abuse of Process against the Defendant Officers, Defendant Gonzales, and the City;

Count IV:       Plaintiffs Silva-Banuelos, Michael Kisner, and Doyon's claims for Wrongful Seizure and Arrest under 42 U.S.C. § 1983 against the Defendant Officers and Defendant Gonzales;

Count V:        All named Plaintiffs' claims for Use of Excessive Force under 42 U.S.C. § 1983 against the Defendant Officers and Defendant Gonzales;

Count VI:       All named Plaintiffs' claims for Suppression of Rights to Freedom of Expression and Assembly under 42 U.S.C. § 1983 against the Defendant Officers and Defendant Gonzales;

Count VII:      Plaintiffs Silva-Banuelos, Michael Kisner, and Doyon's claims for Retaliatory Prosecution under 42 U.S.C. § 1983 against the Defendant Officers and Defendant Gonzales;

Count VIII:     Plaintiffs Silva-Banuelos, Michael Kisner, and Doyon's claims for Malicious Prosecution under 42 U.S.C. § 1983 against the Defendant Officers and Defendant Gonzales; and

Count IX:       All named Plaintiffs' claims for Supervisory Liability and Municipal Liability for Violations of Constitutional Rights under 42 U.S.C. § 1983 against the City and Defendants Chavez, Schultz, and Gonzales.

Counts I through VIII  contain claims against the Defendant Officers, who seek dismissal of those claims.  Counts III through IX include claims against Defendant Gonzales, who seeks dismissal of all claims against him.

## II.    FACTUAL BACKGROUND

The following facts are either undisputed or are relevant facts, established by admissible

evidence, that most favor Plaintiffs.[2]

### A. Overview of the March 20, 2003 Demonstration

At approximately 5:00 p.m. on March 20, 2003, the demonstration commenced in front of the UNM Bookstore located at the intersection of Central and Cornell Avenues.  Defs.' Undisputed Fact 2.[3]  Estimates of the number of participants range from approximately 200 to 1,000.  *See* John Gonzales Dep. at 124 (Pls.' Ex. in Supp. of Pleadings, Ex. 29 (Doc. No. 133, filed April 11, 2006) (hereinafter "Pls.' Ex. __")); Lynn Buck Dep. at 47-48 (Mem. in Supp. of Defendant Gonzales' MSJ, Ex. B).

Prior to March 20, 2003 the city administration had not given the APD any directives on how to handle demonstrations of this nature.  Pls.' Undisputed Fact 137.[4]  As a result, there was confusion within the APD about the management of demonstrations and who was to be deployed to respond to them.  Pls.' Undisputed Fact 30.  Moreover, there was confusion concerning who would be in command of any response to a demonstration.  *Id.*

On March 20, 2003 Defendant Schultz, at that time the Deputy Chief in charge of the Field Service Bureau, was Defendant Gonzales' direct supervisor.  Pls.' Undisputed Fact 13,

---

[2] These background facts are taken from the undisputed material facts set forth in Plaintiffs' MPSJ, Defendants' MPSJ No. II, Defendant Gonzales' MSJ, the parties' briefs responding to each others' undisputed material facts, and the exhibits attached to the parties' motions and other briefs.  Where the facts are disputed on an issue subject to the parties' cross motions for summary judgment, the Court views them in the light most favorable to the nonmoving party for the purposes of ruling on the opposing party's motion for summary judgment.

[3] The Court's references to "Defs.' Undisputed Fact" refer to undisputed facts set forth in the Memorandum in Support of Defendant Gonzales' MSJ (Doc. No. 114, filed Feb. 1, 2006).

[4] The Court's references to "Pls.' Undisputed Fact" refer to undisputed facts set forth in Plaintiffs' Statement of Undisputed Material Facts (Doc. No. 134, filed April 11, 2006).

184.[5]  Defendants Gonzales and Schultz briefed then-Chief of Police Gilbert Gallegos on their plans for handling the demonstration.  Gilbert Gallegos Dep. at 50-52 (Pls.' Ex. 28).  Chief Gallegos understood that APD officers had agreed on a plan to close a lane of Central Avenue for the protest, *id.* at 54-56, and approved of Defendants Gonzales and Schultz's plan.  Pls.' Undisputed Fact 185.

At the time of the protest, Defendant Gonzales was the captain of the Metro Division of the police, which included the air unit, bomb squad, Special Weapons and Tactics ("SWAT") team, K-9 division, horse unit, and traffic-related operations.  Pls.' Undisputed Fact 65.  On March 20, 2003 Defendant Gonzales was the incident commander in charge of the APD's response to the demonstration.  Gonzales Dep. at 22 (Pls.' Ex. 29); Robert Huntsman Dep. at 17 (Pls.' Ex. 38).  In that position, Defendant Gonzales was the point of contact and immediate supervisor of all police officers assigned to duty at the demonstration, *see* Gonzales Dep. at 22, 116 (Pls.' Ex. 29), and was in control of all decisions made and acted upon.  Pls.' Undisputed Fact 96.

Prior to the demonstration, APD officers had staged at the bus yard on Yale Boulevard and had at their disposal several buses for transporting arrested protestors, but the number of arrests (17) did not warrant their use.  Pls.' Undisputed Fact 75.  Defendant Gonzales had a total of approximately 200 officers available to him that night.  *See* John Gonzales Dep. at 98 (Pls.' Ex. 29).  All of the Defendant Officers were part of the APD's response to the anti-war protest. Defs.' Motion for Partial Summary Judgment No. I ("MPSJ No. I"), Undisputed Fact 1 (Doc. No. 107).  The Emergency Response Team ("ERT"), which was created for the purposes of

---

[5] Defendant Schultz became Chief of the APD in April 2005.  Pls.' Undisputed Fact 13.

crowd control and handling demonstrations, Pls.' Undisputed Fact 183, constituted 140 of the available officers.  *See* Gonzales Dep. at 98 (Pls.' Ex. 29).[6]  Defendant Gonzales also had the SWAT team under his command that evening.  Pls.' Undisputed Fact 96.  Although the SWAT team generally does not handle protests, it was asked to respond because it acts as a "force multiplier."  Pls.' Undisputed Fact 229.  The final component of the APD's response to the protest was the K-9 unit, whose use was ordered and approved by Defendant Gonzales.  Pls.' Undisputed Fact 120.  The dogs in the K-9 unit are used as an intimidation tactic.  *Id.*

Most of the officers at the demonstration were equipped with riot gear (gas masks, external vests, riot batons) and did not wear name badges, making it difficult to identify them.  *See* Ray Schultz Dep. at 45-47 (Pls.' Ex. 48); Pls.' Undisputed Fact 112; Defs.' MPSJ No. I (Doc. No. 107), Ex. A-10 at 3.  At the time of the protest, officers were not required to wear name plates or designators.  Pls.' Undisputed Fact 209.  ERT officers wore surplus military Kevlar helmets, gas masks, load bearing vests, rubber gloves, black utility uniforms, bullet proof vests, knee protectors, and boots.  Pls.' Undisputed Fact 215.  SWAT team members were attired in green flight suits, black vests, green helmets, and black gas masks.  Pls.' Undisputed Fact 233. The officers in the horse-mounted unit wore regular uniforms.  Gonzales Dep. at 142 (Pls.' Ex. 29).   Defendant Gonzales did not wear headgear or a gas mask.  Defs.' Undisputed Fact 19.

Defendant Gonzales did not want the officers under his authority to take independent action.  *Id.* at 104.  They were to use force only by direction from a superior officer or if there was fear for the safety of another person.  *Id.*  Generally, in regard to any large-scale

---

[6] Although Defendant Gonzales dismissed the ERT at approximately 1:30 p.m. that day, the ERT was recalled later that evening to respond to the demonstration.  *See* Gonzales Dep. at 101 (Pls.' Ex. 29); Michael Castro Dep. at 9-12 (Pls.' Ex. 20).

demonstration, a decision to use force is made by the supervisor.  *See* Schultz Dep. at 67 (Pls.'
Ex. 48).  Officers usually do not use force or make arrests unless they are directed to do so by a
superior.  Pls.' Undisputed Fact 216.

When approximately 150-200 protestors had gathered at the UNM Bookstore, the police
decided to close Central Avenue to traffic.  *See* Pls.' Ex. 71 at 14-15.  Some of the protestors
were overflowing outside the crosswalks into the westbound traffic lanes.  *See* Gonzales Dep. at
135 (Pls.' Ex. 29).  Defendant Gonzales conveyed verbal commands to the crowd over his public
address ("PA") system to stay on the sidewalks and out of the street.  *Id.* at 134, 136-37.  Lt. Bob
Hunstman requested over the radio that the officers on Central Avenue shut down the street.
Pls.' Undisputed Fact 149.  Because of the size of the demonstration and the overflow from the
sidewalks into the street crosswalks, Defendant Gonzales ordered his officers to close part of
Central Avenue to traffic so that the demonstrators could move into the street.  Mayor Martin
Chavez Dep. at 39 (Pls.' Ex. 21); Schultz Dep. at 27 (Pls.' Ex. 48); Gonzales Dep. at 135-36
(Pls.' Ex. 29); Pls.' Ex. 71 at 22-24.  Defendant Gonzales reminded his officers that the procedure
was to route traffic and buses away from the demonstration area.  Pls.' Undisputed Fact 150.
Although the protestors did not have a parade permit, once the police closed the street most of
the crowd moved onto Central Avenue and proceeded west both on the sidewalk and in
westbound traffic lanes toward University Boulevard.  Defs.' Undisputed Fact 2; Defs.' MPSJ
No. II (Doc. No. 108), Undisputed Fact 6.

Officer Gregory Cunningham and his partner, Officer Danny Garcia, were located among
the demonstrators for purposes of monitoring the crowd.  Gregory Cunningham Dep. at 105-06
(Mem. in Supp. of Def. Gonzales' MSJ, Ex. E); Danny Garcia Dep. at 16 (Mem. in Supp. of Def.

Gonzales' MSJ, Ex. F).  Officer Cunningham observed that approximately seven to eight protestors in the crowd were wearing shin guards, helmets, and backpacks.  *See* Cunningham Dep. at 75.  One of these protestors removed a face mask from a backpack while another five to ten removed rags doused in vinegar from their backpacks.  *See id.* at 75, 77, 131.  They explained to people in the crowd that vinegar would counteract the effects of tear gas.  *Id.*  Officer Cunningham believed that these protestors were affiliated with a nationwide protest organization known as the Black Bloc.  *See id.* at 102-03.  Officer Cunningham also heard two or three protestors talk about marching onto the freeway.  *Id.* at 112, 117.  While APD officers were directing the movement of the protestors' march, individuals in the crowd became confrontational with the officers every time they were forced to turn or change direction because they were not being allowed to go where they wanted to go.  *Id.* at 119.  Based on his observations, Officer Cunningham believed that the crowd was more confrontational and aggressive with the police than people had been at other protests he had witnessed.  *See id.* at 107-08.

Shortly after the demonstration had commenced, pro-war demonstrators arrived and began making statements in support of President Bush and American troops.  Pls.' Undisputed Fact 245; Garcia Dep. at 19-20 (Pls.' Ex. 60).  The anti-war demonstrators responded in kind, but were neither aggressive nor verbally threatening, and no physical altercations occurred between the two groups.  Garcia Dep. at 19-20 (Pls.' Ex. 60).  Officer Garcia observed that a majority of the anti-war protestors were peaceful and, for the most part, complied with police commands.  *Id.* at 52.  He did not see anyone throw any kind of projectile.  Pls.' Undisputed Fact 242.  Nevertheless, Officer Garcia concluded that there were approximately five or six people involved in the demonstration who seemed to be attempting to cause trouble.  Garcia Dep. at 52-53, 55

8

(Pls.' Ex. 60).  Sergeant Clarence Davis eventually pulled Officer Cunningham and his partner out of the crowd because of his concern for their safety.  Cunningham Dep. at 106, 117.

Defendant Gonzales decided to use traffic unit rolling road blocs to protect the protestors from traffic as well as to protect vehicles from the protestors.  Pls.' Undisputed Fact 101. Defendant Gonzales also ordered a police skirmish line to be set up at University Boulevard to divert the crowd from its westbound course on Central Avenue northward onto University Boulevard.  Defs.' Undisputed Fact 2; Pls.' Undisputed Fact 153.  Several protestors in the crowd attempted to break the police line and were forced back by officers using their riot batons.  Pls.' Ex. 74.  Defendant Gonzales gave the crowd commands to move north on University Boulevard. Gonzales Dep. at 137 (Pls.' Ex. 29).  Following a period of confusion, the crowd complied with Defendant Gonzales' order.  *Id.* at 127.  The ERT was recalled to assist with the protest at this time.  Pls.' Undisputed Fact 156.

At the intersection of University Boulevard and Copper Avenue, the crowd turned westbound onto Copper Avenue.  Defs.' Undisputed Fact 2.  As the march approached Cedar Avenue, another line of police officers directed the crowd southward onto Cedar Avenue back toward Central Avenue due to concerns that the protestors might try to move westward onto Interstate 25.  *See id.*; Pls.' Ex. 71 at 35-36.  Defendant Gonzales authorized the use of chemical munitions, including pepper ball rounds,[7] to turn the crowd away from the interstate highway.  *Id.* at 34-36.  The crowd cut across vacant lots and streets to the east of Cedar Avenue in order to

---

[7]  A pepper ball launcher is commonly referred to as a pepper ball gun and uses compressed air to deliver or "shoot" pepper ball rounds, which are small plastic spheres weighing approximately two grams each.  Defs.' MPSJ No. II (Doc. No. 108), Undisputed Facts 20-22.  Pepper ball rounds may contain Oleoresin Capsicum (OC) powder, commonly referred to as mace, or PAVA (capsaicin II).  *See id.*, Ex. B, ¶ 98; Pls.' Ex. 61.  Pepper balls are designed to fracture into multiple pieces upon impact.  Defs.' MPSJ No. II (Doc. No. 108), Undisputed Fact 24.

9

return to Central Avenue.  Defs.' Undisputed Fact 2.  At the intersection of Cedar and Central

Avenues, additional police officers directed the crowd east on Central Avenue back toward the

UNM Bookstore area.  *Id.*

By the time the crowd returned to Central Avenue, officers in the horse-mounted unit had

identified five to seven individuals who were acting as provocateurs.  Pls.' Undisputed Facts 106-

07.  Defendant Gonzales ordered the arrest and removal of these individuals from the crowd.  *Id.*

The identified provocateurs, however, disappeared into the crowd before they could be arrested.

*See id.*

During the protest, Defendant Gonzales followed the crowd by car as well as on foot.

Gonzales Dep. at 128 (Pls.' Ex. 29).  He kept track of the protestors' activities by maintaining

communication with other officers, including officers in the crowd and the horse-mounted unit.

*See id.*  None of the named Defendants, however, worked as a horse-mounted officer on March

20, 2003.  Defs.' MPSJ No. I (Doc. No. 107), Undisputed Fact 72.

The crowd began to lose its westbound momentum and eventually complied with

Defendant Gonzales' PA commands to move eastward.  *See* Pls.' Undisputed Facts 106-07, 163;

Gonzales Dep. at 134 (Pls.' Ex. 29).  As the crowd moved to the east, Defendant Gonzales

authorized the use of pepper ball rounds to move protestors away from gas pumps at the 7-11

store at the intersection of University Boulevard and Central Avenue.  Gonzales Dep. at 158 (Pls.'

Ex. 29); Pls.' Ex. 71 at 40-41.  He also ordered officers to issue warnings and then use beanbag

rounds if the crowd stopped moving eastward.  Pls.' Ex. 71 at 43.  Defendant Gonzales

specifically directed an officer to fire a beanbag round at an aggressive male protestor because the

protestor looked like he was about to engage the officers physically.  Gonzales Dep. at 145, 164

(Pls.' Ex. 29).

Before the crowd reached the intersection of Central Avenue and Yale Boulevard, Defendant Gonzales had already requested a pepper fogger.  Pls.' Ex. 71 at 45-46.  After giving a verbal warning that chemical agents would be used against them, Defendant Gonzales personally dispensed OC pepper spray to move the crowd.  Gonzales Dep. at 144, 183 (Pls.' Ex. 29).  At the same time, Defendant Gonzales ordered certain officers to provide sting balls to officers on the line.  Pls.' Ex. 71 at 51.

A number of protestors began drumming when the crowd, which now numbered approximately 200 people, returned to the area around the UNM Bookstore.  Pls.' Undisputed Facts 111, 207-08.  At that time, people were laughing, chanting, and dancing in the street.  Eric Sirotkin Aff. ¶¶ 15-16, 24 (Pls.' Ex. 53).  No one was engaged in making threats or violent gestures or otherwise attempting to provoke the police.  *Id.*

Nevertheless, Captain Michael Castro ordered a number of ERT officers to form a skirmish line across Cornell Drive at the intersection of Cornell and Central Avenue.  Pls.' Undisputed Fact 206.  The ERT deployed in an L-formation, and with other officers on Central Avenue, began to direct protestors onto UNM property and off the street.  Pls.' Undisputed Facts 207-08.  Likewise, Defendant Gonzales ordered the use of sting balls to clear the street, Pls.' Ex. 72 at 4, and ordered the confiscation of protestors' drums because the drums were loud and drowning out communication.  Gonzales Dep. at 170-71 (Pls.' Ex. 29); Pls.' Ex. 72 at 4.  He told his officers to arrest the protestors with drums if need be.  Gonzales Dep. at 171 (Pls.' Ex. 29).  The drummers, however, were not told to stop drumming before officers took their drums and arrested them.  Pls.' Undisputed Fact 129.

Defendant Gonzales then ordered officers to fire additional non-lethal ammunition rounds at the crowd.  Pls.' Ex. 72 at 12.  He also authorized the use of force to "sweep the people from the sidewalk of the Frontier [restaurant]."  *Id.* at 13.  Around this time, Sergeant Donny Keith deployed a smoke canister.  Gonzales Dep. at 162 (Pls.' Ex. 29).

APD officers gave orders over the PA system to clear the streets.  Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶ 92.  However, many protestors did not hear these orders before the police used tear gas.  *See*, *e.g.*, Maria Santelli Dep. at 41; Denis Doyon Dep. at 14.  Defendant Gonzales personally participated in deploying two volleys of rubber coated tear gas canisters into the crowd in order to disperse the protestors.  Gonzales Dep. at 176-77 (Pls.' Ex. 29); Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶¶ 94-95.  The first volley of canisters landed in front of the crowd, and the second volley went into the crowd.  Gonzales Dep. at 176-77 (Pls.' Ex. 29).  Defendant Gonzales personally deployed one of the gas canisters into the crowd.  *Id.*; Castro Dep. at 25-26 (Pls.' Ex. 20).  Defendant Officers Hill and Lopez also threw gas canisters into or in front of the crowd.  Gonzales Dep. at 176-77 (Pls.' Ex. 29).  Hill and Lopez were the only officers authorized by Defendant Gonzales to deploy tear gas.  Gonzales Dep. at 178 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. G).  Nevertheless, Defendant Officer Hancock also launched a canister behind the crowd.  A. Shawn Hancock Dep. at 52 (Pls.' Ex. 35).

Although the police ordered the protestors to leave the area, they were not told how they could do so.  Schultz Dep. at 74 (Pls.' Ex. 48); Pls.' Undisputed Fact 50.  Because of the location of the police officers, the protestors did not know where they could go.  Pls.' Undisputed Fact 174; Pls.' Ex. 72 at 15.  By 7:45 p.m., the crowd had largely dispersed and the protest came to a close.  Defs.' Undisputed Fact 2.  When the police departed, there were approximately 75 people

still in front of the UNM Bookstore.  Pls.' Undisputed Fact 175; Pls.' Ex. 72 at 18.

Throughout the demonstration, Defendant Gonzales did not see anyone in the crowd throw anything at any of the officers.  Gonzales Dep. at 163 (Pls.' Ex. 29).  The protest never became a riot.  Pls.' Undisputed Fact 22.  Nonetheless, Defendant Gonzales ordered his officers to book and jail arrested persons downtown.  Pls.' Ex. 72 at 20; Huntsman Dep. at 53 (Pls.' Ex. 38).  This was contrary to APD's general practice of citing and releasing demonstrators.  *See* Huntsman Dep. at 53 (Pls.' Ex. 38).

Though Defendant Schultz was present at the March 20, 2003 protest, he did not arrive until the crowd was at University Boulevard and Central Avenue near the 7-11 store.  Schultz Dep. at 13-14, 26-27 (Pls.' Ex. 48).  His role that evening was as a senior advisor.  *Id.* at 83.  He spoke with Defendant Gonzales about the events that occurred during the course of the demonstration and was involved in the decision-making behind the APD's response.  *Id.* at 84; Pls.' Undisputed Fact 54.  Defendant Schultz did not see any destruction of property at the demonstration.  Pls.' Undisputed Fact 36.  During the protest, Defendant Schultz updated Chief Gallegos on current developments.  Pls.' Undisputed Fact 53.

Chief Gallegos was present at the protest until it ended.  Pls.' Undisputed Facts 189, 195. He spoke to Defendant Gonzales during the demonstration and monitored his actions during most of the protest from his police car.  Pls.' Undisputed Fact 190, 195.  Had Chief Gallegos disagreed with anything that Defendant Gonzales did as incident commander that evening, Chief Gallegos could have exercised his authority to stop Defendant Gonzales.  Pls.' Undisputed Fact 191.

Chief Gallegos briefed Department of Public Safety Chief Nick Bakas and Mayor Martin Chavez about what had occurred during the March 20, 2003 demonstration.  Pls.' Undisputed

Fact 199.  Neither Bakas nor Mayor Chavez took issue with how the APD had handled the

protest.  *Id.*

B.  **Individual Experiences of the Sixteen Plaintiffs**[8]

1.    **Lynn Buck**

Plaintiff Lynn Buck was present at the March 20, 2003 demonstration.  She first smelled

tear gas while walking east on Central Avenue near the intersection with University Boulevard,

and saw a police officer use a baton to strike an elderly man laying in the street, and then drag him

away.  Lynn Buck Dep. at 79-80 (Pls.' Ex. 1).

After hearing the APD's orders to clear the streets, Plaintiff Buck moved onto the UNM

campus.  While Plaintiff Buck was standing in front of the UNM Bookstore, a tear gas canister

landed in a planter close to where she was standing.  The tear gas that was released burned her

eyes and made them red, and rendered her tongue numb.  Buck Dep. at 140 (Pls.' Ex. 1).  Plaintiff

Buck saw another tear gas canister strike a man in the forehead.  In addition, Plaintiff Buck also

witnessed police horses backing up other protestors and the arrests of Plaintiff Alma Rosa Silva-

Banuelos and four drummers.   Buck Dep. at 104, 115, 135-36 (Pls.' Ex. 1).

2.    **Alma Rosa Silva-Banuelos**

Plaintiff Silva-Banuelos was present at the March 20, 2003 demonstration.  As the crowd

of protestors traveled westbound on Central Avenue, the police formed a line on University

Boulevard, one large step in front of the marchers.  Alma Rosa Silva-Banuelos Dep. at 55 (Pls.'

Ex. 15).  Plaintiff Silva-Banuelos observed officers in the line pushing demonstrators back away

---

[8] Unless otherwise noted, the following facts are taken from each Plaintiff's Answers/Responses to Defendants' First Set of Interrogatories, attached as Exhibits A-1 through A-16 to Defendants' MPSJ No. I (Doc. No. 107).

from the line. *Id.*

  After the protestors returned to the intersection of University Boulevard and Central Avenue, a group of people sat down in the intersection and APD officers moved toward them. The officers dispensed pepper spray on the crowd, causing Plaintiff Silva-Banuelos' eyes to water and making it difficult for her to breathe. Silva-Banuelos Dep. at 92-93 (Pls.' Ex. 15). While attempting to distance herself from the pepper spray by moving east, *id.,* Plaintiff Silva-Banuelos heard an explosion from somewhere in the crowd. The sound was extremely loud, and protestors began to run and scatter from the area. Meanwhile, the APD continued to dispense pepper spray into the crowd.

  Plaintiff Silva-Banuelos saw another group of people sit down in front of the Baskin-Robbins store on Central Avenue. Silva-Banuelos Dep. at 103 (Pls.' Ex. 15). The police "laid [the protestors] out" and were "on top of them." *Id.* at 103-04. An officer jabbed at one of the protestors with his baton. *Id.* at 104.

  Near the intersection of Central Avenue and Yale Boulevard, Plaintiff Silva-Banuelos observed that the police were slowing down and allowing the march to return to its starting point. Horse-mounted officers continued to follow the march. Plaintiff Silva-Banuelos stood in the street near the curb in front of a parked car. Pls.' Ex. VID00008 at 39:30. At that time, a few protestors near her began to chant, "Police strike." Plaintiff Silva-Banuelos joined in the chant. She addressed the officers and told them that she understood that they were being treated poorly by the City. The horse-mounted police reacted with laughter. As she walked past Yale Boulevard, the horse-mounted police charged forward. Someone could be heard saying, "Back it up." *See* Pls.' Ex. VID00008 at 41:03. Plaintiff Silva-Banuelos stepped onto the sidewalk in

front of the Papa John's Pizza restaurant and put her arms in the air while flashing peace signs. She realized that the horse-mounted police were charging at her and two other protestors.

The horse-mounted police encircled Plaintiff Silva-Banuelos and told her not to move. As she stood still on the sidewalk, facing east, with her hands in the air making peace signs, Plaintiff Silva-Banuelos was grabbed from behind by a police officer who twisted her arms behind her back and above her shoulders. The officer held her in this painful position, which forced her to walk on her tippy toes while she was led to a police transport vehicle. She was then handcuffed and put inside the vehicle with other protestors. She did not see the officer's face until she was being booked and transported. Plaintiff Silva-Banuelos, however, cannot recall the name of the officer who arrested her. Silva-Banuelos Dep. at 184 (Pls.' Ex. 15). Furthermore, she did not have any direct interaction with Defendant Gonzales. Silva-Banuelos Dep. at 161 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. J).

Plaintiff Silva-Banuelos was charged with the misdemeanor offenses of Resisting, Evading, or Obstructing an Officer in violation of NMSA § 30-22-1 and Public Nuisance in violation of NMSA § 30-8-1. Defs.' Undisputed Fact 11. Officer Kenny Sadler signed the criminal complaint charging Plaintiff Silva-Banuelos with these offenses. *Id.* On April 28, 2003 the prosecutor filed a motion to reduce the state law charge under NMSA § 30-22-1 to a charge of Refusal to Obey a Lawful Order of a Peace Officer in violation of Albuquerque, N.M., Revised Ordinances of 1994 ("ROA 1994") § 12-2-19. *Id.* The prosecutor also moved to dismiss the Public Nuisance charge. *Id.* On May 28, 2003 the Bernalillo Metropolitan Court dismissed all charges against Plaintiff Silva-Banuelos. *Id.*

16

3.      Camille Chavez

Plaintiff Camille Chavez was present at the March 20, 2003 demonstration.  Near Central

Avenue and Harvard Drive, Plaintiff Chavez saw an officer shoot a non-lethal round at the

protestor next to her, causing the protestor to scream and fall down.  Camille Chavez Dep. at 31-

32 (Pls.' Ex. 2).  Plaintiff Chavez sat down in the street on Central Avenue near Cornell Drive as

a sign of protest.  She witnessed officers taking away other protestors in the crowd.  Camille

Chavez Dep. at 48 (Pls.' Ex. 2).

While seated in the street and not posing any threat, Plaintiff Chavez was subjected to tear

gas and then shot repeatedly with pepper ball rounds.  She saw officers deploy tear gas canisters

into the crowd.  Camille Chavez Dep. at 51 (Pls.' Ex. 2).  She also witnessed the police shoot a

second volley of tear gas canisters into the area in front of the UNM Bookstore, which is where

the officers had been directing protestors to go.  *Id.* at 64.  Plaintiff Chavez felt that she could not

move.  The gas burned her eyes and she started choking.  Camille Chavez Dep. at 54 (Pls.' Ex. 2).

Because she was focused on regaining control of her breathing, Plaintiff Chavez does not recall

feeling the impact of the pepper ball rounds on her body, nor did the projectiles leave any welts,

marks, or bruises.  *Id.* at 70.  She did, however, know that guns were pointed in her direction.  *Id.*

at 71.

Plaintiff Chavez was aware of the possibility that she might be arrested for sitting in the

street, but she did not expect to be subjected to tear gas or shot.  Even after laying down to show

that she was not a threat, Plaintiff Chavez was repeatedly shot with pepper ball rounds.  Other

protestors eventually attempted to escort Plaintiff Chavez to safety, but as they were doing so an

officer shoved Plaintiff Chavez from behind with his baton, knocking her down onto Central

17

Avenue. She lay there unable to stand, trying to breathe, coughing, her eyes burning. Once she could stand, other protestors helped her onto the sidewalk in front of the Frontier restaurant.

Plaintiff Chavez leaned against a light pole, trying to recover, when more police officers, yelling, screaming, and pushing with their batons, forced her back onto Central Avenue. She did not know what they wanted her to do, so she cried out to them to tell her where to go. They yelled back that she was to go across the street, and Plaintiff Chavez complied.

### 4.    Denis Doyon

Plaintiff Denis Doyon arrived at the UNM Bookstore at around 6:00 p.m. on March 20, 2003 in order to participate in the demonstration. After catching up with the marching demonstrators, Plaintiff Doyon and his friends started playing samba music on drums and percussion instruments that they had brought.

Plaintiff Doyon witnessed police officers shoving protestors in their backs with batons as they were walking toward the UNM Bookstore. Doyon Dep. at 74, 85-86 (Pls.' Ex. 4). As the police moved from Harvard Drive to Cornell Drive on Central Avenue, Plaintiff Doyon saw one officer with a rifle that appeared to shoot beanbag rounds. *Id.* at 74, 82-83. The officer aimed the rifle at a young man who was walking east on the sidewalk, and Plaintiff Doyon heard the officer say that if the man did not move faster, he would shoot him. *Id.* at 74, 83-84.

As traffic on Central Avenue was still blocked in both directions by police cars, most of the demonstrators remained on the street when the crowd arrived at the intersection of Central and Cornell Drive. Tensions were running high because of the threats issued by the police and their use of chemical agents against the protestors. Plaintiff Doyon and his friends resumed playing samba music, and other drummers joined them. The drumming appeared to ease some of

18

the tension in the crowd and many people began to smile, sing, and dance.  No one complained to

Plaintiff Doyon about his drumming, nor did he hear any orders to leave the intersection or

warnings about the use of chemical agents.  Doyon Dep. at 14-15 (Pls.' Ex. 3).

Eventually, a number of horse-mounted officers approached the edge of the crowd and

several other officers in riot gear approached the crowd on foot.  Officer Larry Campbell spoke to

the officers on foot, pointing to Plaintiff Doyon and the other drummers.  The officers in riot gear

immediately entered the crowd, passing several people in order to apprehend four of the

drummers.  Two officers grabbed Plaintiff Doyon by the shoulders, causing him to trip.  They

dragged him from the crowd and pushed him face down onto the pavement.  One of the officers

placed his knee on the small of Plaintiff Doyon's back, pinning him to the ground.  Plaintiff Doyon

did not resist.  After holding Plaintiff Doyon for a minute or two in this position, the officer

removed his knee from Plaintiff Doyon's back and allowed him to stand.  Plaintiff Doyon was

pushed face forward onto the hood of a police car and handcuffed with plastic flexicuffs.  He and

three other drummers were arrested.  Plaintiff Doyon walked peacefully to the police van.  He

does not know the name of the officers who arrested him.

Just before Plaintiff Doyon was placed into the police van, he saw an officer walking

toward the crowd at Central Avenue and Cornell Drive with a tear gas canister launcher.  Doyon

Dep. at 30-31 (Pls.' Ex. 3).  As he entered the van, Plaintiff Doyon heard a loud pop followed by

the sounds of people in the crowd screaming and yelling.  *Id.*  Shortly thereafter, tear gas began

wafting into the van, burning Plaintiff Doyon's eyes, throat, and nasal passages.  *Id.* at 31.  The

officers then shut the van door.  *Id.*  Plaintiff Doyon had difficulty breathing because of the

presence of tear gas in the van.  *Id.* at 31-32.  Other protestors in the van began to panic because

they were trapped in a van permeated with tear gas with no way to get fresh air.  *Id.* at 32.

Plaintiff Doyon was later booked at a police substation on Menaul Avenue and was held in a cell at the Bernalillo County Detention Center until some time after midnight, when he was released on his own personal recognizance.  He was charged with the misdemeanor offenses of Resisting, Evading, or Obstructing an Officer in violation of NMSA § 30-22-1 and Public Nuisance in violation of NMSA § 30-8-1.  Defs.' Undisputed Fact 17.  Officer Larry Campbell signed the criminal complaint.  *Id.*  All charges against Plaintiff Doyon were dismissed on December 6, 2003 after he successfully completed an alternative sentencing program.  *Id.*

### 5.    Lori Eaton

Plaintiff Lori Eaton attended the March 20, 2003 demonstration.  At the end of the march, Plaintiff was on the east edge of the plaza in front of the UNM Bookstore, facing Central Avenue. Plaintiff Eaton observed the events in the street from what she felt was a safe distance.  She saw protestors who were sitting in the street being forcefully grabbed by the police.  Lori Eaton Dep. at 72 (Pls.' Ex. 5).  She also witnessed protestors being subjected to tear gas.  *Id.* at 80. However, Plaintiff Eaton did not hear any police commands directing the protestors to leave the streets or any warnings that chemical agents would be used if the protestors did not disperse.  *Id.* at 86-87.  Without any warning, a tear gas canister came sailing through the air from the direction of the police and struck a protestor who was standing directly to her left.  Gas poured forth from the canister and Plaintiff Eaton's eyes began to burn.  Eaton Dep. at 88 (Pls.' Ex. 5).

Plaintiff Eaton started running toward the back of the plaza when a protestor told her that another protestor had collapsed.  Because she is a healthcare professional (RN), Plaintiff Eaton made her way to the unconscious protestor to see if she could assist him.  While Plaintiff Eaton

was on her knees attending to the protestor, three or four horse-mounted officers rode onto the plaza and surrounded her, with the horses extremely close to her on all sides.  An officer on foot told her to get up and step away from the protestor.  As she rose to move away, the officer grabbed her by the back of her shirt and forcefully pulled her to her feet.  Plaintiff Eaton told the officer that he did not have to do that because she was already complying with his order.  The contact did not cause her any physical pain.  *See* Eaton Dep. at 105 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. V).

Afterwards, Plaintiff Eaton attempted to speak to paramedics about the injured protestor, who had been down for approximately thirty minutes without medical attention.  As Plaintiff Eaton tried to pass an officer to speak to the emergency medical team, the officer dodged back and forth in front of her to prevent her from passing.  The officer then shoved her in the upper chest with his nightstick held in a horizontal position.

Defendant Officers DeFrates, Fox, Nicholas Gonzales, Lopez, Magetteri, and O'Connell admitted that they were among the officers who set up a perimeter around the unconscious protestor.  *See* Raymond DeFrates Dep. at 15 (Pls.' Ex. 22); James Leroy Fox Dep. at 11 (Pls.' Ex. 26); Nicholas Gonzales Dep. at 17-18 (Pls.' Ex. 34); Charles Lopez Dep. at 15 (Pls.' Ex. 39); Daniel S. Magetteri Dep. at 13 (Pls.' Ex. 40); Shawn O'Connell Dep. at 18 (Pls.' Ex. 43).  Defendant Officer Nicholas Gonzales also admitted that officers pushed out of the perimeter the people who were with the unconscious protestor.  *See* Pls.' Ex. 34 at 18.

### 6.  Lucy Gilster

Plaintiff Lucy Gilster attended the March 20, 2003 protest.  At one point during the demonstration, she heard what sounded like a gunshot and shortly thereafter saw a protestor

21

displaying a bruise and angrily yelling that he had just been shot with a beanbag round.  Lucy

Gilster Dep. at 74-76 (Pls.' Ex. 6).

       While she was in a crowd of protestors at the intersection of Cornell Drive and Central

Avenue, Plaintiff Gilster played music and danced with her fellow protestors.  Officers then

launched tear gas canisters into the crowd and Plaintiff Gilster was forced onto the sidewalk along

with most of the crowd.  While she stood on the UNM Bookstore plaza, someone yelled, "Tear

gas!" and Plaintiff Gilster saw a canister land on the sidewalk a few feet away from where she was

standing.  The tear gas had a physical effect on her, and Plaintiff Gilster turned to run away.

Gilster Dep. at 127 (Pls.' Ex. 6).  Plaintiff Gilster also saw police fire pepper ball rounds at ten to

twelve protestors who were sitting down at the intersection of Central Avenue and Cornell Drive.

Gilster Dep. at 128-29 (Pls.' Ex. 6).

       In addition, Plaintiff Gilster was struck twice by police officers.  The first time, Plaintiff

Gilster was at the corner of Buena Vista Drive and Central Avenue, when an officer approached

her from behind and struck her in the back with his club while other officers were arresting her

friends.  An armed horse-mounted policeman also approached her and almost trampled her,

forcing her to retreat despite the fact that an officer was hitting her friend with his club.  Gilster

Dep. at 85 (Pls.' Ex. 6).  The second time Plaintiff Gilster was struck was at the intersection of

Cornell Drive and Central Avenue, when an officer pulled her out of the crowd by her collar, took

her drum, and then shoved her back into the crowd with his club.

      **7.**    **Brian Haney**

       Plaintiff Brian Haney joined the March 20, 2003 protest after it was already well under

way.  The protestors were moving east along Central Avenue, some in the street and others on

the sidewalk.  The police, however, did not appear to be trying to clear the street.  When Plaintiff Haney arrived at Cornell Avenue, there were many protestors in the street.  Some were drumming and chanting anti-war slogans.  Plaintiff Haney heard sirens off to the west, but did not hear any orders from the police.  At one point, a line of officers marched quickly in formation through the crowd from the east side of the protest to the west.  Plaintiff Haney had to jump out of their way to avoid being pushed aside.

Some time later, the police began moving toward the crowd, spraying people with what appeared to be mace or pepper spray.  Although he saw officers deploy pepper spray on protestors on the sidewalks and streets, Plaintiff Haney himself was not sprayed.  Plaintiff Haney could not identify any of the officers because their faces were covered and they wore no insignia. At the southwest corner of Cornell Drive and Central Avenue, Plaintiff Haney encountered an elderly man who had been sprayed directly in the face and was in substantial pain.  Plaintiff Haney and others tilted the man's head back and emptied water bottles over his face in order to flush his eyes with water.  Plaintiff Haney was concerned because the man could not see at all.

At that point, police officers began firing tear gas canisters into the street and onto the sidewalks.  The tear gas burned Plaintiff Haney's eyes, nose, and throat and made it difficult for him to breathe.  To escape the gas, Plaintiff Haney ran south along Cornell Drive with other protestors and found that once he had put some distance between himself and the tear gas, he could breathe easier, although his eyes continued to burn.

Despite his growing apprehension of the police and their possible actions against the protestors, Plaintiff Haney returned to the intersection of Cornell Drive and Central Avenue.  He was concerned for the safety of his friends, who were still involved with the protest, and wanted

23

to see what was happening.  This was not possible, however, because police officers, including those with dogs, were positioned to block the intersection on all sides.  Plaintiff Haney saw officers drag protestors who had gathered on the UNM campus out into the street to arrest them. After they had blocked the intersection for some time, the police finally pulled back, loaded their vehicles, and departed.

### 8.   Alicia Kisner

Plaintiff Alicia Kisner was present at the March 20, 2003 demonstration.  As she stood at the intersection of University Boulevard and Central Avenue, Plaintiff Alicia Kisner could smell pepper spray, which made her eyes water.  Alicia Kisner Dep. at 59 (Pls.' Ex. 9).

After being corralled back to the UNM Bookstore, Plaintiff Alicia Kisner joined other protestors in the intersection of Central Avenue and Cornell Drive from approximately 6:00 p.m. to 7:00 p.m and proceeded to sing and dance.  She saw an officer point and aim his beanbag gun directly at her, and later observed police officers grabbing, dragging, and roughly arresting people who were playing drums.  Alicia Kisner Dep. at 98-100, 102-04, 108-09 (Pls.' Ex. 9).  Plaintiff Alicia Kisner believed that the drumming had lightened the overall mood of the protest.  *Id.* at 103.  Subsequently, a police officer shot a tear gas canister into the crowd.  Plaintiff Alicia Kisner did not hear any warnings or orders prior to the deployment of tear gas.  Alicia Kisner Dep. at 117-18 (Pls.' Ex. 9).  After moving onto the north sidewalk with her mother, Plaintiff Alicia Kisner saw another tear gas canister land approximately three feet away from them on the sidewalk.  The tear gas made Plaintiff Alicia Kisner's eyes burn and water and made it difficult for her to breathe.  Alicia Kisner Dep. at 122 (Pls.' Ex. 9).

After being exposed to the tear gas, Plaintiff Alicia Kisner and her mother made their way

to the Frontier restaurant on the south side of Central Avenue.  Plaintiff Alicia Kisner was

standing on the sidewalk behind her mother, facing west and observing the police.  As they

watched, an officer pushed with a baton Plaintiff Alicia Kisner's mother, who fell back onto

Plaintiff Alicia Kisner.  Plaintiff Alicia Kisner could not make out the name of the officer who

shoved them.

### 9.    Lisa Kisner

Plaintiff Lisa Kisner, mother of Plaintiff Alicia Kisner, was also present at the March 20,

2003 demonstration.  As the protestors marched on the streets, APD horse-mounted officers

followed closely, sometimes making physical contact with people in the crowd.  *See* Lisa Kisner

Dep. at 136-37 (Pls.' Ex. 10).  Because of the pepper spray that the police had deployed around

the area between Harvard Drive and Cornell Drive, Plaintiff Lisa Kisner's eyes burned and she

had difficulty breathing.  *Id.* at 60-61.

After the marchers were corralled into the intersection of Central Avenue and Cornell

Drive, Plaintiff Lisa Kisner joined other protestors who were drumming and singing.  APD

officers dispensed pepper spray into the crowd and launched tear gas canisters in the vicinity.

Along with her daughter, Plaintiff Lisa Kisner moved to the sidewalk on the north side of Central

Avenue just east of the UNM Bookstore.  Shortly thereafter, a tear gas canister landed on the

sidewalk within a few feet of them.  The tear gas strongly affected Plaintiff Lisa Kisner to the

point that she could not see or breathe, and she experienced tightness and burning in her lungs.

Lisa Kisner Dep. at 42.  Her husband, daughter, and son also had trouble breathing.  *Id.* at 46-47.

Plaintiff Lisa Kisner's daughter eventually led her to the front of the Frontier restaurant on

the south side of Central Avenue.  While she was bent over trying to catch her breath, Plaintiff

Lisa Kisner was approached by two APD officers dressed in black riot gear with masks and batons. One of them shoved her twice without saying a word, causing her to fall toward her daughter. Plaintiff Lisa Kisner described her injuries as more emotional than physical. *See* Lisa Kisner Dep. at 97-98 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. Y).

### 10.   Michael Kisner

Plaintiff Michael Kisner attended the March 20, 2003 demonstration. He arrived at the rally around 5:00 p.m. and participated in it from beginning to end.

As the protestors' march neared the intersection of University Boulevard and Central Avenue, Plaintiff Michael Kisner saw officers use pepper spray and batons to keep the crowd moving. Michael Kisner Dep. at 62 (Pls.' Ex. 11). In general, the officers pushed protestors in their backs with their batons straight out, using enough force to cause the protestors' heads to lurch backwards. *Id.* at 70. The pepper spray caused Plaintiff Michael Kisner's eyes and nose to burn. *Id.* at 73. Plaintiff Michael Kisner also heard the sound of shots being fired, attributing the noise to the discharge of beanbag rounds. *Id.* at 62. One protestor showed Plaintiff Michael Kisner a bruise on his stomach and informed him that he had been shot with a beanbag. *Id.*

At the intersection of Central Avenue and Cornell Drive, Plaintiff Michael Kisner observed police officers grabbing drummers and throwing them to the ground. *Id.* at 84-85. The police threw canisters of tear gas directly into the crowd and onto the sidewalks and street, with one canister striking a man in the head and knocking him down, and another canister landing behind the crowd on Central Avenue. *Id.* at 98, 102, 105. The tear gas slightly irritated Plaintiff Michael Kisner's eyes, nose, and lungs. *Id.* at 98.

Around this time, a number of protestors sat down in the street while others moved onto

the sidewalks.  *Id.* at 105.  An officer with a pepper ball gun approached a female protestor who

had seated herself in front of the officers on the skirmish line.  *Id.* at 106.  The officer fired

approximately 15 rounds at her from less than five feet away.  *Id.* at 106-07.  Plaintiff Michael

Kisner and other protestors approached the female protestor to help her up, but as they were

doing so, the officer started firing at them as well.  *Id.* at 108.  The officer shot Plaintiff Michael

Kisner in the shoulder and pectoral muscle.  *Id.*

     At approximately 7:30 p.m., Plaintiff Michael Kisner was standing directly in front of the

Frontier restaurant's main entrance on the south sidewalk of Central Avenue.  Most of the

remaining protestors had been pushed onto the sidewalk and steps near the UNM Bookstore.  A

skirmish line of police in riot gear (gas masks, guns, bulletproof vests, batons, and boots) kept the

crowd from returning to the street.

     About four APD horse-mounted officers moved into the remaining crowd and continued

to arrest people.  Because the crowd did not pose a threat to anyone, several people, including

Plaintiff Michael Kisner, stood on the corner and chanted, "Shame," to the police.  The horse-

mounted officers then marched their horses across the street, passing directly in front of everyone

on the corner.  They did not say anything or look at Plaintiff Michael Kisner.  Suddenly, the

horse-mounted officers moved onto the sidewalk approximately fifty feet east of the corner and

proceeded to march toward Plaintiff Michael Kisner.

     A horse-mounted male officer dressed in black with black plastic shin guards demanded

that everyone on the corner depart.  Several people, including Plaintiff Michael Kisner, questioned

the officer as to why they could not be on the sidewalk and why he was demanding that they

leave, but the officer continued to demand their departure.  Plaintiff Michael Kisner consented,

27

informing the officer that he would leave immediately but that his car was parked on the North side of Central Avenue on the UNM campus.  The officer did not allow Plaintiff Michael Kisner to pass him and said that Plaintiff Michael Kisner could not go in the direction of his car.  Plaintiff Michael Kisner insisted that he would leave but that his car and friends were across the street on the UNM campus.  The officer refused to let him pass.  When Plaintiff Michael Kisner asked where he was supposed to go once he was on Cornell Drive, the officer responded that he did not care so long as Plaintiff Michael Kisner moved south down Cornell.

The officer then moved his horse forward and brought the horse's muzzle down on Plaintiff Michael Kisner's face.  As the officer advanced toward him, the horse's head repeatedly hit Plaintiff Michael Kisner in the face and about the head, and its legs struck his chest.  Fearing that the horse would trample him, Plaintiff Michael Kisner moved toward Cornell Drive where another horse-mounted officer blocked Plaintiff Michael Kisner's retreat.  When the second male officer began advancing toward him, Plaintiff Michael Kisner positioned himself between two posts on the edge of the sidewalk in order to avoid being trampled by the horses.  Both horse-mounted officers wore dark uniforms, either navy blue or black, and were not wearing gas masks. Michael Kisner Dep. at 118-20 (Pls.' Ex. 11).

As Plaintiff Michael Kisner stood between the posts facing Central Avenue, a non-masked, white male officer in a standard issue APD uniform approached him, raising a large can of pepper spray in the process.  The officer's uniform was dark in color, either navy blue or black.  Michael Kisner Dep. at 120 (Pls.' Ex. 11).  The officer sprayed a cloud of pepper spray at Plaintiff Michael Kisner, who quickly turned his back to the officer and covered his face and ears.

As Plaintiff Michael Kisner made his way south down Cornell Drive, the two horse-

28

mounted officers came up on either side of him and smashed him between their horses as one of the officers kicked him in the middle of the back.  One of the officers then grabbed the shoulder strap of the backpack Plaintiff Michael Kisner was wearing and shook him violently back and forth.  The officer then impelled Plaintiff Michael Kisner forward in the direction that he was previously heading, and released the backpack.  At that time, Plaintiff Michael Kisner was no longer between the horses and the officers still had not said anything to him.

Plaintiff Michael Kisner continued to walk south down Cornell Drive when the officers again came up on either side of him and pulled him back between their horses.  Both officers then grabbed the shoulder straps of the backpack and lifted Plaintiff Michael Kisner onto his toes. Another officer on foot who was wearing a standard APD uniform had Plaintiff Michael Kisner put his hands behind his back.  The officer, who only loosely held Plaintiff Michael Kisner's thumbs together behind his back, led him down Central Avenue to a police van.  None of the officers ever informed Plaintiff Michael Kisner that he was under arrest.  Plaintiff Michael Kisner does not know who arrested him or filed criminal charges against him.  *See* Michael Kisner Dep. at 123 (Pls.' Ex. 11).

Plaintiff Michael Kisner was handcuffed and placed in a van with other protesters.  He was charged with the misdemeanor offenses of Resisting, Evading, or Obstructing an Officer in violation of NMSA § 30-22-1 and Public Nuisance in violation of NMSA § 30-8-1.  Defs.' Undisputed Fact 14.  Officer Damon Hensley signed the criminal complaint.  *Id.*  All charges against Plaintiff Michael Kisner were dismissed on June 2, 2003 after he successfully completed an alternative sentencing program.  *Id.*

### 11.   Lane Leckman

Plaintiff Lane Leckman attended the March 20, 2003 demonstration.  As the protestors marched through the intersection of University Boulevard and Central Avenue, he saw what appeared to be a downed protestor being struck by officers behind the police skirmish line.  *See* Lane Leckman Dep. at 74-75 (Pls.' Ex. 8).  Plaintiff Leckman also saw tear gas in the air near the intersection of Cornell Drive and Central Avenue.  *Id.* at 111.

When Plaintiff Leckman had returned to the front of the UNM Bookstore, an officer approached him and told him to move away from the area.  Plaintiff Leckman and his fiancee had attempted to comply with the officer's order, but were prevented from moving back any further because of the presence of a bicycle rack directly behind them.  Plaintiff Leckman inquired as to what the problem was and stated that he was simply standing there.  In response, the officer shoved Plaintiff Leckman with his baton, causing him to fall backwards onto his fiancee.  While Plaintiff Leckman experienced soreness related to his fall for about one day, he did not develop any bruises.  Leckman Dep. at 108-09 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. Z).

Without further warning, the same officer used his baton to strike two other protestors, including a 67-year-old woman.  Although Plaintiff Leckman, his fiancee, and the two other protestors were peacefully assembled, the officer gave no warning to them prior to using force.  When Plaintiff Leckman asked the officer for his name, the officer refused to give it to him.  Consequently, Plaintiff Leckman does not know the name of the officer who shoved him.  *See* Leckman Dep. at 122 (Pls.' Ex. 8).

### 12.   Maria Santelli

Plaintiff Maria Santelli attended the March 20, 2003 demonstration.  By the time Plaintiff

Santelli reached the intersection of University Boulevard and Central Avenue, a police line had formed to prevent further westward movement on Central.  The police used their batons to shove a number of protestors backwards.  One officer fired a beanbag round at point blank range at a protestor standing directly next to Plaintiff Santelli.  Fearing that she might be shot as well, Plaintiff Santelli ran east on Central Avenue until she reached Buena Vista Drive, where the overall atmosphere of the demonstration was calmer.

Plaintiff Santelli continued east to Cornell Drive, where she joined a peaceful crowd of people who were drumming and dancing.  Shortly thereafter, a line of armed police jogged west through the crowd on Central Avenue and formed a skirmish line on Cornell Drive.  Police officers began arresting the drummers and seized their instruments.  Maria Santelli Dep. at 48, 50 (Pls.' Ex. 13).  In addition, the police began shooting tear gas canisters into the crowd without first issuing a warning.  Many of the protestors began running around in fear and panic, trying to get fresh air.  Plaintiff Santelli's eyes, throat, and lungs burned from the tear gas.  Santelli Dep. at 41 (Pls.' Ex. 13).

After the officers deployed a second volley of tear gas, Plaintiff Santelli saw officers firing projectiles at a female protestor who had remained in the intersection.  *Id.* at 55-56.  Because the protestor seemed unable to move, other protestors surrounded the woman and carried her away, even as they were shot themselves.  *Id.* at 56-57.

### 13.   Susan Schuurman

Plaintiff Susan Schuurman arrived at the March 20, 2003 demonstration at approximately 7:00 p.m.  When Plaintiff Schuurman was at the intersection of Central Avenue and Cornell Drive, the police deployed a tear gas canister, causing a cloud chemicals to waft toward her.  The

tear gas burned her lungs, causing her to choke, cough, spit, and tear.  Susan Schuurman Dep. at 49 (Pls.' Ex. 14).  After launching the first volley of tear gas, the police aimed what looked like rifles at the protestors.  *Id.* at 52.  Plaintiff Schuurman ran to the entrance of the Frontier restaurant on the south side of Central Avenue.

From there, Plaintiff Schuurman witnessed police officers firing weapons at protestors.  *See* Schuurman Dep. at 53 (Pls.' Ex. 14).  One officer on the south side of the Central Avenue and Cornell Drive intersection fired his weapon between six to twelve times at a group of protestors standing on the median.  *Id.* at 59-60.  In addition, Plaintiff Schuurman saw a woman, who she believed was named Camille, lying in a puddle, but Plaintiff Schuurman was too frightened to assist her.  *Id.* at 56.

As she watched a group of vocal protestors who were standing on the Central Avenue median, Plaintiff Schuurman was struck with a baton in the small of her back and then shoved violently into the street.  Her knee, which had been injured previously, buckled and she almost fell.  Schuurman Dep. at 65, 77 (Pls.' Ex. 14).  Plaintiff Schuurman saw several officers with helmets and face masks shoving her.  There was no way for her to identify them, as they did not have their names displayed.  The officers did not give her any verbal orders before shoving her.  Schuurman Dep. at 66-67 (Pls.' Ex. 14).  Other officers used their batons to shove her back onto the sidewalk.  As she was now sandwiched between two groups of officers who shoved her back and forth from the street to the sidewalk, Plaintiff Schuurman pleaded with them, saying, "I thought you wanted us out of the street?  Where do you want me to be?"  One of the officers sneered, "You should have thought of that before."  Plaintiff Schuurman repeated her question as to where they wanted her to go.  Schuurman Dep. at 65 (Pls.' Ex. 14).  After the officers

32

responded, "Across the street," Plaintiff Schuurman complied.  *Id.*

After the demonstration, Plaintiff Schuurman had to wear a knee brace for one week. Schuurman Dep. at 77 (Pls.' Ex. 14).  She does not, however, claim any permanent injuries resulting from police conduct the evening of the demonstration.  Schuurman Dep. at 78 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. X).

### 14.    Christina Maya Trafton

Plaintiff Christina Maya Trafton attended the March 20, 2003 demonstration.  After picking up materials for a protest sign, Plaintiff Christina Trafton passed the bus station on Yale Boulevard where she saw APD officers preparing for the protest.  Because the officers were putting on riot gear and the horse mounted unit was armoring its horses, Plaintiff Christina Trafton feared that the police were preparing to use force.

Later, Plaintiff Christina Trafton saw horse-mounted officers moving into the crowd. Christina Maya Trafton Dep. at 29-30, 54 (Pls.' Ex. 16).  When Plaintiff Christina Trafton was at the intersection of Central Avenue and University Boulevard, the police fired tear gas into the crowd.  The gas spread quickly, causing people to scream and yell, and causing Plaintiff Christina Trafton's eyes and skin to burn.  Believing that the APD did not have a plan in place to treat injured people, Plaintiff Christina Trafton telephoned 911 for ambulances.

### 15.    Curtis Trafton

Plaintiff Curtis Trafton attended the March 20, 2003 demonstration.  While he marched eastbound on Central Avenue, Plaintiff Curtis Trafton saw a horse-mounted officer approach him with his horse's head in a down position.  When the officer tapped the horse, it threw its head into Plaintiff Curtis Trafton's chest.  Plaintiff Curtis Trafton was lifted off his feet by the force of the

33

impact and was unable to regain his balance, staggering backwards for several yards.  He did not look for the horse or rider to get the officer's name.

Plaintiff Curtis Trafton was also exposed to tear gas, which caused his eyes to itch. However, he was far enough away from the deployed canisters that the effects were mild.  *See* Curtis Trafton Dep. at 110-11 (Pls.' Ex. 17).  Frightened, Plaintiff Curtis Trafton left the march and began looking for his wife and daughter so that they could leave the demonstration.  Curtis Trafton Dep. at 91 (Defs.' Motion for Partial Summary Judgment No. III ("MPSJ No. III") (Doc. No. 109, filed Jan. 31, 2006), Ex. G).

Some time after the protest, Plaintiff Curtis Trafton watched a video entitled "Street Heat" in which he saw himself being struck by the police horse.  *Id.* at 89.  Though he could identify the horse that struck him as the only gray or silver colored horse used by the APD that evening, Plaintiff Curtis Trafton could not identify the police officer, even though the officer had not worn a gas mask.  *Id.* at 90-91, 93.

### 16.    Nick Wechselberger

Plaintiff Nick Wechselberger was also among the protestors at the March 20, 2003 demonstration.  As the protestors moved east on Central Avenue, a line of policemen followed closely behind at a speed that forced the protestors to walk quickly in order to stay in front of them.  Nick Wechselberger Dep. at 52 (Pls.' Ex. 18).  Plaintiff Wechselberger felt threatened by the officers' pace and because they were dressed in "battle garments."  *Id.*  In addition, he observed policemen pressing down with their batons on an elderly man.  *Id.* at 44.

After returning to the area near the UNM Bookstore, Plaintiff Wechselberger saw a tear gas canister land near him.  Although he could smell the tear gas, it only had a minimal effect on

him.  *Id.* at 81.  Plaintiff Wechselberger believed that the police were not interested in allowing the protestors to leave, and he saw the police launch another volley of tear gas canisters, one of which struck a protestor in the head.  *Id.* at 79.  The police also fired pepper ball rounds at a woman who was sitting in the intersection of Cornell Drive and Central Avenue.  *Id.* at 70.

## III.    STANDARDS: Motions for Summary Judgment; Qualified Immunity

A motion for summary judgment[9] is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See Jones v. Denver Post Corp.*, 203 F.3d 748, 751 (10th Cir. 2000) (quoting Fed. R. Civ. P. 56(c)).  Normally, the summary judgment standard requires a court to examine the record and draw reasonable inferences therefrom in the light most favorable to the non-moving party.  *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000); *Bisbee v. Bey*, 39 F.3d 1096, 1100 (10th Cir. 1994).

The parties' filing of cross-motions for summary judgment does not change this standard of review.  *Burrows v. Cherokee County Sheriff's Officers*, 2005 WL 1185620 (D. Kan. May 18, 2005) (unpublished opinion) (citing *Taft Broadcasting Co. v. U.S.*, 929 F.2d 240, 249 (6th Cir.

---

[9]  Though Plaintiffs for the most part address the Defendant Officers' motion as one for summary judgment, they also claim that "it is properly a Fed. R. Civ. P. 12(b)(6) motion to dismiss," requiring the Court to apply the standard of review appropriate to such motions and "accept the allegations in Plaintiffs' complaint as true . . ."  Pls.' Resp. to Defs.' MPSJ No. II at 14-15.  Because the parties have argued their respective positions under the summary judgment standard and have presented matters outside of the pleadings, the Court treats Defendant Officers' motion as one for summary judgment (as labeled), even if it could be construed as a Rule 12(b)(6) motion.  *Marquez v. Cable One, Inc.*, 463 F.3d 1118, 1121 (10th Cir. 2006) ("[Rule] 12(b) states that, where a Rule 12(b)(6) motion raises matters outside the pleadings, it shall be treated as a motion for summary judgment subject to the requirements of [Rule] 56") (alterations in original).

1991)).  Where the parties file cross motions for summary judgment, the court is "entitled to

assume that no evidence needs to be considered other than that filed by the parties, but summary

judgment is nevertheless inappropriate if disputes remain as to material facts."  *James Barlow

Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997).

"Cross-motions for summary judgment are to be treated separately; the denial of one does not

require the grant of another."  *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir.

1979).

>          In the specific context of qualified immunity, the United States Court of Appeals for the

Tenth Circuit has stated:

>> We review summary judgment decisions involving a qualified immunity defense
>> somewhat differently than other summary judgment rulings.  This difference arises from
>> the unique nature of qualified immunity, which is designed to protect public officials from
>> spending inordinate time and money defending erroneous suits at trial.

*Whitesel v. Sengenberger*, 222 F.3d 861, 872 (10th Cir. 2000) (alterations, internal quotation

marks, and citation omitted).

>          Qualified immunity protects "government officials performing discretionary functions . . .

from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  *Harlow v.

Fitzgerald*, 457 U.S. 800, 818 (1982).  Once "a defendant raises qualified immunity as a defense,

the plaintiff must meet a heavy two-part burden."  *Martinez v. Carr*, --- F.3d ---, 2007 WL

901922, *2 (10th Cir. March 27, 2007).  The plaintiff must demonstrate that the defendant

violated a constitutional or statutory right and that the right was clearly established at the time of

the conduct at issue.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Nelson v. McMullen*, 207 F.3d

1202, 1206 (10th Cir. 2000).

"A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991); *see Bella v. Chamberlain*, 24 F.3d 1251, 1254 (10th Cir. 1994) (same, quoting *Siegert*). For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In addition, "[i]n order for the law to be considered clearly established . . . there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Martinez*, 2007 WL 901922 at *2 (internal quotation marks and citation omitted); *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). Finally, the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition . . ." *Saucier*, 533 U.S. at 201. "If the plaintiff fails to carry either part of [the] two part burden, the defendant is entitled to qualified immunity." *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995). If a plaintiff meets this two-part burden, then the burden shifts to the defendant to show that there are no genuine issues of material fact which will defeat the claim for qualified immunity. *See Woodward v. City of Worland*, 977 F.2d 1392, 1396-97 (10th Cir. 1992).

For a plaintiff's claim to survive summary judgment, the record must contain facts that rebut the presumption of an entitlement to qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1130 (10th Cir. 2001). The Court is not to focus on just one piece of evidence. Summary

judgment is proper where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997) ("Genuine factual issues must be supported by more than a mere scintilla of evidence") (internal quotation marks and citation omitted).


## IV.    DISCUSSION

In their motion for summary judgment, Defendant Officers assert that they are entitled to summary judgment on (1) Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's state law tort claims for false imprisonment and malicious abuse of process; (2) all named Plaintiffs' state law tort claims for battery; and (3) all named Plaintiffs' constitutional claims.  In the alternative, Defendant Officers contend that they are entitled to qualified immunity on Plaintiffs' constitutional claims.  Likewise, Defendant Gonzales argues in his motion for summary judgment that he is entitled to summary judgment on Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's state law tort claims for malicious abuse of process, as well as summary judgment based on qualified immunity on all named Plaintiffs' constitutional claims.  Finally, Plaintiffs contend in their motion that Plaintiff Chavez is entitled to summary judgment on her excessive force and battery claims. The Court will first consider the merits of Plaintiffs' constitutional claims before addressing their

state law claims.[10]

### A.      Federal Constitutional Claims under 42 U.S.C. § 1983

#### 1.      Count IV:  Claims of Wrongful Seizure and Unlawful Arrest (Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner)

Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have alleged that Defendant Officers and Defendant Gonzales violated their Fourth Amendment right to be free from unreasonable searches and seizures when police officers, under the direct supervision of and according to the orders of Defendant Gonzales, arrested them without probable cause.  Defendant Officers assert that they are not the police officers who arrested these three plaintiffs, and consequently they cannot be held liable even if constitutional violations occurred.

It is uncontested that Defendant Gonzales did not personally arrest, seize, or detain Plaintiffs.  Defendant Gonzales contends that he is entitled to summary judgment because he cannot be held liable based on his supervisory capacity.  He also argues that he is entitled to qualified immunity because his actions were made for safety reasons based on the rapidly changing situation and the need to disperse the crowd to keep the peace and prevent a public disturbance.

#### a.      Unlawful Arrest Principles

The constitutional validity of a warrantless arrest depends on whether the arresting officer

---

[10]   At the conclusion of Plaintiffs' response to Defendant Gonzales' MSJ, Plaintiffs make a one sentence request that "the Court should grant summary judgment in favor of the plaintiffs."  Pls.' Resp. to Pleadings Doc 113 and 114: Def. Gonzales' MSJ (Doc. No. 129, filed April 10, 2006).  Although Plaintiffs argue in their response why summary judgment should not be granted to Defendant Gonzales, Plaintiffs do not offer any argument or legal authority, as required in the District of New Mexico, on why summary judgment should be granted in their favor. *See* D.N.M.LR-Civ. 56(b).  Due to the cursory nature of Plaintiffs' request, Defendant Gonzales appears to have overlooked it and has failed to provide argument, legal authority, or evidence in response.  Because Plaintiffs' request for summary judgment was not properly raised, the Court will deny it at this time.

had probable cause to effect that arrest.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).  Probable

cause exists where the facts and circumstances within the officer's knowledge are sufficient to

warrant a prudent man to believe that the suspect has committed or was committing an offense.

*Id.*  "[I]n determining whether probable cause exists, the courts must apply the 'totality of

circumstances' test."  *Brierley v. Schoenfeld,* 781 F.2d 838, 841 n.1 (10th Cir. 1986) (citing

*Illinois v. Gates*, 462 U.S. 213 (1983)).  In the qualified immunity context, a defendant is entitled

to immunity if a reasonable officer could have believed that probable cause existed to arrest the

plaintiff.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).  Law enforcement officers who reasonably

but mistakenly conclude that probable cause is present are also entitled to qualified immunity.  *Id.*

at 227.

Moreover, the Court must also take into consideration whether probable cause existed to

arrest the suspect for crimes with which he was not charged.  *Devenpeck v. Alford*, 543 U.S. 146,

153 (2004) (an officer's "subjective reason for making the arrest need not be the criminal offense

as to which the known facts provide probable cause"); *Apodaca v. City of Albuquerque*, 443 F.3d

1286, 1289 (10th Cir. 2006) ("All that matters is whether [the arresting officer] possessed

knowledge of evidence that would provide probable cause to arrest [plaintiff] on *some* ground").

Following their arrests, Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner were all

charged with the misdemeanor offenses of Resisting, Evading, or Obstructing an Officer in

violation of NMSA § 30-22-1 and Public Nuisance in violation of NMSA § 30-8-1.  "Resisting,

evading or obstructing an officer consists of:  . . . resisting or abusing any . . . peace officer in the

lawful discharge of his duties."  NMSA § 30-22-1(D).  "A public nuisance consists of knowingly

creating, performing or maintaining anything affecting any number of citizens without lawful

authority which is either: A) injurious to public health, safety, morals or welfare; or B) interferes with the exercise and enjoyment of public rights, including the right to use public property." NMSA § 30-8-1.  In addition, Defendants assert that probable cause existed to arrest Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner for several crimes with which they were not charged. These include violations of the following statutes: Parade Ordinance, Albuquerque, N.M., Revised Ordinances of 1994 ("ROA 1994") § 7-3-1 et. seq. (Ord. 85-1970 superceded by Ord. 35-2005) ("No person . . . shall use the public streets, sidewalks, or public grounds of the city for processions . . . in conflict with any of the provisions of the Traffic Code, laws or regulations of the city, or impede, hinder or obstruct normal pedestrian or vehicular traffic in any manner, except upon application in writing . . ."); Pedestrians on Roadways, NMSA § 66-7-339 ("Where sidewalks are provided it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway.  Where sidewalks are not provided any pedestrian walking along and upon a highway shall when practicable walk only on the left side of the roadway or its shoulder facing traffic which may approach from the opposite direction"); Walking Along a Roadway, ROA 1994 § 8-2-7-7 (essentially identical to the New Mexico Pedestrians on Roadways statute); Disorderly Conduct, NMSA § 30-20-1(A) (Repl. Pamp. 1994) ("Disorderly conduct consists of . . . engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace . . ."); and Disorderly Conduct, ROA 1994 § 12-2-5(D) ("Disorderly conduct consists of . . . [i]nciting, causing, aiding, abetting or assisting in creating any riot, affray, or disturbance at . . . any . . . public place in the city . . .").

### 1)      Alma Silva-Banuelos

According to Plaintiff Silva-Banuelos' criminal complaint, a non-defendant APD officer,

Kenny Sadler, who was not the arresting officer, charged her with resisting, evading, or

obstructing an officer and with public nuisance.  Defs.' Reply to Resp. to Defendant Officers'

MPSJ No. I (Doc. No. 145), Ex. A.  The prosecutor moved to reduce the first charge to a

violation of ROA 1994 § 12-2-19 of the Albuquerque City Code and to dismiss the second

charge.  Both charges were ultimately dismissed by the state court.  ROA 1994 § 12-2-19(B)-(D)

provides that it is unlawful to resist, abuse, interfere with, obstruct, or oppose any peace officer in

the lawful discharge of his duties, or to refuse to obey or comply with any lawful order given by

any peace officer acting in the lawful discharge of his duties.

 Prior to her arrest, Plaintiff Silva-Banuelos was standing in the street near the intersection

of Central Avenue and Yale Boulevard, chanting, "Police strike."  When horse-mounted officers

began to charge toward her, she stepped onto the sidewalk and raised her arms with her hands

making peace signs.  The horse-mounted officers surrounded Plaintiff Silva-Banuelos and told her

not to move.  She continued to stand still on the sidewalk with her arms in the air, and was then

arrested by an officer who was on foot.

 Concerning the two original charges and third subsequent charge that were filed against

Plaintiff Silva-Banuelos, the Court finds that when viewed in the light most favorable to Plaintiff,

the evidence does not demonstrate that the arresting officer had probable cause to arrest her for

these crimes.  NMSA § 30-22-1 (D) makes it unlawful to resist or abuse an officer in the lawful

discharge of his duties.  According to Plaintiff Silva-Banuelos' answers to Defendants'

interrogatories, the only real activity she engaged in that was directed at the police was to join in a

chant calling for a police strike.  Defs.' MPSJ No. I (Doc. No. 107), Ex. A-2.  None of the

Defendants have argued that this constitutes either resisting or abusing an officer in the course of

his duties.  Therefore, APD officers could not have had probable cause to arrest Plaintiff Silva-Banuelos under NMSA § 30-22-1.

NMSA § 30-8-1 makes it an offense to knowingly create, perform or maintain anything without lawful authority which is either injurious to public health, safety, morals, or welfare, or which interferes with the exercise and enjoyment of public rights, including the right to use public property.  While Defendants have not argued that Plaintiff Silva-Banuelos was engaged in endangering public health, safety, morals, or welfare, they have argued that the protestors as a whole interfered with the right to use public property.  In his deposition, Defendant Officer Schultz stated that a number of restaurant owners were concerned with the effect that the protest was having on their businesses.  Schultz Dep. at 100 (Defs.' MPSJ No. III, Ex. I).  Plaintiffs have responded that the APD's actions, particularly the use of chemical agents, were the cause of any interference with the right to use public property.  Pls.' Rebuttal to Defs.' Undisputed Material Facts in Docket No. 108, at para. 11 (citing Pls.' Ex. 36).  The question remains, however, whether Plaintiff Silva-Banuelos herself was interfering with the right to use public property.  Because Defendants have presented no evidence that Plaintiff Silva-Banuelos was individually involved in interfering with such a right, the Court concludes that APD officers did not have probable cause to arrest her under NMSA § 30-8-1.  *See e.g., Barham v. Ramsey*, 434 F.3d 565, 574 (D.C. Cir. 2006) (requiring "particularized" probable cause for individuals arrested in a demonstration instead of "refer[ring] generically to what 'demonstrators' were seen doing").

Finally, Albuquerque City Ordinance ROA 1994 § 12-2-19 provides that it is unlawful for a person to resist, abuse, interfere with, obstruct, or oppose any peace officer in the lawful discharge of his duties, or to refuse to obey or comply with any lawful order given by any peace

officer acting in the lawful discharge of his duties.  As was the case with NMSA § 30-22-1,

Defendants have not asserted that Plaintiff Silva-Banuelos resisted or abused any of the APD

officers at the demonstration.  In the video of Plaintiff Silva-Banuelos' arrest, Plaintiff Silva-

Banuelos is shown chanting, "Police strike" at the horse-mounted officers in the vicinity, but the

officers appear almost indifferent.  *See* Pls.' Ex. VID0008 (39:30-41:13).  There are no audible

commands from the police to clear the streets or to refrain from chanting.  *Id*.  Again, viewed in

the light most favorable to Plaintiff, the evidence does not suggest that Plaintiff Silva-Banuelos

interfered with, obstructed, or opposed any APD officer, or refused to comply with police orders.

To the contrary, when the horse-mounted officers approached her, Plaintiff Silva-Banuelos moved

onto the sidewalk with her arms raised and stood still in compliance with the officers' orders.

Therefore, the Court concludes that a reasonable officer would not have believed, based on the

facts most favorable to Plaintiff Silva-Banuelos, that probable cause existed to arrest her for the

crimes with which she was charged.  However, this does not conclude the Court's analysis.

    In their supplemental briefing, Defendants claim that probable cause existed to arrest

Plaintiff Silva-Banuelos for additional crimes with which she was not charged.  *See* Defs.'

Consolidated Supp. Brief Filed in Resp. to this Court's Order (Doc. No. 185).  The first of these,

the Parade Ordinance, forbids processions which are not authorized by written approval from the

Chief of Police.  ROA 1994 § 7-3-1 et. seq. (Ord. 85-1970 superceded by Ord. 35-2005).  It is

undisputed that the protestors, including Plaintiffs, did not obtain a parade permit from the City.

Pls.' Rebuttal to Defs.' Undisputed Material Facts, MSJ No. II, Docket No. 108, at para. 6 (Doc.

No. 134).  Defendants contend that even if the particular, unidentified officer who arrested

Plaintiff Silva-Banuelos did not have probable cause to arrest her for violation of this ordinance,

44

the APD as a whole may "pool their information to establish probable cause." *U.S. v. Corral*, 970

F.2d 719, 725 n.4 (10th Cir. 1992) (internal quotation marks and citation omitted); *see also U.S.

v. Morgan*, 936 F.2d 1561, 1569 (10th Cir. 1991) (probable cause may be derived from

information relayed by a supervising officer).  Because Plaintiff Silva-Banuelos was marching in a

procession without a parade permit, any APD officer who saw her could have concluded that she

was in violation of the ordinance.  Indeed, at least one non-defendant APD officer, Danny Garcia,

specifically identified Plaintiff Silva-Banuelos at the demonstration as "the long-haired girl" and

observed some of her actions.  Garcia Dep. at 67, Pls.' Supp. Brief Filed in Resp. to Defs.' Supp

Brief and Pursuant to the Order of the Court, Ex. 1 (Doc. No. 196).  Furthermore, Captain

Gonzales, whom Plaintiffs assert was responsible for ordering the arrest of Plaintiff Silva-

Banuelos, can be seen in one of Plaintiffs' videos apparently directing her arrest.  *See* Pls.' Ex.

VID0008 at 42:42.  However, Plaintiffs have presented evidence that the protestors took to the

streets and began their march only after the police closed Central Avenue to traffic.  *See*

Conclusion and Findings of the Independent Review Investigator, Pls.' Exhibit 58 at D000158.

Seen in the light most favorable to Plaintiffs, the evidence suggests that Defendants may have

implicitly sanctioned the march not only by closing off streets to traffic, but also by directing the

progress and direction of the procession.  In addition, because the authority to grant parade

permit applications lay with the APD Chief of Police (Chief Gilbert Gallegos was present at the

demonstration), any action by APD officers acquiescing to an unplanned march could reasonably

have been interpreted as a waiver of the parade permit requirement.  Under the circumstances

viewed in a light most favorable to Plaintiff Silva-Banuelos, none of the APD officers could have

had probable cause to arrest Plaintiff Silva-Banuelos for violating the Parade Ordinance.

NMSA § 66-7-339 and ROA 1994 § 8-2-7-7 prohibit pedestrians from walking along roads when sidewalks are available.  As part of the protestors' march, Plaintiff Silva-Banuelos undisputedly walked along roads lined with sidewalks.  Plaintiffs' video footage of Plaintiff Silva-Banuelos' arrest also depicts her standing in the street on Central Avenue.  Nonetheless, the APD's closure of Central Avenue and subsequent direction of the protestors' march indicate that the APD may have permitted the protestors to walk along the road as part of a tacitly sanctioned procession.  Therefore, none of the APD officers could have had probable cause to arrest Plaintiff Silva-Banuelos for violating statutes related to pedestrians on roadways.

Finally, NMSA § 30-20-1(A) and ROA 1994 § 12-2-5(D) prohibit disorderly conduct, which is defined as engaging in violent, abusive, or boisterous conduct which disturbs the peace, or assisting in creating any riot, affray, or disturbance.  Prior to her arrest, Plaintiff Silva-Banuelos was engaged in calling for a police strike with two other protestors.  After approximately a minute of chanting, she can be seen in Plaintiffs' video standing quietly in the street.  Plaintiff Silva-Banuelos' actions do not rise to the level of a violation of either of the disorderly conduct statutes.  *See State v. Hawkins*, 128 N.M. 245, 247-48, 991 P.2d 989, 991-92 (N.M. App. 1999) (despite evidence that defendant advanced upon an officer while waving his arms and yelling, the court remanded the case with instructions to dismiss the charge for disorderly conduct and noted that "[t]he mere fact that people may have heard Defendant's remarks, however loud or offensive they may have been, is insufficient to support a charge of disorderly conduct").  This is especially true in the context of a large-scale demonstration, where a minute of chanting a slogan which was neither abusive nor profane could hardly qualify as disturbing the peace.  *See e.g., U.S. v. McKinney*, 9 Fed.Appx. 887 (10th Cir. 2001) (considering the totality of the circumstances

surrounding defendant's conduct and remarks in determining whether disorderly conduct occurred).  The version of the facts that most favors Plaintiff Silva-Banuelos shows that she did not violate the disorderly conduct laws.

In summary, the Court concludes that a reasonable officer would not have believed, based on the facts most favorable to Plaintiff Silva-Banuelos, that probable cause existed to arrest her for the crimes with which she was not charged.  The law regarding unlawful arrest under the Fourth Amendment was sufficiently clear that the arresting officers and Defendant Gonzales should have understood that their conduct, as alleged by Plaintiff Silva-Banuelos, was unlawful.

### 2)   Denis Doyon

According to Plaintiff Doyon's criminal complaint, non-defendant APD officer Larry Campbell, who was not the arresting officer, charged Plaintiff Doyon with resisting, evading, or obstructing an officer and with public nuisance.  Defs.' Reply to Resp. to Defs.' MPSJ No. I (Doc. No. 145), Ex. D.  These charges were dismissed on December 6, 2003 after Plaintiff Doyon successfully completed an alternative sentencing program.  Defs.' Undisputed Fact 17.

Prior to his arrest, Plaintiff Doyon was striking a cowbell along with a group of percussion instrument playing protestors at the intersection of Central Avenue and Cornell Drive.  He has stated that he did not hear any commands to leave the intersection or to cease playing his instrument.  Indeed, Plaintiff Doyon claims that the music eased tensions in the crowd caused by the APD's use of chemical agents against the protestors.  When officers on foot, apparently under the direction of Officer Larry Campbell, entered the crowd and seized Plaintiff Doyon, he did not resist, attempt to flee, or react with any aggressive movements.  Plaintiffs' video exhibits show Plaintiff Doyon being dragged across the street by officers during his arrest.

Concerning the two charges that were filed against Plaintiff Doyon, the Court finds that when viewed in the light most favorable to Plaintiff, the evidence does not demonstrate that the arresting officer had probable cause to arrest him for these crimes. NMSA § 30-22-1 (D) makes it a crime for a person to resist or abuse an officer in the lawful discharge of his duties. According to Plaintiff Doyon's answers to Defendants' interrogatories, he did not engage in any conduct directed at the police and did not resist when he was arrested. Defs.' MPSJ No. I (Doc. No. 107), Ex. A-4. None of the Defendants have argued that Plaintiff Doyon's conduct constitutes either resisting or abusing an officer in the course of his duties. Therefore, under Plaintiff Doyon's presentation of the facts, APD officers could not have had probable cause to arrest Plaintiff Doyon under NMSA § 30-22-1.

NMSA § 30-8-1 makes it unlawful to knowingly create, perform or maintain anything without lawful authority which is either injurious to public health, safety, morals, or welfare, or which interferes with the exercise and enjoyment of public rights, including the right to use public property. While Defendants have not argued that Plaintiff Doyon was engaged in endangering public health, safety, morals, or welfare, they have argued that the protestors as a whole interfered with the right to use public property. For the reasons stated in the discussion of Plaintiff Silva-Banuelos' liability under this statute, the Court also finds that Plaintiff Doyon did not individually interfere with the right to use public property and that APD officers did not have probable cause to arrest him under NMSA § 30-8-1.

As to additional crimes with which Plaintiff Doyon was not charged, the Court concludes that the Parade Ordinance and NMSA § 66-7-339 / ROA 1994 § 8-2-7-7 (prohibition of pedestrians from walking along roads when sidewalks are available) did not give any of the APD

officers probable cause to arrest Plaintiff Doyon for the same reasons stated in the discussion of

Plaintiff Silva-Banuelos' liability under these statutes.

Finally, NMSA § 30-20-1(A) and ROA 1994 § 12-2-5(D) prohibit disorderly conduct,

which is defined as engaging in violent, abusive, or boisterous conduct which disturbs the peace,

or assisting in creating any riot, affray, or disturbance.  Prior to his arrest, Plaintiff Doyon was

striking a cowbell amid a group of protestors who were playing percussion instruments.  Because

he was surrounded by other protestors who were chanting, speaking into megaphones, and

playing percussion instruments, and because he testified that no one complained about his

conduct, Plaintiff Doyon's actions, when seen in the light most favorable to Plaintiff, do not rise

to the level of a violation of either of the disorderly conduct statutes.  *See Swiecicki v. Delgado*,

463 F.3d 489, 499 (6th Cir. 2006) (district court erred in holding as a matter of law that police

officer had probable cause to arrest plaintiff because a genuine issue of material fact existed as to

whether plaintiff's behavior was inappropriately loud or offensive during a raucous sports match);

*see also McKinney*, 9 Fed.Appx. at 888; *Hawkins*, 991 P.2d at 991.  Moreover, disturbing the

peace is defined under New Mexico law as "an act of violence," "any act likely to produce

violence," or an act which causes "consternation and alarm . . ."  *State v. James. M.*, 111 N.M.

473, 476, 806 P.2d 1063, 1066 (N.M. App. 1990).  Defendants have not alleged that Plaintiff

Doyon's playing of a cowbell was likely to produce violence, or that anyone in the vicinity felt

consternation and alarm as a result of Plaintiff Doyon's actions.  Indeed, Plaintiff's evidence is

exactly to the contrary, as Plaintiff Doyon stated that playing his cowbell actually helped to de-

escalate the rising tension in the crowd.  Plaintiff Doyon has provided sufficient evidence that

officers did not have probable cause to arrest him for disorderly conduct.

49

Since Plaintiff Doyon (1) by inference had permission to be in the street; (2) took his actions in the context of a protest; (3) did not engage in activity that falls under the definition of disturbing the peace as pronounced by the New Mexico Court of Appeals; and (4) was in no other sense disorderly, the Court concludes that a reasonable officer would not have believed, based on the facts most favorable to Plaintiff Doyon, that probable cause existed to arrest him for crimes with which he was not charged.  The law regarding unlawful arrest under the Fourth Amendment was sufficiently clear that the arresting officers and Defendant Gonzales should have understood that their actions, as demonstrated by Plaintiff Doyon, were unlawful.

### 3)  Michael Kisner

According to Plaintiff Michael Kisner's criminal complaint, non-defendant APD officer Damon Hensley, who was not the arresting officer, charged him with resisting, evading, or obstructing an officer and with public nuisance.  Defs.' Reply to Resp. to Defs.' MPSJ No. I (Doc. No. 145), Ex. F.  These charges were dismissed on June 2, 2003 after Plaintiff Michael Kisner successfully completed an alternative sentencing program.  Defs.' Undisputed Fact 14.

Prior to his arrest, Plaintiff Michael Kisner was standing on the sidewalk on the southeast corner of the intersection of Cornell Drive and Central Avenue.  After watching the police arrest a number of protestors, he began to chant, "Shame" toward the police.  A horse-mounted officer ordered Plaintiff Michael Kisner and everyone else on the corner to depart.  After questioning the officer as to why he could not remain on the sidewalk, Plaintiff Michael Kisner stated that he would comply with the order, but that his car was parked on the UNM campus on the north side of Central Avenue.  When the officer refused to let him pass, Plaintiff Michael Kisner moved south down Cornell Drive in accordance with the officer's order.  After the officer maneuvered

the horse to strike him, Plaintiff Michael Kisner was confronted by a second horse-mounted officer who blocked his path. Plaintiff Michael Kisner then stood between two posts on the sidewalk in order to avoid being trampled by the horses. From there, an officer on foot dispensed pepper spray at Plaintiff Michael Kisner, causing him to move south on Cornell Drive. As he was walking, the two horse-mounted officers approached and kicked, shook, and used their horses to strike Plaintiff Michael Kisner. Without saying a word to him, the officers seized Plaintiff Michael Kisner by his backpack, and an officer on foot finally arrested him.

Concerning the two charges that were filed under NMSA §§ 30-22-1 and 30-8-1 against Plaintiff Michael Kisner, the Court finds that when viewed in the light most favorable to Plaintiff, the evidence does not demonstrate that the officer had probable cause to arrest him for these crimes. As discussed above, NMSA § 30-22-1(D) makes it a crime for a person to resist or abuse an officer in the lawful discharge of his duties. According to Plaintiff Michael Kisner's answers to Defendants' interrogatories, the only conduct that he engaged in that was directed at the police was to chant, "Shame" toward a number of officers and to ask an officer why he could not remain on the sidewalk. In addition, he did not resist when he was arrested. Defs.' MPSJ No. I (Doc. No. 107), Ex. A-10. None of the Defendants have argued that Plaintiff Michael Kisner's conduct constitutes abusing an officer in the course of his duties. As to the possibility that Plaintiff Michael Kisner's questioning of the officer as to why he needed to depart from the sidewalk constitutes resisting an officer, the prevailing legal authority states that it does not. *See Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) ("Although [plaintiff] briefly asked Defendants what was going on before complying with their commands to exit the residence, this does not amount to resistance"); *Mackinney v. Nielsen*, 69 F.3d 1002, 1008 (9th Cir. 1995) (failure to

comply immediately with officer's request is not obstruction of justice where citizen ultimately complies); Christopher Hall, *What Constitutes Obstructing or Resisting Officer, in Absence of Actual Force*, 66 A.L.R. 5th 397 §§ 2, 7[b] (1999) (noting that "significant" number of courts have concluded that questioning officer in orderly manner while he is performing his duty does not amount to obstructing or delaying officer in performance of his duties).  This is especially true where Plaintiff Michael Kisner verbally indicated to the officer that he would comply with the order, and indeed complied with every subsequent order to move in a particular direction.  *See State v. Prince*, 126 N.M. 547, 551, 972 P.2d 859, 863 (N.M. App. 1998) (concluding that there was no evidence that defendant resisted officer's order to remain outside where officer grabbed her and caused her to fall off porch and she remained outside thereafter).  Therefore, APD officers could not have had probable cause to arrest Plaintiff Michael Kisner under NMSA § 30-22-1.

Also as discussed above, NMSA § 30-8-1 makes it unlawful for a person to knowingly create, perform or maintain anything without lawful authority which is either injurious to public health, safety, morals, or welfare, or which interferes with the exercise and enjoyment of public rights, including the right to use public property.  While Defendants have not argued that Plaintiff Michael Kisner was engaged in endangering public health, safety, morals, or welfare, they have argued that the protestors as a whole interfered with the right to use public property.  For the reasons stated in the discussion of Plaintiff Silva-Banuelos' liability under this statute, the Court also finds that Plaintiff Michael Kisner was not individually involved in interfering with the right to use public property and that APD officers did not have probable cause to arrest him under NMSA § 30-8-1.

Concerning the additional crimes with which Plaintiff Michael Kisner was not charged, the

52

Court concludes that the Parade Ordinance and NMSA § 66-7-339 / ROA 1994 § 8-2-7-7 (prohibition of pedestrians from walking along roads when sidewalks are available) did not give any of the APD officers probable cause to arrest Plaintiff Michael Kisner for the same reasons stated in the discussion of Plaintiff Silva-Banuelos' liability under these statutes. Moreover, Plaintiff Michael Kisner was standing on the sidewalk on the south side of Central Avenue when the APD initiated the series of events that led to his arrest. Defendants fail to discuss how any of these three statutes is applicable to Plaintiff Michael Kisner.

Finally, NMSA § 30-20-1(A) and ROA 1994 § 12-2-5(D) prohibit disorderly conduct, which is defined as engaging in violent, abusive, or boisterous conduct which disturbs the peace, or assisting in creating any riot, affray, or disturbance. Prior to his arrest, Plaintiff Michael Kisner directed cries of "Shame" toward the police. Plaintiff Michael Kisner's actions do not rise to the level of a violation of either of the disorderly conduct statutes. *See Hawkins*, 991 P.2d at 989. This is especially true in the context of a large-scale demonstration, where chanting a slogan which was neither abusive nor profane could hardly qualify as disturbing the peace. *See e.g., McKinney*, 9 Fed.Appx. at 888. Thus, Plaintiff Michael Kisner has provided sufficient evidence that officers did not have probable cause to arrest him for disorderly conduct.

In summary, the Court concludes that a reasonable officer would not have believed, based on the facts most favorable to Plaintiff Michael Kisner, that probable cause existed to arrest him for the crimes with which he was not charged. The law regarding unlawful arrest under the Fourth Amendment was sufficiently clear that the arresting officers and Defendant Gonzales should have understood that their conduct, as shown by Plaintiff Michael Kisner, was unlawful.

### b.      Liability of Defendant Officers

Despite the Court's finding that none of the APD officers present at the demonstration had probable cause to arrest Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner, these three Plaintiffs have failed to demonstrate that any of the named Defendant Officers were the individuals who violated their constitutional right to be free from unlawful arrest.

In order to hold a police officer personally liable for violating a citizen's constitutional rights, the Court needs evidence that provides a sound basis for concluding that the officer in question is the one who violated the Constitution.  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation"); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir.1996) ("[P]ersonal involvement is an essential allegation in a § 1983 claim"); *Scull v. New Mexico*, 236 F.3d 588, 599 (10th Cir. 2000) ("As a preliminary matter, we note that none of the [defendants] was involved in the delay.  Consequently, [plaintiff] has no § 1983 claims against the [defendants], regardless of the lawfulness of the detention") (citation omitted); *Williams v. State of Kansas*, 2003 WL 22255965, slip opinion at *1 (10th Cir. Oct. 2, 2003) ("Moreover, [plaintiff] fails to allege facts establishing [defendants] personally caused a constitutional violation").

"It is not merely enough for a plaintiff to allege a violation.  The law is clear that in the Tenth Circuit that an individual plaintiff must allege which officer or officers personally participated in the violation of that plaintiff's rights."  *Panaderia La Diana, Inc. v. Salt Lake City Corp.*, 342 F. Supp. 2d 1013, 1031-32 (D. Utah 2004), *aff'd*, *Trevizo v. Adams*, 455 F.3d 1155 (10th Cir. 2006).  Because personal participation is an essential element of proof for purposes of establishing a constitutional violation, Plaintiffs must show that the Defendant Officers personally

participated in Plaintiff Silva-Banuelos, Doyon, and Michael Kisner's unlawful arrests in order to establish the liability of the Defendant Officers.

In responding to the motions for summary judgment, Plaintiffs presented no evidence that any of the Defendant Officers arrested them.  Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner concede that they do not know the names of the officers who arrested them.  *See* Silva-Banuelos Dep. at 184 (Pls.' Ex. 15); Doyon Dep. at 42-43 (Pls.' Ex. 3); Michael Kisner Dep. at 123 (Pls.' Ex. 11).  While Plaintiff Doyon was arrested by officers who wore gas masks and riot gear, both Plaintiffs Silva-Banuelos and Michael Kisner have stated that they were arrested by APD officers in standard uniforms without gas masks.  Curiously, Plaintiffs did not sue or depose any officers who wore standard uniforms at the protest.  Defs.' Reply to Resp. to Defs.' MPSJ No. II at 20.  Although Plaintiff Michael Kisner was struck and seized by horse-mounted officers just prior to being arrested by a foot officer, Plaintiffs did not sue or depose any of the horse-mounted officers who were at the protest.  *Id*.  Indeed, none of the arresting officers listed on Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's criminal complaints was named as a Defendant, and of the thirteen Defendant Officers, Plaintiffs only deposed Defendant Officer Hancock.  Because it is "impossible to identify with any certainty which officer was participating in which action," Pls.' Rebuttal to Defs.' Undisputed Material Facts in Docket No. 107, at para. 7 (citing Pls.' Ex. 48), Plaintiffs urge the Court to adopt the Ninth Circuit's reasoning in *Dubner v. City and County of San Francisco*, 266 F.3d 959 (9th Cir. 2001).

In *Dubner*, the court shifted the burden of identifying the arresting officers to the defendants because the plaintiff "did everything she possibly could to identify the arresting officers," and the court felt that the identity of the officers had been concealed for the purpose of

preventing suit. *Id*. at 965. As discussed above, Plaintiffs do not seem to have even come close to exhausting their options for discovering the identities of the actual arresting officers. Unlike the plaintiff in *Dubner*, Plaintiffs did not name as Defendants the arresting officers listed on their criminal complaints, nor did they depose twelve of the thirteen Defendant Officers who allegedly conducted the arrests. Moreover, unlike in *Dubner*, though some of the officers at the demonstration did not wear name tags, Plaintiffs did not present evidence that this was done "to frustrate the efforts of potential plaintiffs in false arrest cases . . ." *Id*. Plaintiffs' own expert testified that he did not know whether there was any decision by the APD to consciously have officers obscure their identification in order to prevent lawsuits. Lou Reiter Dep. at 90 (Defs.' MPSJ No. III, Ex. J). Finally, this burden shifting approach has been held "impracticable" under circumstances similar to those found in Plaintiffs' action. *See Panaderia La Diana*, 342 F. Supp. 2d at 1033. In *Panaderia La Diana*, the court analyzed the holding in *Dubner* and concluded that the Ninth Circuit's approach might be feasible under the specific facts of *Dubner*, which involved only one plaintiff and two defendants. *Id*. The court went on to state:

> However, in this case we have 19 plaintiffs and at least 17 Salt Lake City officers. In addition, agents from Davis County, the FBI, the DEA, and the INS participated in the raid. Moreover, each of the [defendants] likely encountered more than one plaintiff and each plaintiff likely encountered more than one of the defendants during the raid. It is simply impracticable to shift the burden in this case. More important, it was made clear in the pleadings and during oral arguments that the plaintiffs did not do everything they could have during discovery to discover the identities of individual officers.

*Id*. Given the factual similarities between *Panaderia La Diana* and the present case, the Court concludes that it would be impracticable to shift the burden here. Because there is no direct evidence linking any of the Defendant Officers with the unlawful arrests of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner, there can be no individual liability under Section 1983.

*See Jenkins v. Wood*, 81 F.3d 988, 995-96 (10th Cir. 1996).  Therefore, the Court will grant Defendants' MPSJ No. II as to Count IV of Plaintiffs' Complaint.

<strong>c.      Liability of Defendant Gonzales</strong>

"Though state actors who participate in a violation in a supervisory role may incur liability, there is no concept of strict supervisor liability under section 1983.  In other words, it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation."  *Jenkins*, 81 F.3d at 994 (internal quotation marks and citation omitted).  As with any individual defendant, the plaintiff must establish "a deliberate, intentional act by the supervisor to violate constitutional rights."  *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir.1992) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)); *Winters v. Board of County Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993).  "A plaintiff may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance."  *Jenkins*, 81 F.3d at 995 (citation omitted); *Winters,* 4 F.3d at 855.

A plaintiff may show that an affirmative link exists between the constitutional violation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.  *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001).  An official can also be held liable if the official set in motion a series of events that the defendant knew or reasonably should have known would cause others to violate a citizen's constitutional rights.  *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (citing *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)).  "Because mere negligence is not enough to hold a supervisor liable under § 1983, a plaintiff must establish that the supervisor acted knowingly or with deliberate

indifference that a constitutional violation would occur." *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1151 (10th Cir. 2006) (internal quotation marks omitted).

It is undisputed that Defendant Gonzales played a role in developing the APD's plan for the protest and acted as the incident commander in charge of the police response to the March 20, 2003 demonstration. Consequently, he was the point of contact for, and the immediate supervisor of, all police officers assigned to duty at the demonstration. By his own admission, Defendant Gonzales did not expect his officers to take independent action unless they received specific directives, and this was particularly true concerning the use of force. As the incident commander, Defendant Gonzales directly supervised his officers' conduct and issued specific directives as he followed the progress of the march and the protest.

When the march neared its conclusion after the demonstrators returned to Central Avenue, Defendant Gonzales ordered the arrest and removal of five to seven individuals who were acting as provocateurs. After the crowd returned to the intersection of Central Avenue and Cornell Drive, Defendant Gonzales ordered his officers to seize the percussion instruments that certain protestors were playing and directed his officers to make arrests if necessary. Toward the end of the protest, Defendant Gonzales deviated from the APD's general policy of citing and releasing demonstrators and ordered his officers to book the arrested persons downtown.

The Court finds that these facts are sufficient to establish that Defendant Gonzales directly participated and acquiesced in the seizures and arrests of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner. *See Winters*, 4 F.3d at 855 (indicating that if deputy sheriff advised officer to seize object, deputy sheriff was affirmatively linked to unconstitutional seizure). Defendant Gonzales ordered the arrest of Plaintiff Doyon because he was playing a percussion instrument.

From what can be seen in Plaintiffs' video exhibits, Defendant Gonzales also appears to have directed the arrest of Plaintiff Silva-Banuelos.  In addition, though he may not have specifically directed the arrest of Plaintiff Michael Kisner, Defendant Gonzales ordered the arrest of provocateurs in the crowd, exercised control over and supervised the officers, and ordered the booking of all arrested persons downtown.  Defendant Gonzales set in motion the actions of his officers.  He exercised strict control over not only the APD's actions, but also the unfolding of the protest and march as a whole, leading to the inevitable conclusion that he was aware that the APD was arresting protestors other than those who he specifically identified.  Moreover, because the Court has already found that the APD lacked probable cause to arrest Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner, the Court also concludes that Defendant Gonzales knew or reasonably should have known that he was creating a situation that would cause others to violate citizens' constitutional rights.  *Snell*, 920 F.2d at 700.  Given that the Defendants have not asserted with any specificity what any of the officers witnessed that allowed them to infer that probable cause existed to arrest Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner, this is not a case where the arresting officers or Defendant Gonzales could be entitled to immunity based on reasonably but mistakenly concluding that probable cause was present.  *See Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).  By issuing arrest orders without first establishing probable cause to arrest, Defendant Gonzales acted with deliberate indifference as to whether constitutional violations would occur, and is thus not entitled to qualified immunity.

The Court concludes that Plaintiffs have demonstrated an affirmative link between Defendant Gonzales and the unconstitutional arrests of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner sufficient to overcome a motion for summary judgment.  Seen in the light most

favorable to Plaintiffs, genuine issues of material fact exist as to whether Defendant Gonzales is liable under Section 1983 for directing the unconstitutional arrests of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner.  Therefore, the Court denies Defendant Gonzales' MSJ as to Count IV of Plaintiffs' Complaint.[11]

### 2.    Count V:  Claims of Use of Excessive Force and Qualified Immunity Defenses

All of the Plaintiffs have alleged that the Defendant Officers and Defendant Gonzales violated their Fourth Amendment right to be free from the use of excessive force when police officers, under the direct supervision of and according to the orders of Defendant Gonzales, used against them force which was objectively unreasonable under the circumstances.  Defendant Officers assert that they are not the police officers who used force against Plaintiffs, and consequently cannot be held liable even if constitutional violations occurred.  Furthermore, Defendant Officers claim that even if they were involved with the conduct alleged by Plaintiffs, they did not seize or otherwise acquire physical control over Plaintiffs, and that the clearly established Fourth Amendment case law at the time did not bar the Defendant Officers' use of tear gas and pepper ball rounds against the protestors, thereby entitling the Defendant Officers to qualified immunity.

Defendant Gonzales contends that he is entitled to summary judgment because he did not have any direct contact or interaction with any of the Plaintiffs sufficient to impose individual liability, and also because he cannot be held liable for any alleged constitutional violations based

---

[11] The Court notes that Judge William P. Johnson employed almost identical reasoning in denying Defendant Gonzales' motion for summary judgment in parallel proceedings brought by another protestor against Defendant Gonzales and various police defendants.  *See Fogarty v. City of Albuquerque, et al.*, No. Civ. 05-26 WJ/LFG, slip. op. at 13-14 (D.N.M. Aug. 1, 2006) (Doc. No. 193).

on his supervisory capacity.  Moreover, Defendant Gonzales claims that he is entitled to summary judgment based on qualified immunity because the force used against Plaintiffs was not excessive.

### a.        Excessive Force and Qualified Immunity Principles

As a threshold inquiry to qualified immunity, the Court first must determine whether Plaintiffs' allegations state a claim for violation of any rights secured under the United States Constitution.  *Maldonado v. Josey*, 975 F.2d 727, 729 (10th Cir.1992) (citing *Siegert*, 500 U.S. at 231).  All claims that law enforcement officers have used excessive force in the course of an arrest or other seizure of a free citizen are to be analyzed under the objective reasonableness standard of the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395-97 (1989).  To state such a claim properly, a plaintiff must demonstrate both that a seizure occurred and that the seizure was unreasonable.  *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989); *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994).

### 1)        Seizure Defined

To succeed on their excessive force claims, Plaintiffs must first demonstrate that they were "seized" within the meaning of the Fourth Amendment.  *See Bella,* 24 F.3d at 1256 ("It must be remembered that [t]he Fourth Amendment prohibits unreasonable *seizures*, not unreasonable or ill-advised conduct in general") (internal quotation marks omitted, alterations in original). Generally, "[a] person is seized within the meaning of the Fourth Amendment when a reasonable person would believe that he or she is not free to leave." *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) (quotation marks and citation omitted).  Where the "free to leave" analysis is inapplicable, to decide whether a seizure occurred under the totality of the circumstances, "the appropriate inquiry is whether a reasonable person would feel free to decline

the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429,

436 (1991); *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (same).  However, it

should be remembered that the Fourth Amendment addresses misuse of power, not the accidental

effects of otherwise lawful government conduct.  *Brower*, 489 U.S. at 596.  As the Supreme

Court explained:

> a Fourth Amendment seizure does not occur whenever there is a governmentally
> caused termination of an individual's freedom of movement (the innocent
> passerby), nor even whenever there is a governmentally caused and governmentally
> *desired* termination of an individual's freedom of movement (the fleeing felon), but
> only when there is a governmental termination of freedom of movement *through
> means intentionally applied*.

*Id.* at 596-97.  Therefore, a seizure occurs when a person has been "stopped by the very

instrumentality set in motion or put in place in order to achieve that result," and even when an

unintended person or thing is the object of the detention, so long as the detention itself is willful.

*Id.* at 596-99.

Having been arrested, Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner were clearly

'seized' within the meaning of the Fourth Amendment.  *See California v. Hodari D*, 499 U.S.

621, 624 (1991) (arrest is "the quintessential 'seizure of the person'").  As for the Plaintiffs who

were not arrested, the alleged seizures they experienced can be divided into two broad categories:

(1) exposure to chemical agents (tear gas and/or pepper spray); and (2) direct physical contact,

including any form of hitting, holding, shoving, and dragging, as well as being shot with pepper

ball rounds.  Each of the Plaintiffs has alleged that he or she was the subject of one or both

categories of alleged seizures.  The Court decides that, to the extent the officers' actions were

taken to restrict Plaintiffs' freedom of movement, the alleged conduct by the Defendant Officers

and Defendant Gonzales constitutes seizures as defined by the Supreme Court.

### A.    Seizure by Chemical Agent

Twelve of the Plaintiffs (Buck, Chavez, Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and Wechselberger) who were not arrested allege that they were exposed to tear gas and suffered its effects to varying degrees.  At the time of their exposure, Plaintiffs were located at or near the intersection of Central Avenue and Cornell Drive.  After APD officers had formed police lines across two or three sides of the intersection, Defendant Gonzales, along with Defendant Officers Hancock, Hill, and Lopez, intentionally deployed tear gas canisters into and around the crowd in order to disperse the protestors.  These four Defendants stated that they intended only to disband the protestors.  However, depending on a Plaintiff's location, a reasonable person could have concluded that he or she was not free to leave the area or otherwise terminate the encounter.

### 1.    Plaintiff Camille Chavez

Plaintiff Chavez was seated in the middle of the intersection and was surrounded on two or three sides by APD officers.  Defendant Officer Hancock launched at least one tear gas canister behind the crowd and into the area of the UNM Bookstore, where the police had been directing the protestors to go, thereby sealing the perimeter around Plaintiff Chavez, who was subsequently overwhelmed by the effects of the tear gas and who stated in her deposition testimony that she felt that she could not move.  Because she was effectively surrounded by the ring of officers and tear gas, and knowing that guns were pointed in her direction, Plaintiff Chavez laid down to show that she was not a threat.  Having acquiesced to the officers' show of authority, Plaintiff Chavez was clearly seized by that show of authority and the APD's use of tear gas.  *See Hodari D.*, 499 U.S.

63

at 629 (person is seized when they acquiesce to a "show of authority"); *U.S. v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (a coercive show of authority may be demonstrated by the presence of more than one officer or the display of a weapon). Defendant Gonzales and other APD officers intended to limit Plaintiff Chavez's freedom of movement by surrounding her with a combination of manpower and tear gas through means intentionally applied. Plaintiff Chavez did not believe that she was free to depart or terminate the encounter, and indeed seems to have been physically unable to depart even if she had not been surrounded, exposed to tear gas, and threatened with firearms. Based on the totality of the circumstances, a reasonable person in Plaintiff Chavez's situation would have believed that he or she was not free to terminate the encounter. Hence, a jury could find that Plaintiff Chavez was seized within the meaning of the Fourth Amendment.

> **2.** **Plaintiffs Buck, Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and Wechselberger**

The facts of the other eleven Plaintiffs' situations present a much closer legal question. In their excerpted deposition testimony, Plaintiffs Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, and Schuurman testified that they moved away from the area permeated by tear gas, and thus neither acquiesced to the officers' show of authority nor experienced any termination of their freedom of movement. Unlike Plaintiff Chavez, these Plaintiffs were not seized by the officers' show of authority. *Hodari D.*, 499 U.S. at 626 (a seizure does not occur when, following a show of authority, a subject does not yield).

Plaintiffs Buck, Santelli, Curtis Trafton, and Wechselberger, who either suffered only

minimally from the effects of the tear gas or who were located outside of the police - tear gas ring did not allege any curtailment of their freedom of movement.  Plaintiff Christina Trafton does not appear to have been at the intersection of Central Avenue and Cornell Drive at the time in question; she seems to have been exposed to tear gas only at the intersection of Central Avenue and University Boulevard.  Plaintiff Christina Trafton has not proffered any evidence that, to the extent that she was exposed to tear gas at Central and Cornell, she suffered its effects or was restricted in her movement.

Nonetheless, there is a small body of authority from a number of district courts which suggests that the use of a chemical agent to exert control over a crowd constitutes a seizure within the meaning of the Fourth Amendment.  *See, e.g., Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1260 (E.D. Wash. 2005) (night club patrons who were intentionally sprayed with chemical agent were seized because officers deployed chemical agent in attempt to gain physical control over crowd); *Marbet v. City of Portland*, 2003 WL 23540258, *10 (D. Or. Sept. 8, 2003) (unpublished opinion) (officers' use of pepper spray to move protestors 120 feet to create larger entryway to street and to circumscribe area of movement of other protestors constituted seizure); *Lamb v. City of Decatur*, 947 F. Supp. 1261, 1265-67 (C.D. Ill. 1996) (police officers' use of pepper spray on group of protestors could constitute seizure).  The two most factually relevant decisions, *Marbet* and *Lamb*, are distinguishable from the case before the Court.  In deciding a motion to dismiss, the *Marbet* court found that the defendants had exercised control over the plaintiffs by using pepper spray and physical force to move the plaintiffs 120 feet, while cordoning off certain areas and preventing the plaintiffs from leaving.  *Marbet*, 2003 WL 23540258, *10.  In contrast, the Defendants here did not exercise control over Plaintiffs Buck, Eaton, Gilster, Haney,

Alicia Kisner, Lisa Kisner, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and

Wechselberger, nor were these Plaintiffs restrained or prevented from dispersing.  The court in

*Lamb* did not expressly analyze the question of whether a seizure had occurred, and seemed

primarily concerned with allowing the Fourth Amendment claim to go forward because no First

Amendment claim had been raised despite the First Amendment implications of the case.  *Lamb*,

947 F. Supp. at 1264 ("The fact that this is a Fourth Amendment case and not a First Amendment

case does not diminish the First Amendment protections available to the plaintiffs").  Because

Plaintiffs here have alleged a First Amendment claim, the *Lamb* court's analysis is inapposite and

unpersuasive.

The most pertinent authority concerning Plaintiffs Buck, Eaton, Gilster, Haney, Alicia

Kisner, Lisa Kisner, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and Wechselberger's

excessive force claim may be the Tenth Circuit's ruling in *Roska v. Peterson*.  There, state

employees and social workers forcibly removed a child from his home based on suspicion of

abuse.  While doing so, a case worker pushed the child's two sisters against a wall and uttered

profanity encouraging them to leave.  *Roska*, 328 F.3d at 1242-43.  The Tenth Circuit held that

there was no seizure within the meaning of the Fourth Amendment because there was no

indication that the plaintiffs "did not feel free to leave."  *Id.* at 1243.  Similarly, Plaintiffs Buck,

Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Santelli, Schuurman, Christina Trafton, Curtis

Trafton, and Wechselberger have not argued that the APD's use of tear gas caused them to feel

that they were not free to leave; to the contrary, most of these Plaintiffs fled from the irritant,

even if they were unable to hear the APD's orders to clear the streets.  The APD's use of tear gas

is akin to the type of force used in *Roska* in that it was used not to take control of its target, but

66

rather to cause the target to disperse.  Because there is nothing else to indicate that these eleven

Plaintiffs' freedom of movement was terminated, the Court finds that a reasonable person would

not have believed that he was not free to leave in these circumstances.  Consequently, none of

these eleven Plaintiffs was seized within the meaning of the Fourth Amendment by the APD's use

of chemical agents.

## B.      Seizure by Physical Contact

Nine of the Plaintiffs (Chavez, Eaton, Gilster, Alicia Kisner, Lisa Kisner, Leckman,

Santelli, Schuurman, and Curtis Trafton) who were not arrested allege that they came into direct

physical contact – including any form of hitting, holding, shoving, dragging, and being shot with

pepper ball rounds – with one or more APD officers.  The encounters occurred at various times

and locations throughout the demonstration.  As with its analysis of Plaintiffs' claims that they

were seized by the APD's use of tear gas, the Court finds that, depending on the totality of the

circumstances of each encounter, a reasonable person could have concluded that he or she was

not free to leave or otherwise terminate the encounter.

## 1.      Plaintiff Camille Chavez

As discussed above, Plaintiff Chavez was seized by the APD when she was encircled,

subjected to tear gas, and threatened with firearms.  While she has testified that she did not feel

the impact of the ammunition, there is uncontroverted evidence that an APD officer, possibly

Defendant Officer Fisher,[12] fired multiple pepper ball rounds at Plaintiff Chavez while she was

incapacitated in the street.  This additional fact bolsters the Court's finding that Plaintiff Chavez

was seized by the APD.  *See Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (plaintiff

---

[12] There is a genuine issue of material fact as to the identity of the officer.

was seized within the meaning of the Fourth Amendment when he was shot with a bean bag gun while he was attempting to leave the scene of a riot); *Otero v. Wood*, 316 F. Supp. 2d 612, 621 & n.6 (S.D. Ohio 2004) (analyzing plaintiff's excessive force claim under the Fourth Amendment and noting that the defendant officer violated a clearly established right when he fired a wooden baton at plaintiff while attempting to disperse a crowd).

### 2.  Plaintiffs Lucy Gilster, Lane Leckman, and Susan Schuurman

Plaintiffs Gilster, Leckman, and Schuurman have presented evidence that they were subjected to direct force in a manner which suggests that they may have been seized by the APD. Without necessarily deciding if seizures occurred, the Court will analyze each of Plaintiffs Gilster, Leckman, and Schuurman's claims in turn.

Plaintiff Gilster was struck twice by unidentified APD officers.  During the first incident, officers were using their batons to hit Plaintiff Gilster's friends, who were being arrested.  When she tried to assist one of her friends, Plaintiff Gilster was struck in the back.  Seen in the light most favorable to Plaintiff Gilster, a reasonable person in her position could have believed that he or she was also about to be arrested and therefore was not free to terminate the encounter with the police, especially because the totality of the circumstances suggests that Plaintiff Gilster's friends were struck in the process of being arrested.  *See Darrah v. City of Oak Park*, 255 F.3d 301, 306-07 (6th Cir. 2001) (assuming that an officer's striking of a protestor who was interfering with the arrest of another protestor constituted a seizure for purposes of conducting an objective reasonableness analysis, but ultimately not deciding the question of whether a seizure had occurred).  The second incident took place at the intersection of Cornell Drive and Central

Avenue after Defendant Gonzales had ordered the removal of the protestors' drums. Plaintiff Gilster alleges that she was pulled out of the crowd by her collar, stripped of her drum, and then shoved back into the crowd. Because the police engaged Plaintiff Gilster with the purpose of confiscating her drum, a reasonable person might have believed that he or she was not free to decline the officers' requests or otherwise terminate the encounter.

At the time of his encounter with an APD officer, Plaintiff Leckman was standing near the front of the UNM Bookstore. An officer ordered him to move away from the area, but Plaintiff Leckman was unable to comply with the order because there was a bicycle rack directly behind him. After Plaintiff Leckman inquired as to why he had to move, the officer shoved Plaintiff Leckman with his baton, causing him to fall backwards. Seen in the light most favorable to Plaintiff, and given that Plaintiff Leckman was caught between the officer and an obstacle, a reasonable person could have believed under the totality of the circumstances that he or she was not free to decline the officer's command or otherwise terminate the encounter. *Cf. Secot v. City of Sterling Heights*, 985 F. Supp. 715, 720-21 (E.D. Mich. 1997) (officer not entitled to qualified immunity on excessive force claim under Fourth Amendment where plaintiff provided evidence that officer struck him in hand with baton while plaintiff was peaceably standing in picket line).

Finally, Plaintiff Schuurman was standing on the sidewalk at the intersection of Central Avenue and Cornell Drive when she was struck with a baton in the small of her back and then shoved violently from the sidewalk and into the street. Another group of officers used their batons to shove her back onto the sidewalk. Sandwiched between these two groups of officers who shoved her back and forth from the street to the sidewalk, Plaintiff Schuurman pleaded with them because she did not know where she could go. Seen in the light most favorable to Plaintiff

Schuurman, and given that she was caught between two groups of officers, a reasonable person in her situation could have believed under the totality of the circumstances that he or she was not free to terminate the encounter. *Id*. Accordingly, Plaintiff Schuurman, in addition to Plaintiffs Gilster and Leckman, has presented evidence that she may have been seized within the meaning of the Fourth Amendment.

> **3.    Plaintiffs Lori Eaton, Alicia Kisner, Lisa Kisner, Maria Santelli, and Curtis Trafton**

Plaintiffs Eaton, Alicia Kisner, Lisa Kisner, Santelli, and Curtis Trafton were subjected to direct force in a manner which suggests that they were not seized by the APD. While each of these Plaintiffs' individual scenarios presents a close factual distinction when compared to the cases of Plaintiffs Gilster, Leckman, and Schuurman, the Court finds that Plaintiffs Eaton, Alicia Kisner, Lisa Kisner, Santelli, and Curtis Trafton have not made evidentiary showings as strong as those presented by Plaintiffs Gilster, Leckman, and Schuurman.

While attending to an incapacitated protestor, Plaintiff Eaton was pulled to her feet by an officer and prevented from reapproaching the fallen protestor by an officer who shoved her in the upper chest with his baton. Plaintiff Lisa Kisner was shoved by APD officers in front of the Frontier Restaurant and fell backward onto her daughter Plaintiff Alicia Kisner, knocking both of them back. Plaintiff Santelli was shoved by officers who had formed a skirmish line at the intersection of University Boulevard and Central Avenue. A horse-mounted officer's horse rammed its head into Plaintiff Curtis Trafton's chest, lifting him off his feet and causing him to stagger backwards. The Court concludes that these five Plaintiffs were not seized within the meaning of the Fourth Amendment because the totality of the circumstances of each incident fails

70

to suggest that any of these Plaintiffs would not have felt free to leave or terminate his or her encounter with the police. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment") (internal citation and quotation marks omitted).

> **C.    Whether the APD Officers' Conduct Violated Clearly Established Law (Claims of Plaintiffs Gilster, Leckman, and Schuurman)**

Having determined as a preliminary matter that the conduct of the APD as shown by Plaintiffs Gilster, Leckman, and Schuurman may have constituted seizures under the Fourth Amendment, the Court must consider whether the conduct violated "clearly established" law. *Nelson*, 207 F.3d at 1206.

The Court's analysis concerning Plaintiffs Gilster, Leckman, and Schuurman's claims revolves around the question of whether their constitutional right was so clearly established at the time that it would have been sufficiently clear to a reasonable officer that his conduct was unlawful under the circumstances. *Anderson*, 483 U.S. at 640. Having reviewed the existing body of case law, the Court determines that it was not clearly established that the use of chemical agents or physical force by APD officers, intended only to disperse the crowd and not to effect a stop or arrest, was a violation of the Fourth Amendment.

The Supreme Court has not ruled on this precise question. The language in *Hodari D.* indicating that "[t]he word 'seizure' readily bears the meaning of a[n] . . . application of physical force to restrain movement," 499 U.S. at 626, is dicta, as the actual holding was limited to the proposition that a show of authority coupled with submission to that authority constitutes a seizure. *Id*. at 629. Moreover, there is other language in the opinion suggesting that an officer

71

does not effect a seizure merely by touching a person unless the officer has an intent to seize that person as well.  *See id.* at 624-25 ("[A]n officer effects an arrest of a person whom he has authority to arrest, by laying his hand on him *for the purpose of arresting him . . .*") (quoting *Whitehead v. Keyes*, 85 Mass. 495, 501 (1862)) (emphasis added); *see also* Renee Paradis, *Carpe Demonstratores: Towards a Bright-Line Rule Governing Seizure in Excessive Force Claims Brought by Demonstrators*, 103 Colum. L. Rev. 316, 341 (2003) ("The applicability of Hodari D.'s slightest touching rule to seizures by physical force where officers have no intent to seize remains uncertain").

The Court is not aware of any Tenth Circuit case on point.  As discussed earlier, the Tenth Circuit's ruling in *Roska v. Peterson*, which was decided after the March 20, 2003 protest, may be the most relevant decision for purposes of analyzing Plaintiffs' claims.  While factually distinct from Plaintiffs' case, *Roska* suggests that within the Tenth Circuit, the use of physical force alone by an official does not constitute a seizure when the person knows that he or she is free to leave.  *See Roska*, 328 F.3d at 1243.  Still, even after *Roska*, it appears that in cases where there is no intent to seize, but rather an intent merely to disperse, the contours of what constitutes a seizure are not clearly established within the Tenth Circuit.

Finally, these Plaintiffs have not shown that the weight of authority from other courts clearly establishes a constitutional violation where an officer uses force with an intent to disperse.  *Ciminillo v. Streicher*, *Logan v. City of Pullman*, *Marbet v. City of Portland*, and *Otero v. Wood* were all decided after the March 20, 2003 protest, reflecting the recent and unsettled nature of this area of law.  In addition, the district courts in *Lamb v. City of Decatur* and *Secot v. City of Sterling Heights* did not analyze in any detail whether or not the use of pepper spray on protestors

(*Lamb*) or the striking of a protestor with a baton (*Secot*) constituted seizures.  They merely assumed that the Fourth Amendment applied to the respective claims.  Indeed, other case law indicates support for the opposite conclusion – that using force with an intent to disperse, not detain or arrest, may not constitute a seizure.  *See White v. City of Markham*, 310 F.3d 989, 995 (7th Cir. 2002) (noting that where officer slightly touched plaintiff and threatened immediate arrest if plaintiff did not comply with order to leave house, it was unclear whether seizure occurred because plaintiff was free to leave and terminate encounter at any time); *Slocum v. Palinkas*, 50 Fed.Appx. 300, 302 (6th Cir. 2002) (unpublished opinion) (plaintiff not seized where officer told the approaching plaintiff to step back and pushed plaintiff, but otherwise made no effort to arrest or detain him during the course of plaintiff's brother's arrest); *Darrah*, 255 F.3d at 305 (avoiding issue as to whether protest participant was seized when struck with baton by passing police officer, and analyzing and rejecting excessive force claim under both Fourth and Fourteenth Amendments); *Ellsworth v. City of Lansing*, 34 F. Supp. 2d 571, 581 (W.D. Mich. 1998) (without engaging in seizure analysis, court analyzed union picketers' excessive force claims arising from officers' use of tear gas under substantive due process clause of Fourteenth Amendment rather than the Fourth Amendment); *see also* Paradis, *supra* (analyzing uncertainty in whether Fourth Amendment applies to excessive force claims brought by demonstrators, and advocating bright-line rule that it should apply).

In sum, it was not clearly established at the time of the March 20, 2003 demonstration that the APD officers' attempts to disperse Plaintiffs through the use of chemical agents or direct physical contact constituted violations of the Fourth Amendment.  Therefore, regardless of whether the APD officers' actions were reasonable or not, it was not sufficiently clear that a

reasonable officer would have understood that what he was doing would have violated Plaintiffs' constitutional rights.  Thus, the APD officers and Defendant Gonzales are entitled to qualified immunity on the Fourth Amendment excessive force claims of Plaintiffs Gilster, Leckman, and Schuurman.

**2)      Reasonableness of Force (Claims of Plaintiffs Silva-Banuelos, Chavez, Doyon, and Michael Kisner)**

Having established that Plaintiffs Silva-Banuelos, Chavez, Doyon, and Michael Kisner were seized within the meaning of the Fourth Amendment, Plaintiffs must also demonstrate that the seizures of these four Plaintiffs were unreasonable.  *Bella*, 24 F.3d at 1255.  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotation marks and citation omitted).  Recognizing the fact that the right to make an arrest necessarily carries with it the right to use some degree of physical force to effect it, the Supreme Court has stated that the application of this balancing test "requires careful attention to the facts and circumstances of each particular case . . . "  *Id.*  Among the factors that courts should consider in determining whether a police officer applied excessive force are (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the person is actively resisting arrest or attempting to evade arrest by flight.  *Id.*  In addition, the reasonableness of the use of force depends, in part, on whether the officer's own reckless or deliberate conduct unreasonably created the need to use such force.  *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  Finally, "[t]he

74

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

### A)      Plaintiff Silva-Banuelos

Plaintiff Silva-Banuelos alleges two instances of use of unreasonable force.  The first concerns the APD's use of pepper spray on the marching protestors near the intersection of University Boulevard and Central Avenue.  Because this was prior to her arrest, and because Plaintiff Silva-Banuelos testified that she moved to distance herself from the area affected by the pepper spray, the Court concludes that there was no seizure of Plaintiff Silva-Banuelos at this point for the same reasons discussed above in the Court's analysis of the twelve Plaintiffs' claims that they were seized by the APD's use of tear gas.  Accordingly, there is no need to conduct a reasonableness analysis on this claim.

Plaintiff Silva-Banuelos' second allegation of unreasonable force concerns the conduct of an APD officer during her arrest.  An officer grabbed Plaintiff Silva-Banuelos' arms, twisted them behind her back and above her shoulders, and kept her in this painful hold that forced her to walk on her tippy toes.  Plaintiff Silva-Banuelos, however, has not proffered any evidence that the officer's hold caused any actual injury beyond temporary pain.  Therefore, the Court concludes that the force used by the officer was not excessive as a matter of law.  *See Cortez,* 478 F.3d at 1129 (where the only evidence of injury was de minimis in a claim concerning the tight application of handcuffs, the court held that it was insufficient as a matter of law to support an excessive force claim).  The APD officers and Defendant Gonzales are entitled to summary judgment on Plaintiff Silva-Banuelos' excessive force claim.

### B)      Plaintiff Chavez

Plaintiff Chavez alleges that APD officers' use of force on her at the intersection of Central Avenue and Cornell Drive was unreasonable.  Having been overwhelmed by the APD's use of tear gas, Plaintiff Chavez was repeatedly shot with pepper ball rounds even after she laid down in the street.  "Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use." *Holland*, 268 F.3d at 1193.  The person who fired at Plaintiff Chavez shot non-lethal ammunition.  Nevertheless, the continuous firing of rounds at Plaintiff Chavez constituted unreasonable force in the same way that simply aiming a loaded firearm at a person in similar circumstances would be unreasonable.  *See also Gouskos v. Griffith*, 122 Fed.Appx. 965, 977 (10th Cir. 2005) (reversing district court's grant of summary judgment based on qualified immunity where plaintiff presented evidence that officer had stomped on his back after he had been subdued); *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (holding that post-detention pre-arrest kicking, beating, and choking of plaintiff was constitutionally excessive in light of the fact that the plaintiff had made no additional "aggressive moves or threats" toward officer).

### C)      Plaintiff Doyon

Plaintiff Doyon presented the following evidence that APD officers' use of force during his arrest was unreasonable.  Two officers grabbed Plaintiff Doyon by the shoulders, caused him to trip, dragged him from the crowd, and pushed him face down on the pavement.  One of the

officers placed his knee on Plaintiff Doyon's back, pinning him to the ground. An officer later pushed him face forward onto the hood of a police car. As he sat handcuffed in a police van, Plaintiff Doyon was exposed to tear gas that officers had discharged at the intersection of Central Avenue and Cornell Drive. The tear gas caused Plaintiff Doyon's eyes, nose, and throat to burn, and he had difficulty breathing.

There is evidence that Plaintiff Doyon did not resist, attempt to flee, or pose a threat to any officers. Moreover, Plaintiff Doyon faced only misdemeanor charges arising out of his playing of a cowbell in the middle of an intersection that had been closed off during the protest. This evidence is sufficient to support an excessive force claim under the Fourth Amendment. *See Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987) (finding plaintiff's excessive force claim trialworthy where plaintiff testified that she did not resist arrest and that during the course of her arrest for disturbing the peace, plaintiff was kneed in the back, threatened with being struck, dragged down a hallway, and handcuffed tightly).

### D)   Plaintiff Michael Kisner

Plaintiff Michael Kisner's allegation of unreasonable force concerns the conduct of several APD officers during his arrest. A horse-mounted officer used his horse to repeatedly hit Plaintiff Michael Kisner in the face, about the head, and in his chest. When he had positioned himself between two posts to avoid being trampled by approaching horse-mounted officers, Plaintiff Michael Kisner was sprayed with pepper spray. As he attempted to retreat, Plaintiff Michael Kisner was surrounded by two horse-mounted officers who smashed him between their horses, kicked him in the back, shook him violently back and forth by the shoulder strap of his backpack, and impelled him forward by releasing the strap. The officers approached Plaintiff Michael Kisner

again shortly thereafter and pulled him back between their horses, grabbing the shoulder straps of the backpack and lifting him onto his toes.

Again, there is no evidence that Plaintiff Michael Kisner resisted arrest, attempted to flee, or posed a threat to any officer.  Moreover, Plaintiff Michael Kisner faced only misdemeanor charges related to his standing on the sidewalk during the demonstration and not immediately leaving when ordered to do so by the police.  Based on these facts, Plaintiff Michael Kisner has demonstrated sufficient evidence that he was subjected to excessive force in violation of the Fourth Amendment.  *See Lester*, 830 F.2d at 714.

### E)  Whether the APD Officers' Conduct Violated Clearly Established Law

The Court also concludes that the law governing Fourth Amendment excessive force claims as to physical force used following a person's submission to a show of authority was clearly established at the time of the March 20, 2003 protest.  Based on Plaintiff Chavez's testimony, it would have been clear to a reasonable officer that the conduct of the officer who continued to fire pepper ball rounds at Plaintiff Chavez even after she lay prostrate in the street was unlawful.  *See Holland*, 268 F.3d at 1193.  The APD officers and Defendant Gonzales are therefore not entitled to qualified immunity on Plaintiff Chavez's excessive force claim.

Furthermore, the law governing Fourth Amendment excessive force claims as to physical force exerted during an arrest was clearly established at the time of the March 20, 2003 incident. Prior to March 2003, the law was clear that an officer's seizure of a suspect is unreasonable if the officer uses excessive force during an arrest or investigatory stop.  *Graham*, 490 U.S. at 394. Based on Plaintiff Doyon's and Michael Kisner's evidence concerning their arrests, it would have

been clear to a reasonable officer that the arresting officers' conduct was unlawful.  *Cf. Secot*, 985

F. Supp. at 720-21 (officer not entitled to qualified immunity on excessive force claim where

plaintiff provided evidence that officer struck him in hand with baton while plaintiff was peaceably

standing in picket line).  The APD officers and Defendant Gonzales are therefore not entitled to

qualified immunity on Plaintiffs Doyon and Michael Kisner's excessive force claims.

Plaintiffs Chavez, Doyon, and Michael Kisner have properly stated claims for violation of

their rights under the Fourth Amendment.  *Brower*, 489 U.S. at 599.

3)      **Reasonableness of Force Used on Protestors who were not Seized**

Having determined that Plaintiffs Buck, Eaton, Haney, Alicia Kisner, Lisa Kisner, Santelli,

Christina Trafton, Curtis Trafton, and Wechselberger were not seized within the meaning of the

Fourth Amendment, the Court must conduct a substantive due process analysis of their claims.[13]

*County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("'*Graham* simply requires that if a

constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth

Amendment, the claim must be analyzed under the standard appropriate to that specific provision,

not under the rubric of substantive due process.'  Substantive due process analysis is therefore

inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment")

(quoting *U.S. v. Lanier*, 520 U.S. 259, 272, n. 7 (1997)).  The Fourteenth Amendment protects

citizens against state actions that deprive them of life, liberty, or property without due process of

---

[13] Having found that Plaintiffs Gilster, Leckman, and Schuurman may have been seized by APD officers, the Court is not required to analyze these Plaintiffs' claims under the substantive due process clause of the Fourteenth Amendment.  Nonetheless, assuming that Plaintiffs Gilster, Leckman, and Schuurman were not seized, the Court notes that its discussion of the remaining nine Plaintiffs' excessive force claims under the Fourteenth Amendment applies with equal force to Plaintiffs Gilster, Leckman, and Schuurman's claims.

law.  U.S. Const. amend. XIV.  In determining whether force was excessive within the meaning of

the Fourteenth Amendment, courts look to three factors : (1) the relationship between the amount

of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of

the state actor.  *Roska*, 328 F.3d at 1243 (citation omitted).  "Force inspired by malice or by

'unwise, excessive zeal amounting to an abuse of official power that shocks the conscience ... may

be redressed under [the Fourteenth Amendment].'"  *Id.*  (quoting *Hewitt v. City of Truth or*

*Consequences*, 758 F.2d 1375, 1379 (10th Cir.1985).  This high standard is met only where the

government actor intended to injure a citizen in some way unjustifiable by any government

interest.  *County of Sacramento,* 523 U.S. at 849.  A court must look at whether the force was

applied in a good faith effort to maintain order, or maliciously and sadistically for the purpose of

causing harm.  *Id.* at 853.

     Here, none of the three factors supports a finding that the APD officers used excessive

force under the Fourteenth Amendment.  None of the Plaintiffs suffered more than de minimis

physical injuries or required medical care, and nothing in the record suggests that Defendant

Gonzales and the officers under his command applied force maliciously or sadistically.  For

example, many of the Plaintiffs' allegations concern shoving by various officers, yet this use of

force was not severe enough to cause Plaintiffs physical injury, indicating that it was not engaged

in for the purpose of causing harm.  This factor alone counsels against a finding of excessive

force.  *See Roska*, 328 F.3d at 1243 ("[W]e have never upheld an excessive force claim without

some evidence of physical injury outside of the context of a Fourth Amendment violation")

(internal quotation marks and citation omitted).  Likewise, although the use of tear gas and

pepper spray caused temporary pain and discomfort, the record reflects that the police used a PA

system to order the crowd to disperse prior to using these chemical agents.  Even if Plaintiffs could not hear the announcements, this fact indicates that the police did not use force arbitrarily or for the purpose of injuring Plaintiffs, and demonstrates that the police were involved in the legitimate task of clearing the streets.  In sum, the facts alleged here fall short of describing the type of force that has been found to rise to the level of a substantive due process violation.  *See Roska*, 328 F.3d at 1243-44 (affirming dismissal of substantive due process claim where official did not use a disproportionate amount of force to accomplish his objective, did not inflict serious physical injury, and was not motivated by malice or an improper motive); *Slocum*, 50 Fed.Appx. at 303 (where officer wanted to prevent plaintiff from interfering with arrest, plaintiff's substantive due process rights were not violated when officer pushed him down, causing him to break two vertebrae); *Ellsworth*, 34 F. Supp. 2d at 581 (release of tear gas into air to disperse picketers did not shock conscience where police attempted to clear area for two hours).  Because the Court concludes that there was no substantive due process violation, the Defendant Officers and Defendant Gonzales are entitled to qualified immunity on Plaintiffs Buck, Eaton, Haney, Alicia Kisner, Lisa Kisner, Santelli, Christina Trafton, Curtis Trafton, and Wechselberger's substantive due process claims.

### b.        Liability of Defendant Officers

Despite the Court's finding that Plaintiffs Chavez, Doyon, and Michael Kisner have set forth sufficient favorable evidence to show a violation of their rights under the Fourth Amendment, Plaintiffs have failed to proffer any evidence that the named Defendant Officers, with the exception of Defendant Officer Fisher, were the individuals who violated their constitutional right to be free from the use of excessive force.

81

In their cross-motions for summary judgment on Plaintiff Chavez's excessive force claim, the parties have submitted evidence concerning Defendant Officer Fisher's responsibility for firing pepper ball rounds at Plaintiff Chavez. *See* Defs.' Resp. to Pls.' MPSJ, Disputed Material Fact No. 15 (Doc. No. 149); Pls.' Rebuttal to Defs.' Undisputed Material Facts - MSJ No. I, Disputed Material Facts No. 17-18 (Doc. No. 134); Pls.' Rebuttal to Defs.' Undisputed Material Facts - MSJ No. II, Disputed Material Facts No. 26-28 (Doc. No. 134). Because the parties' competing assertions and evidence have created a genuine issue of material fact as to whether Defendant Officer Fisher was the officer who fired pepper ball rounds at Plaintiff Chavez, the Court will deny both Plaintiffs' MPSJ and Defendants' MPSJ No. II as to Plaintiff Chavez's excessive force claim.

In contrast to Plaintiff Chavez' claim against Defendant Officer Fisher, there is no sound basis for concluding that the Defendant Officers are the APD officers who violated Plaintiffs Doyon and Michael Kisner's rights. As discussed above concerning the Defendant Officers' liability for unlawful arrest, Plaintiffs have not satisfied their burden of establishing the personal involvement of any Defendant Officer, except Defendant Officer Fisher, in the use of excessive force. *See Foote*, 118 F.3d at 1423; *Mitchell*, 80 F.3d at 1441; *Panaderia La Diana*, 342 F. Supp. 2d at 1031-32. Because personal participation is a prerequisite to liability, Plaintiffs Doyon and Michael Kisner must show that the Defendant Officers personally participated in using excessive force against them in order to establish the liability of the Defendant Officers.

In responding to the motions for summary judgment, Plaintiffs Doyon and Michael Kisner presented no evidence that any of the Defendant Officers used excessive force against them. Plaintiff Doyon concedes that he can not describe any distinguishing characteristics about the

officers who grabbed him and arrested him, nor did he see the officer who placed his knee on Plaintiff Doyon's back. *See* Doyon Dep. at 17 (Pls.' Ex. 3). Likewise, Plaintiff Michael Kisner concedes that he can not recall any specific features that would identify any of the officers who used force against him. Michael Kisner Dep. at 118-122 (Pls.' Ex. 11). Without repeating its analysis from above, the Court agrees with Plaintiffs that it is "impossible to identify with any certainty which officer was participating in which action." Pls.' Rebuttal to Defs.' Undisputed Material Facts in Docket No. 107, at para. 7 (citing Pls.' Ex. 48). Thus, there is no direct evidence linking any of the Defendant Officers with the use of excessive force against Plaintiffs Doyon and Michael Kisner, and consequently there can be no liability under Section 1983. *See Jenkins*, 81 F.3d at 995-96.

Therefore, the Court will grant in part Defendants' MPSJ No. II as to Plaintiffs' Count V claims against Defendant Officers Schultz, DeFrates, Fox, Nicholas Gonzales, Hancock, Hill, Lopez, Magetteri, Montoya, O'Connell, Padilla, and Perdue. The Court will deny in part Defendants' MPSJ No. II as to Plaintiff Chavez' Count V claim against Defendant Officer Fisher only. Likewise, the Court will deny Plaintiffs' MPSJ as to Count V of Plaintiffs' Complaint.

### c.     Liability of Defendant Gonzales

As discussed above, Defendant Gonzales' supervisory liability for the actions of his subordinates must be premised on his having "personally directed the violation or ha[ving] actual knowledge of the violation and acquiesc[ing] in its continuance." *Jenkins*, 81 F.3d at 995. This affirmative link may be demonstrated by showing that Defendant Gonzales set in motion a series of events that he knew or reasonably should have known would cause others to violate a person's constitutional rights. *Snell*, 920 F.2d at 700.

It is undisputed that Defendant Gonzales acted as the incident commander in charge of the police response to the March 20, 2003 demonstration.  It has also already been established that Defendant Gonzales did not expect his officers to take independent action unless they received specific directives, and this was particularly true concerning the use of force.  As the incident commander, Defendant Gonzales directly supervised his officers' conduct and issued directives as he followed the progress of the protest.  In addition, Defendant Gonzales authorized the use of chemical munitions and pepper ball rounds, and personally deployed a tear gas canister.  Also as discussed above, Defendant Gonzales directed his officers to arrest certain protestors who were playing percussion instruments, including Plaintiff Doyon, and ordered the use of force to sweep people from the sidewalk in front of the Frontier restaurant, where Plaintiff Michael Kisner was standing.

Based on these facts, the Court finds that there is an affirmative link between Defendant Gonzales and the use of excessive force against Plaintiffs Chavez, Doyon, and Michael Kisner sufficient to overcome a motion for summary judgment.   Seen in the light most favorable to these three Plaintiffs, the evidence suggests that Defendant Gonzales set in motion a series of events that he knew or reasonably should have known would cause his officers to violate Plaintiffs Chavez, Doyon, and Michael Kisner's constitutional rights when he authorized the use of pepper ball rounds, ordered Plaintiff Doyon's arrest, and ordered his officers to sweep people from the front of the Frontier restaurant.  *See Snell*, 920 F.2d at 700.  By allowing his officers to use force against protestors who did not resist his officers' actions or commands, Defendant Gonzales acted with deliberate indifference as to whether constitutional violations would occur, and is thus not entitled to qualified immunity.

Because genuine issues of material fact exist as to whether Defendant Gonzales is liable under Section 1983 for directing the use of excessive force against Plaintiffs Chavez, Doyon, and Michael Kisner, the Court will deny in part Defendant Gonzales' MSJ as to Plaintiffs Chavez, Doyon, and Michael Kisner's Count V claims against Defendant Gonzales.  The Court will grant in part Defendant Gonzales' MSJ as to Plaintiffs Silva-Banuelos, Buck, Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Leckman, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and Wechselberger's Count V claims against Defendant Gonzales.[14]

### 3.   Count VI:  Suppression of Rights to Freedom of Expression & Assembly

All of the named Plaintiffs have alleged that the Defendant Officers and Defendant Gonzales violated their First Amendment rights to freedom of expression and assembly when police officers, under the direct supervision of and according to the orders of Defendant Gonzales, and Defendant Gonzales, personally, used force to break up the protest.

The Defendant Officers, with the exception of Defendant Officers Hancock, Hill, Lopez, Fisher, and Perdue, assert that they are entitled to summary judgment because they did not use force against Plaintiffs and there is no evidence that Plaintiffs observed the Defendant Officers using force against other protestors.  Defendant Officers Hancock, Hill, Lopez, Fisher, and Perdue contend that they too are entitled to summary judgment because their use of tear gas and pepper ball rounds was not motivated by Plaintiffs' exercise of their First Amendment rights.

---

[14] In addition, Defendant Gonzales may be held liable for failing to stop the use of excessive force that occurred under his on-site supervision.  *See Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated on other grounds by City of Lawton v. Lusby*, 474 U.S. 805 (1985) (holding that an officer who stands by and does not prevent fellow officer from using excessive force may also be liable under § 1983); *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (officer who fails to prevent use of excessive force by another officer can be held liable for his nonfeasance).

Likewise, Defendant Gonzales claims that he is entitled to summary judgment because none of his actions was motivated by a desire to interfere with Plaintiffs' First Amendment rights. He also asserts that he is entitled to qualified immunity because "there is no clearly established law that would have prohibited [him] from deploying tear gas or authorizing reasonable use of force for crowd control purposes."  Mem. in Supp. of Def. Gonzales' MSJ (Doc. No. 114) at 27.

### a.       First Amendment Retaliation Principles

"[A]ny form of official retaliation for exercising one's freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and legal harassment, constitutes an infringement of that freedom."  *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (citation omitted).  To prove a First Amendment retaliation claim against a non-employer defendant, a plaintiff must show the following: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.  *Id.*  As the parties are in agreement that the *Worrell* retaliation framework applies to both Counts VI and VII of Plaintiffs' First Amended Complaint, the Court will apply the *Worrell* analysis to both claims.[15]

Plaintiffs have satisfied the first two elements set forth in *Worrell* for their First Amendment retaliation claims.  There is no question that protesting the government's decision to

---

[15] Although Defendant Gonzales discusses in his motion permissible time, place, and manner restrictions placed on speech, that framework is inapposite here because this case does not involve allegations of a prior restraint.  *See Barney v. City of Eugene*, 20 Fed.Appx. 683, 684 n.1 (9th Cir. 2001) (unpublished opinion) (content-neutral time, place, and manner restriction analysis is limited to cases involving prior restraints and should not be used where basis of action is discretionary police action).

go to war is a constitutionally protected activity.  *See New York Times Co. v. Sullivan*, 376 U.S.

254, 273 (1964) (right to criticize public officials is protected by First Amendment); *Shuttlesworth*

*v. City of Birmingham*, 394 U.S. 147, 152 (1969) (describing privilege of citizens to assemble,

parade, and discuss public questions in streets and parks).  Likewise, the Defendant Officers and

Defendant Gonzales' use of tear gas, pepper spray, and physical force to disperse Plaintiffs could

have chilled a person of ordinary firmness from continuing to participate in the demonstration.

*Cf. Perez v. Ellington*, 421 F.3d 1128, 1132 (10th Cir. 2005) (quick issuance of jeopardy tax

assessments against plaintiffs could chill reasonable person from associating with outside

distributor); *Cox v. City of Charleston*, 250 F. Supp. 2d 582, 591 (D.S.C. 2003) (requiring

person to provide social security number on application for a protest permit would chill the

speech of potential protesters by discouraging them from applying for permits).

      The third *Worrell* element presents a somewhat more difficult question.  Plaintiffs must

demonstrate that the Defendant Officers and Defendant Gonzales' reaction to the protest was

substantially motivated as a response to Plaintiffs' speech.    To prove substantial motivation, a

plaintiff must show that "but for" the retaliatory motive, the adverse action would not have taken

place.  *Smith v. Maschner*, 899 F.2d 940, 949-50 (10th Cir. 1990).  Because proof of this element

turns on the defendant's state of mind, a plaintiff may present circumstantial evidence to show

retaliatory intent.  *Id.* at 949.

      The Defendant Officers and Defendant Gonzales maintain that they were motivated solely

by their duty to enforce the law, but Plaintiffs have presented evidence that the APD sought to

end the protest altogether, rather than just to clear protestors from the streets.  *See* Schultz Dep.

at 74 (Pls.' Ex. 48).  The record also documents numerous instances in which APD officers either

used force or threatened to use force against protestors who were peaceably assembled on sidewalks and who could not conceivably have been in violation of any of the ordinances cited by Defendants. *See* Defs.' MPSJ No. I (Doc. No. 107), Ex. A-11 at 9 (officer ordered Plaintiff Leckman, who was standing on UNM Bookstore porch, to move and then shoved him with baton); *id.*, Ex. A-10 at 4-5 (horse-mounted officer ordered Plaintiff Michael Kisner, who was standing on the sidewalk outside the Frontier restaurant, to leave and then used horse to strike him); *id.*, Ex. A-9 at 9 (officer shoved Plaintiff Lisa Kisner while she was on sidewalk); Doyon Dep. at 74, 83-84 (Pls.' Ex. 4) (officer aimed rifle at young man who was walking on sidewalk and said if man did not move faster, he would shoot him). In addition, there is evidence that police officers forced protestors back onto the streets after first ordering them to clear the streets. *See* Defs.' MPSJ No. I (Doc. No. 107), Ex. A-3 at 9-10 (officers forced Plaintiff Chavez from sidewalk back onto Central Avenue); *id.*, Ex. A-13 at 9 (officer hit Plaintiff Schuurman with baton, shoving her from sidewalk into street). Furthermore, Defendant Officer Hancock launched at least one tear gas canister into the area of the UNM Bookstore, which is where the police had directed the protestors to go. *See* Defs.' MPSJ No. I (Doc. No. 107), Ex. A-1 at 9; *id.*, Ex. A-9 at 10; Chavez Dep. at 64 (Pls.' Ex. 2); Buck Dep. at 140 (Pls.' Ex. 1).

Because neither the Defendant Officers nor Defendant Gonzales argued that the protestors who were on the sidewalks were breaking any law or ordinance, the evidence suggests that some of the officers and Defendant Gonzales, who was actively supervising and participating in the events, may have harbored retaliatory motives in ordering these protestors to leave and subjecting them to force. Furthermore, the fact that Defendant Gonzales broke with the APD custom of simply citing and releasing protestors by ordering his officers to book arrested protestors

downtown suggests that he may have had a retaliatory motive underlying his actions concerning these particular protestors. *See* Huntsman Dep. at 53 (Pls.' Ex. 38). Although the Defendant Officers and Defendant Gonzales have argued that their actions were not motivated by any desire to limit or otherwise interfere with Plaintiffs' free speech or assembly rights, these assertions are not sufficient to warrant dismissal of Plaintiffs' First Amendment claims where Plaintiffs have proffered evidence suggesting improper motives behind some of the officers and Defendant Gonzales' actions. Because the evidence must be viewed in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have provided sufficient circumstantial evidence of the intent of some of the Defendant Officers and Defendant Gonzales to interfere with Plaintiffs' First Amendment rights to survive summary judgment.

### b.     Liability of Defendant Officers

Although Plaintiffs have properly stated claims for violation of their rights under the First Amendment, Plaintiffs have proffered evidence that implicates only Defendant Officers Hancock, Hill, Lopez, Fisher, and Perdue. It is uncontroverted that Defendant Officers Hancock, Hill, and Lopez launched tear gas canisters during the protest, and that Defendant Officers Fisher and Perdue deployed pepper ball rounds against protestors. Because these actions directly affected Plaintiffs, they have created genuine issues of material fact as to whether these five Defendant Officers may have had retaliatory motives for their actions and violated Plaintiffs' rights under the First Amendment. Because there is some circumstantial evidence that Defendant Officers Hancock, Hill, Lopez, Fisher, and Perdue may have been motivated by a desire to interfere with Plaintiffs' First Amendment rights, they are also not entitled to qualified immunity on this claim. *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848 (10th Cir. 2005) ("[i]t has long been

clearly established that the First Amendment bars retaliation for protected speech and association").   A reasonable officer would have understood that using force against law-abiding demonstrators for the purpose of interfering with their First Amendment rights was contrary to the established law.  *See id.*

As for Defendant Officers Schultz, DeFrates, Fox, Nicholas Gonzales, Magetteri, Montoya, O'Connell, and Padilla, Plaintiffs have failed to link these Defendant Officers to any specific acts. Therefore, there is no basis on which a reasonable jury could find that these eight Defendant Officers were personally involved in the First Amendment violations.  *See Foote*, 118 F.3d at 1423; *Mitchell*, 80 F.3d at 1441; *Panaderia La Diana*, 342 F. Supp. 2d at 1031-32. Consequently, there can be no liability of these Defendant Officers under Section 1983 for violations of Plaintiffs' First Amendment rights.  *See Jenkins*, 81 F.3d at 995-96.

The Court will grant in part Defendants' MPSJ No. II as to Plaintiffs' Count VI claims against Defendant Officers Schultz, DeFrates, Fox, Nicholas Gonzales, Magetteri, Montoya, O'Connell, and Padilla.  The Court will deny in part Defendants' MPSJ No. II as to Plaintiffs' Count VI claims against Defendant Officers Hancock, Hill, Lopez, Fisher, and Perdue.

### c.      Liability of Defendant Gonzales

As noted previously, Defendant Gonzales directly supervised his officers' conduct and issued directives as he followed the progress of the protest, authorized the use of chemical munitions and pepper ball rounds, and personally deployed a tear gas canister.  These facts support finding an affirmative link between Defendant Gonzales and the alleged First Amendment violations.  Seen in the light most favorable to Plaintiffs, the evidence suggests that Defendant Gonzales set in motion a series of events that he knew or reasonably should have known would

cause his officers to violate Plaintiffs' First Amendment rights when he authorized the use of chemical munitions and pepper ball rounds and ordered his officers to sweep people from the sidewalk in front of the Frontier restaurant. *See Snell*, 920 F.2d at 700. In addition, because Plaintiffs have proffered evidence that Defendant Gonzales personally deployed a tear gas canister, Plaintiffs have created a genuine issue of material fact as to whether Defendant Gonzales acted with a retaliatory motive both in his personal and supervisory capacities.

Defendant Gonzales has also raised the defense of qualified immunity, asserting that there was no clearly established law prohibiting the APD from deploying tear gas or using force for purposes of crowd control. This, however, is an incorrect statement of the law that governs First Amendment claims. Plaintiffs' claims concern the APD's use of force as it relates to their First Amendment rights, and "[i]t has long been clearly established that the First Amendment bars retaliation for protected speech and association." *Mimics, Inc.*, 394 F.3d at 848. Because there is some circumstantial evidence that Defendant Gonzales may have been motivated to interfere with Plaintiffs' First Amendment rights, the Court also determines that Defendant Gonzales' motion for qualified immunity on Count VI should be denied. A reasonable officer would have understood that using force against law-abiding demonstrators for the purpose of interfering with their First Amendment rights was contrary to the established law. *See id.* Therefore, the Court denies Defendant Gonzales' MSJ as to Count VI of Plaintiffs' Complaint.

### 4.    Count VII:  Retaliatory Prosecution under 42 U.S.C. § 1983 (Claims of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner)

Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have alleged that the Defendant Officers and Defendant Gonzales violated their First and Fourteenth Amendment rights when

police officers, under the direct supervision of and according to the orders of Defendant Gonzales, arrested them and filed charges against them in retaliation for their exercise of their constitutional rights. The Defendant Officers assert that they are entitled to summary judgment because they did not arrest or file charges against Plaintiffs. Defendant Gonzales claims that he is entitled to summary judgment because none of his actions was motivated by a desire to interfere with Plaintiffs' First and Fourteenth Amendment rights.

### a.    Retaliatory Prosecution Principles

The Tenth Circuit has long recognized claims for retaliatory or vindictive prosecution: "In the context of a government prosecution, a decision to prosecute which is motivated by a desire to discourage protected speech or expression violates the First Amendment and is actionable under § 1983." *Wolford v. Lasater*, 78 F.3d 484, 488 (10th Cir. 1996). As discussed above in the Court's analysis of Plaintiffs' claims in Count VI, a plaintiff must satisfy the three elements set forth in *Worrell* in order to prove a general First Amendment retaliation claim. In the case of a retaliatory prosecution claim, the Supreme Court has held that a plaintiff must plead and prove one additional element: lack of probable cause to support the underlying criminal charge. *Hartman v. Moore*, 547 U.S. 250, 126 S.Ct. 1695, 1707 (2006). "Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution . . ." *Id.* at 1704. In addition, because retaliatory prosecution claims are brought against non-prosecuting officials who may have influenced the prosecutorial decision, the absence of probable cause bridges the gap between the non-prosecuting official's motive and the prosecutor's action. *Id.* at 1706.

Here, the Court has already determined that Plaintiffs Silva-Banuelos, Doyon, and Michael

92

Kisner have provided sufficient evidence on the first and third *Worrell* elements to survive summary judgment. *See* section IV(A)(3), *supra*. The second *Worrell* element is also satisfied because arresting and filing charges against protestors could chill a person of ordinary firmness from continuing to protest. *See, e.g., Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (a realistic threat of arrest is enough to chill First Amendment rights); *Palma v. Atlantic County*, 53 F. Supp. 2d 743, 753 (D.N.J. 1999) (arrest would likely chill person of ordinary firmness from continuing to engage in protected conduct). Concerning the probable cause element of this claim, the Court has already concluded that Plaintiffs have presented sufficient evidence to support their assertion that the police lacked probable cause to arrest Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner. *See* section IV(A)(1)(a), *supra*. Because the evidence must be viewed in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have created genuine issues of material fact as to whether their arrests and prosecution were fueled by retaliatory motives.

### b.    Liability of Defendant Officers

Even though Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have properly stated claims for retaliatory prosecution, these Plaintiffs have not proffered any evidence linking the Defendant Officers to the events spanning their arrests and eventual prosecution. There is no basis on which a reasonable jury could find that the Defendant Officers were personally involved in the retaliatory prosecutions. *See Foote*, 118 F.3d at 1423; *Mitchell*, 80 F.3d at 1441; *Panaderia La Diana*, 342 F. Supp. 2d at 1031-32. Consequently, there can be no liability of the Defendant Officers to Plaintiffs Silva-Banuelos, Doyon, or Michael Kisner under Section 1983 for retaliatory prosecution. *See Jenkins*, 81 F.3d at 995-96.      The Court will grant Defendants'

MPSJ No. II as to Count VII of Plaintiffs' Complaint.

### c.    Liability of Defendant Gonzales

The record contains evidence that Defendant Gonzales directly supervised his officers'
conduct and issued directives as he followed the progress of the protest, and that he personally
participated in, ordered, and acquiesced in the arrests and booking of Plaintiffs Silva-Banuelos,
Doyon, and Michael Kisner.  These facts show an affirmative link between Defendant Gonzales
and the alleged retaliatory prosecutions.  *See Holland*, 268 F.3d at 1187.  The Court concludes
that Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have created genuine issues of material
fact as to whether Defendant Gonzales acted with a retaliatory motive both in his personal and
supervisory capacities.  Moreover, for the same reasons stated in the analysis of Plaintiffs' claims
in Count VI, the Court concludes that Defendant Gonzales is not entitled to qualified immunity on
the claims in Count VII.  Therefore, the Court denies Defendant Gonzales' MSJ as to Count VII
of Plaintiffs' Complaint.

### 5.    Count VIII:  Malicious Prosecution under 42 U.S.C. § 1983 (Claims of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner)

Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have alleged that the Defendant
Officers and Defendant Gonzales violated their constitutional rights by filing false police reports,
initiating unfounded charges, providing false information to prosecuting attorneys, and
encouraging their continued prosecution.  The Defendant Officers assert that they are entitled to
summary judgment because they did not arrest, file charges, or otherwise partake in the
prosecution of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner.  Likewise, Defendant
Gonzales claims that he is entitled to summary judgment because he played no role in the

prosecutions.

### a.    Malicious Prosecution Principles

The Tenth Circuit "has recognized the viability of malicious prosecution claims under

§ 1983."  *Taylor v. Meacham,* 82 F.3d 1556, 1560 (10th Cir. 1996).  While the analysis of a

Section 1983 malicious prosecution claim begins with the common law elements of malicious

prosecution, the ultimate question remains whether the plaintiff has proven a Fourth Amendment

constitutional violation.  *Id.* at 1561.  In *Pierce v. Gilchrist*, the Tenth Circuit clarified that the

common law elements of malicious prosecution do not refer to the specific terms of the tort law

of any particular state, but rather "to general principles of common law among the several states."

359 F.3d 1279, 1288 (10th Cir. 2004).  Thus, a plaintiff need not satisfy each element of the

common law tort of malicious prosecution of the state in which the action arose in order to

present a valid claim under Section 1983.  *Id.* at 1288-90.  Consequently, the Court will look to

the general principles of malicious prosecution described in *Pierce* to analyze Plaintiffs Silva-

Banuelos, Doyon, and Michael Kisner's claims, and will not rely on the standards pertaining to

New Mexico's tort of malicious abuse of process.

The Court initially notes that none of the parties has asserted the correct standard

governing a Section 1983 malicious prosecution claim.  Defendant Gonzales refers only to the

elements of the state tort while the Defendant Officers and Plaintiffs limit themselves to the

*Worrell* framework for retaliatory prosecutions under the First Amendment.  The Court will

therefore conduct its analysis in accordance with the following elements that the Tenth Circuit has

indicated are required to prove a constitutional malicious prosecution claim: (1) initiation of the

original action; (2) termination of the original action in favor of plaintiff; (3) lack of probable

cause to support arrest, continued confinement, or prosecution; and (4) malice.  *See Pierce*, 359

F.3d at 1291-97.

Concerning the first element, there is evidence that Defendant Gonzales ordered and

acquiesced in the arrests and booking of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner.

Although Defendant Gonzales did not sign the criminal complaints, he effectively initiated the

criminal actions against these Plaintiffs by ordering his officers to book Plaintiffs Silva-Banuelos,

Doyon, and Michael Kisner, rather than following the customary practice of citing and releasing

protestors.  This evidence is sufficient to satisfy the first element of *Pierce*.  *See id.* at 1292

("Congress was concerned not just with the officer who formally initiates the process that leads to

an unconstitutional seizure, but to all those who were the 'cause' of deprivations of constitutional

rights").

The second element of *Pierce*, termination of the original action in favor of the plaintiff, is

designed principally to ensure against inconsistent judgments and to avoid parallel litigation as to

questions of probable cause.  *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997).  Plaintiff Silva-

Banuelos was originally charged with violating NMSA §§ 30-22-1 and 30-8-1, but the prosecutor

moved to reduce the first charge to a violation of the City Code and moved to dismiss the second

charge outright.  Both charges were eventually dismissed by the state court.  Under these facts,

the Court finds that dismissal of all the charges against Plaintiff Silva-Banuelos indicates her

innocence and stands as a termination of the action in her favor sufficient to satisfy the second

element of *Pierce*.  *See Murphy*, 118 F.3d at 948 ("Where the prosecution did not result in an

acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its

final disposition is such as to indicate the innocence of the accused"); *Kee v. Ahlm***,** 2007 WL

625633, slip opinion at *5 n.4 (10th Cir. March 2, 2007) (following district court's conclusion that dismissal of criminal charges under a speedy trial statute is a favorable termination for purposes of malicious prosecution claim, circuit court did not reach defendant's argument to the contrary); *Chacon v. Watson*, No. Civ. 03-438 JC/ACT, Memorandum Opinion and Order at 11 (D.N.M. May 7, 2004) (termination in favor of plaintiff found where state dropped all charges against plaintiff); Restatement (Second) of Torts § 659(c) (criminal proceedings are terminated in favor of accused by formal abandonment of proceedings by prosecuting official).

In contrast, the second element proves dispositive in the cases of Plaintiffs Doyon and Michael Kisner.  The charges against them were dismissed only after they successfully completed an alternative sentencing program.  "The prevailing view is that if the abandonment was the result of a compromise to which the accused agreed . . . it is not a termination in favor of the accused for purposes of a malicious prosecution claim." *Murphy*, 118 F.3d at 949.  Because the evidence demonstrates that Plaintiffs Doyon and Michael Kisner procured their dismissals through agreements with prosecuting officials, the Court concludes that their criminal cases did not terminate in their favor and that they are barred from recovering on their malicious prosecution claims. *See Uboh v. Reno*, 141 F.3d 1000, 1004-05 (11th Cir. 1998) (withdrawal of criminal charges according to compromise or agreement does not constitute favorable termination and cannot support malicious prosecution claim); *Murphy*, 118 F.3d at 949 (conditional dismissal that becomes final if accused meets certain criteria during six-month period is not dismissal favorable to accused); *Marchbanks v. Young*, 47 N.M. 213, 139 P.2d 594, 597 (N.M. 1943) (where plaintiff procured dismissal of underlying suit based upon compromise and settlement, plaintiff cannot maintain malicious prosecution action because plaintiff is precluded from arguing that criminal

action terminated favorably to him); Restatement (Second) of Torts § 660 (termination of criminal proceedings via withdrawn charge or abandoned prosecution pursuant to agreement of compromise with accused is not sufficient favorable termination to meet requirements of malicious prosecution cause of action). Thus, the Court will limit its analysis of the remaining two *Pierce* elements to Plaintiff Silva-Banuelos' claim.

The third *Pierce* element requires a plaintiff to demonstrate that there was no probable cause to support the original arrest, continued confinement, or prosecution. *Pierce*, 359 F.3d at 1294; *see also Taylor*, 82 F.3d at 1561-62; *Wolford*, 78 F.3d at 489. As discussed above in section IV(A)(1)(a) of this opinion, Plaintiff Silva-Banuelos has proffered evidence suggesting that the police lacked probable cause to arrest her. This showing is sufficient to satisfy the third *Pierce* element of Plaintiff Silva-Banuelos' malicious prosecution claim.

The final *Pierce* element requires a plaintiff to show that the defendant acted with malice in initiating prosecution of the plaintiff. *See Pierce*, 359 F.3d at 1296-97 & n.12. Having already concluded in section IV(A)(3)(a) that Plaintiffs provided circumstantial evidence of Defendant Gonzales' intent to interfere with Plaintiffs' First Amendment rights sufficient to survive summary judgment, the Court finds that this same evidence, viewed in the light most favorable to Plaintiff Silva-Banuelos, could also demonstrate malice on the part of Defendant Gonzales. Therefore, Plaintiff Silva-Banuelos has made enough of an evidentiary showing to satisfy all four *Pierce* factors and has properly stated a claim for malicious prosecution against Defendant Gonzales.

### b. Liability of Defendant Officers

Despite stating a claim for malicious prosecution, Plaintiff Silva-Banuelos has not proffered any evidence linking any of the Defendant Officers to her arrest and eventual

prosecution.  There is no basis on which a reasonable jury could find that the Defendant Officers were personally involved in the malicious prosecution of Plaintiff Silva-Banuelos.  *See Foote*, 118 F.3d at 1423; *Mitchell*, 80 F.3d at 1441; *Panaderia La Diana*, 342 F. Supp. 2d at 1031-32. Consequently, there can be no liability of the Defendant Officers under Section 1983 for malicious prosecution.  *See Jenkins*, 81 F.3d at 995-96.  The Court will grant Defendants' MPSJ No. II as to Count VIII of Plaintiffs' Complaint.

### c.       Liability of Defendant Gonzales

Plaintiffs have provided evidence that Defendant Gonzales personally participated in, ordered, and acquiesced in the arrest and booking of Plaintiff Silva-Banuelos.  Based on these facts, the Court finds that there is an affirmative link between Defendant Gonzales and the malicious prosecution of Plaintiff Silva-Banuelos.  *See Holland*, 268 F.3d at 1187.  The Court concludes that Plaintiff Silva-Banuelos has created a genuine issue of material fact as to whether Defendant Gonzales acted with malice in initiating her prosecution.  Moreover, the Court also concludes that Defendant Gonzales' alternative request for qualified immunity on this claim lacks merit.  The right to be free from malicious prosecution was clearly established at the time of the demonstration.  *Taylor*, 82 F.3d at 1560 (noting Tenth Circuit's recognition of viability of Section 1983 malicious prosecution claims).  A reasonable officer would have understood that he could not initiate prosecution of Plaintiff Silva-Banuelos by ordering her arrest and booking when probable cause to arrest her did not exist.  The jury must decide whether Defendant Gonzales maliciously initiated the prosecution of Plaintiff Silva-Banuelos.

Therefore, the Court grants in part Defendant Gonzales' MSJ as to Plaintiffs Doyon and Michael Kisner's Count VIII claims.  The Court will deny in part Defendant Gonzales' MSJ as to

99

Plaintiff Silva-Banuelos' Count VIII claim against Defendant Gonzales.

**6.      Count IX: Supervisory and Municipal Liability for Violations of Constitutional Rights under 42 U.S.C. § 1983**

Defendant Gonzales "defer[s] to the City Defendants to argue whether he was a policy maker as alleged in Count IX."   Mem. in Supp. of Def. Gonzales' MSJ (Doc. No. 114) at 34. The Court will therefore reserve ruling on Defendant Gonzales' MSJ as to Plaintiffs' claims in Count IX until the Court rules on Defendants the City of Albuquerque, Mayor Martin Chavez, and Defendant Officers' MPSJ No. III:  Dismissal of Plaintiffs' Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, Supervisory Liability, Injunctive Relief, and *Respondeat Superior* Claims (Doc. No. 109).

**7.      Official Capacity Claims against Defendant Gonzales**

In his reply brief, Defendant Gonzales incorporates Defendants Chavez, Bakas, Gallegos, and Schultz's MPSJ No. I: Dismissal of Plaintiffs' Official Capacity Claims against Chavez, Bakas, Gallegos, and Schultz (Doc. No. 107).  Defendant Gonzales argues that "all the reasons why the claims against Captain Gonzales in his official capacity are barred have been fully set forth" in the briefing of that motion.  Def. Gonzales' Reply to Pls.' Resp. in Opp. to his MSJ (Doc. No. 158, filed May 26, 2006) at 7 n.9.  In its August 8, 2006 Memorandum Opinion and Order (Doc. No. 176), the Court granted Defendants Chavez, Bakas, Gallegos, and Schultz's motion and dismissed Plaintiffs' Section 1983 claims against Defendants Chavez and Schultz in their official capacities.  For the same reasons discussed therein, the Court concludes that Plaintiffs' Section 1983 claims against Defendant Gonzales in his official capacity should also be dismissed.

### B.     State Law Tort Claims

The New Mexico Tort Claims Act ("NMTCA") gives governmental entities and public employees immunity from tort suits unless a specific waiver of that immunity is set forth under the NMTCA. *Weinstein v. City of Santa Fe*, 121 N.M. 646, 649, 916 P.2d 1313, 1316 (N.M. 1996). The court must strictly construe any provision purporting to waive governmental immunity. *See Armijo v. Department of Health & Environment*, 108 N.M. 616, 618, 755 P.2d 1333, 1335 (N.M. App. 1989). While all three of Plaintiffs' state law tort claims fall within the waiver for acts or omissions of law enforcement officers, there is a requirement that the alleged torts be "caused by law enforcement officers" for the waiver to apply. *See* NMTCA § 41-4-12. Thus, in order to avoid summary judgment, Plaintiffs must establish that there are genuine issues of material fact regarding whether the Defendant Officers waived immunity by "causing" the alleged torts.

### 1.     Count I: False Imprisonment (Claims of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner)

Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner allege that the Defendant Officers falsely imprisoned them when the Defendant Officers unlawfully detained and arrested them without reasonable suspicion or probable cause. The Defendant Officers contend that they did not "cause" these torts within the meaning of the NMTCA. As discussed above, none of these three Plaintiffs know the identities of the APD officers who arrested them. *See* Silva-Banuelos Dep. at 184 (Pls.' Ex. 15); Doyon Dep. at 42-43 (Pls.' Ex. 3); Michael Kisner Dep. at 123 (Pls.' Ex. 11). In addition, none of the arresting officers listed on Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's criminal complaints were named as Defendants. Because there is no evidence linking any of the Defendant Officers to Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's

detention and arrests, the Court concludes that no reasonable jury could find that the Defendant

Officers caused the false imprisonment of these three Plaintiffs.  Therefore, the Defendant Officers

are immune from suit on this claim, and the Court will grant Defendants' MPSJ No. II as to

Count I of Plaintiffs' Complaint.

### 2.        Count II: Battery

All of the named Plaintiffs allege that the Defendant Officers battered them when

the Defendant Officers used force against them as detailed above in the Court's discussion of

Plaintiffs' Section 1983 excessive force claims.  The Defendant Officers contend that they did not

"cause" these torts within the meaning of the NMTCA.

To state a claim for battery in New Mexico, a plaintiff must allege the following elements:

(i) the defendant intentionally touched or applied force to him; (ii) the defendant acted in a rude,

insolent, or angry manner; and (iii) the defendant's conduct was unlawful.  *See* UJI 14-320

NMRA.

As the Court has already concluded, Plaintiffs for the most part have failed to produce

evidence linking the Defendant Officers to the alleged batteries.  Indeed, there is uncontroverted

evidence that the APD officers who committed some of the complained of conduct are not among

the Defendant Officers.  Both Plaintiffs Michael Kisner and Curtis Trafton allege that they were

battered by horse-mounted officers, yet none of the Defendant Officers were part of the horse-

mounted unit at the time of the protest.  The Independent Review Officer even concluded that

Plaintiff Leckman was shoved by APD officer Dave Hubbard, who was not sued along with the

Defendant Officers.  The only Defendant Officers who have been linked to specific actions that

may qualify as batteries are Defendant Officers Fisher (use of pepper ball rounds) and Hancock,

Hill, and Lopez (use of tear gas).

Plaintiffs Chavez and Michael Kisner have presented evidence that Defendant Officer Fisher intentionally applied force to them by firing pepper ball rounds at them when Plaintiff Chavez was laying in the street and Plaintiff Michael Kisner was attempting to assist her. Plaintiffs Chavez and Michael Kisner have also already shown that Defendant Officer Fisher may have acted with a retaliatory motive in shooting them.  In addition, these two Plaintiffs have presented evidence that Defendant Officer Fisher's actions in shooting them when they did not present any threat and while Plaintiff Chavez was subdued were contrary to law.  *See Mead v. O'Connor*, 66 N.M. 170, 172-73, 344 P.2d 478, 479-80 (N.M. 1959) (noting that an officer's judgment as to the amount of force necessary to enable him to preserve the peace is subject to limitations of reasonableness).

Plaintiffs Buck, Chavez, Doyon, Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Michael Kisner, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and Wechselberger have presented evidence that Defendant Officers Hancock, Hill, and Lopez applied force to them when they exposed these Plaintiffs to tear gas during the course of the demonstration.  In addition, these Plaintiffs have shown that the Defendant Officers may have acted with retaliatory motives which, when viewed in the light most favorable to Plaintiffs, satisfy the second element of Plaintiffs' battery claims.  Concerning the third battery element, Plaintiffs have presented some evidence that Defendant Officers Hancock, Hill, and Lopez may have engaged in unlawful conduct if they intended to interfere with Plaintiffs' First Amendment rights by using force against them.

Having presented enough evidence to satisfy all three elements of a battery claim against Defendant Officers Fisher, Hancock, Hill, and Lopez, Plaintiffs have managed to preclude

summary judgment in Defendant Officers Fisher, Hancock, Hill, and Lopez' favor.  However, Defendant Officer Fisher has also presented evidence that creates genuine issues of material fact precluding summary judgment in favor of Plaintiff Chavez against Defendant Officer Fisher.

Therefore, the Defendant Officers, with the exception of Defendant Officers Fisher, Hancock, Hill, and Lopez, are immune from suit on Plaintiffs' claims of battery.  The Court will grant in part Defendants' MPSJ No. II as to Plaintiffs' Count II claims against Defendant Officers Schultz, DeFrates, Fox, Nicholas Gonzales, Magetteri, Montoya, O'Connell, Padilla, and Perdue. The Court will deny in part Defendants' MPSJ No. II as to Plaintiffs Buck, Chavez, Doyon, Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Michael Kisner, Santelli, Schuurman, Christina Trafton, Curtis Trafton, and Wechselberger's Count II claims against Defendant Officers Fisher, Hancock, Hill, and Lopez .  The Court will also deny Plaintiffs' MPSJ as to Count II of Plaintiffs' Complaint.

### 3.   Count III:  Malicious Abuse of Process (Claims of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner)

Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner allege that the Defendant Officers and Defendant Gonzales committed the tort of malicious abuse of process against them when they initiated the prosecutions of these Plaintiffs, filed false police reports, and gave false information to the prosecuting attorneys.  The Defendant Officers and Defendant Gonzales contend that they did not "cause" these torts within the meaning of the NMTCA.

### a.   Malicious Abuse of Process Principles

New Mexico has combined the torts of abuse of process and malicious prosecution into a single tort: malicious abuse of process.  *Devaney v. Thriftway Marketing Corp.*, 124 N.M. 512,

518, 953 P.2d 277, 283 (N.M. 1997).  "In restating the torts as a single cause of action, [the New Mexico Supreme Court] observed that they shared a common purpose of protecting a plaintiff who has been made the subject of legal process improperly, where the action was wrongfully brought by a defendant merely for the purpose of vexing or injuring the plaintiff, and resulting in damage to his or her personal rights."  *Weststar Mortgage Corp. v. Jackson*, 133 N.M. 114, 120, 61 P.3d 823, 829 (N.M. 2002) (internal quotation marks and citations omitted).  The tort of malicious abuse of process must nonetheless be construed narrowly to protect the right of access to the courts.  *DeVaney*, 953 P.2d at 284.  The following are the elements of malicious abuse of process:

> (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages.

*Id.* at 283.  The improper act, as required by the second element, need not occur subsequent to the filing of the complaint, and can precede the filing of the complaint or be found in the complaint itself.  *Id.* at 285.  In addition, there are two methods by which a plaintiff may satisfy the second element of the tort: (1) demonstrating that the defendant filed the action against the plaintiff without probable cause, which must be manifest; or (2) showing some "irregularity or impropriety suggesting extortion, delay, or harassment" on the part of the defendant that indicates the wrongful use of proceedings.  *Id.* at 285-87.

### b.      Liability of Defendant Officers

As discussed above, there is no evidence linking any of the Defendant Officers to Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's arrests or eventual prosecutions.  The Court

concludes that no reasonable jury could find that the Defendant Officers caused the malicious

abuse of process alleged by these three Plaintiffs.  Therefore, the Defendant Officers are immune

from suit on this claim, and the Court will grant Defendants' MPSJ No. II as to the Count III

claims of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner against the Defendant Officers.

### c.        Liability of Defendant Gonzales

Analysis of Defendant Gonzales' potential liability for this claim is substantively identical

to that of his liability for Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's Section 1983

malicious prosecution claims.  The Court determined earlier that these Plaintiffs have satisfied

their burden of demonstrating that Defendant Gonzales: (1) participated or acquiesced in the

arrests and booking of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner; (2) lacked probable

cause to arrest these three Plaintiffs; and (3) may have harbored an intent to interfere with

Plaintiffs' First Amendment rights.  This evidence is also sufficient to satisfy the first three

elements of the malicious abuse of process tort claim.  Defendant Gonzales does not contend that

the fourth element of the claim, damages, has not been met.

Unlike a Section 1983 malicious prosecution claim, the termination of the criminal action

in favor of the accused is not an element of New Mexico's tort of malicious abuse of process.

*DeVaney*, 953 P.2d at 286.  Instead, the New Mexico Supreme Court has held that an

unfavorable termination is conclusive evidence of the existence of probable cause.  *Id.*  Thus, New

Mexico allows a defendant to use evidence of an unfavorable termination to rebut a plaintiff's

assertion concerning the lack of probable cause.  *See id.* at 286-87.

Although the Court found that Plaintiffs Doyon and Michael Kisner's agreements to

attend alternative sentencing programs in exchange for the dismissal of the charges against them

106

did not constitute terminations in their favor, the Court nevertheless concludes that these agreements do not thereby constitute unfavorable terminations of the charges brought against them that are conclusive evidence of the existence of probable cause to arrest.  Plaintiffs Doyon and Michael Kisner did not plead guilty to and were not convicted of any charges.  Because the dismissals of the charges against them were not adjudicative of either innocence or of guilt, the terminations were neither favorable nor unfavorable.  *Cf. Hollender v. Trump Village Co-op., Inc.*, 448 N.E.2d 432, 435 (N.Y. 1983) (adjournment in contemplation of dismissal was as unadjudicative of innocence as of guilt).  Consequently, Plaintiffs Doyon and Michael Kisner may proceed with their malicious abuse of process tort claims where they could not with their Section 1983 malicious prosecution claims.  Because Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner have provided evidence to support each element of their state law malicious abuse of process tort claims, Defendant Gonzales is not entitled to summary judgment on these claims.  Therefore, the Court denies Defendant Gonzales' MSJ as to the Count III claims of Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner against Defendant Gonzales.

**IT IS THEREFORE ORDERED** that:

I.     Defendants' Motion for Partial Summary Judgment No. II is **GRANTED** in part as to:

1)     Count I: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for False
       Imprisonment against the Defendant Officers;

2)     Count II: All named Plaintiffs' claims for Battery against Defendant Officers
       Schultz, DeFrates, Fox, Nicholas Gonzales, Magetteri, Montoya, O'Connell,
       Padilla, and Perdue;

3)     Count III: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for
       Malicious Abuse of Process against the Defendant Officers;

4)     Count IV: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for
       Wrongful Seizure and Arrest under 42 U.S.C. § 1983 against the Defendant
       Officers;

5)     Count V: All named Plaintiffs' claims for Use of Excessive Force under 42 U.S.C.
       § 1983 against Defendant Officers Schultz, DeFrates, Fox, Nicholas Gonzales,
       Hancock, Hill, Lopez, Magetteri, Montoya, O'Connell, Padilla, and Perdue;

6)     Count VI: All named Plaintiffs' claims for Suppression of Rights to Freedom of
       Expression and Assembly under 42 U.S.C. § 1983 against Defendant Officers
       Schultz, DeFrates, Fox, Nicholas Gonzales, Magetteri, Montoya, O'Connell, and
       Padilla;

7)     Count VII: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for
       Retaliatory Prosecution under 42 U.S.C. § 1983 against the Defendant Officers;

8)     Count VIII: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for
       Malicious Prosecution under 42 U.S.C. § 1983 against the Defendant Officers.

II.    Defendants' Motion for Partial Summary Judgment No. II is **DENIED** in part as to:

1)     Count II: Plaintiffs Buck, Chavez, Doyon, Eaton, Gilster, Haney, Alicia Kisner,
       Lisa Kisner, Michael Kisner, Santelli, Schuurman, Christina Trafton, Curtis
       Trafton, and Wechselberger's claims for Battery against Defendant Officers Fisher,
       Hancock, Hill, and Lopez;

2)     Count V: Plaintiff Chavez' claim for Use of Excessive Force under 42 U.S.C.
       § 1983 against Defendant Officer Fisher; and

3)     Count VI: All named Plaintiffs' claims for Suppression of Rights to Freedom of
       Expression and Assembly under 42 U.S.C. § 1983 against Defendant Officers
       Hancock, Hill, Lopez, Fisher, and Perdue.

III.    Defendant Gonzales' Motion for Summary Judgment is **GRANTED** in part as to:

    1)    Count V: Plaintiffs Silva-Banuelos, Buck, Eaton, Gilster, Haney, Alicia Kisner, Lisa Kisner, Leckman, Santelli, Schuurman, Christina Maya Trafton, Curtis Trafton, and Wechselberger's claims for Use of Excessive Force under 42 U.S.C. § 1983 against Defendant Gonzales; and

    2)    Count VIII: Plaintiffs Doyon and Michael Kisner's claims for Malicious Prosecution under 42 U.S.C. § 1983 against Defendant Gonzales.

IV.    Defendant Gonzales' Motion for Summary Judgment is **DENIED** in part as to:

    1)    Count III: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for Malicious Abuse of Process against Defendant Gonzales;

    2)    Count IV: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for Wrongful Seizure and Arrest under 42 U.S.C. § 1983 against Defendant Gonzales;

    3)    Count V: Plaintiffs Chavez, Doyon, and Michael Kisner's claims for Use of Excessive Force under 42 U.S.C. § 1983 against Defendant Gonzales;

    4)    Count VI: All named Plaintiffs' claims for Suppression of Rights to Freedom of Expression and Assembly under 42 U.S.C. § 1983 against Defendant Gonzales;

    5)    Count VII: Plaintiffs Silva-Banuelos, Doyon, and Michael Kisner's claims for Retaliatory Prosecution under 42 U.S.C. § 1983 against Defendant Gonzales;

    6)    Count VIII: Plaintiff Silva-Banuelos' claim for Malicious Prosecution under 42 U.S.C. § 1983 against Defendant Gonzales.

V.    The Court reserves ruling on Defendant Gonzales' Motion for Summary Judgment on Plaintiffs'Count IX: All named Plaintiffs' claim for Supervisory Liability and Municipal Liability for Violations of Constitutional Rights under 42 U.S.C. § 1983 against Defendant Gonzales.

VI.    Plaintiffs' 42 U.S.C. § 1983 claims brought against Defendant Gonzales in his official capacity will be **DISMISSED**.

VII.    Plaintiffs' Motion for Partial Summary Judgment No. I is **DENIED**.

VIII.    Plaintiffs' cursory request for summary judgment is **DENIED**.


_____

SENIOR UNITED STATES DISTRICT JUDGE