## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LYNN BUCK, ALMA ROSA SILVA-BANUELOS,
CAMILLE CHAVEZ, DENIS DOYON, LORI EATON,
LUCY GILSTER (by her next best friend, JENNIE LUSK),
BRIAN HANEY, ALICIA KISNER (by her next best
friend, LISA KISNER), LISA KISNER, MICHAEL KISNER,
LANE LECKMAN, MARIA SANTELLI, SUSAN SCHUURMAN,
CHRISTINA MAYA TRAFTON, CURTIS TRAFTON, and
NICK WECHSELBERGER,

      Plaintiffs,

vs.                                                      Civ. No. 04-1000 JP/DJS

CITY OF ALBUQUERQUE; MAYOR MARTIN CHAVEZ,
in his individual capacity; DEPUTY CHIEF OF POLICE RAY
SCHULTZ, in his individual capacity; CAPTAIN JOHN
GONZALES, in his official and individual capacity,
ALBUQUERQUE POLICE OFFICERS RAYMOND DeFRATES,
MICHAEL FISHER, JAMES LEROY FOX, NICHOLAS GONZALES,
ALLEN S. HANCOCK, SGT. STEVEN HILL, CHARLES LOPEZ,
DANIEL S. MAGETTERI, JAMES MONTOYA, SGT. SHAWN
O'CONNELL, PABLO A. PADILLA, and JAMES PERDUE, in
their individual capacities,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

      Defendants[1] City of Albuquerque, Mayor Martin Chavez, Nick Bakas, Gilbert Gallegos,

and Ray Schultz filed a Motion for Partial Summary Judgment No. III: Dismissal of Plaintiffs'

Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, Supervisory

Liability, Injunctive Relief, and *Respondeat Superior* Claims (Doc No. 109) ("Defendants' MPSJ

No. III"). Defendant Captain John Gonzales ("Defendant Gonzales") filed a separate Motion for

---

      [1] Defendants Nick Bakas and Gilbert Gallegos are no longer parties to this motion, having been dismissed from the case by this Court's July 7, 2006 Order (Doc. No. 172).

Summary Judgment (Doc. No. 113) ("Defendant Gonzales' MSJ").  Because Defendant Gonzales

had deferred to Defendants City of Albuquerque, Chavez, and Schultz to address his status as a

policymaker, Mem. in Supp. of Def. Gonzales' MSJ (Doc. No. 114) at 34, the Court reserved

ruling on Plaintiffs' municipal liability claims against Defendant Gonzales in Count IX of their

First Amended Complaint.  *See* Memorandum Opinion and Order, filed April 11, 2007 (Doc. No.

204) at 100.  Having considered the briefs and the evidence in the record, the Court concludes

that Defendants' MPSJ No. III should be granted in part and denied in part as consistent with this

opinion, and that Defendant Gonzales' MSJ should be granted in part.


I.      **INTRODUCTION**

        This case arises out of a March 20, 2003 political demonstration which was organized to

protest the invasion of Iraq.  The sixteen plaintiffs attended the anti-war demonstration which

began at the University of New Mexico ("UNM") Bookstore in Albuquerque, New Mexico.

Plaintiffs allege that their federal constitutional and state law rights were violated in the course of

the Albuquerque Police Department's ("APD") response to the protest.  Defendants Officer

Raymond DeFrates, Officer Michael Fisher, Officer James Leroy Fox, Officer Nicholas Gonzales,

Officer Allen S. Hancock, Sgt. Steven Hill, Officer Charles Lopez, Officer Daniel Mageterri,

Officer James Montoya, Sgt. Shawn O'Connell, Officer Pablo Padilla, Officer James Perdue

(collectively, "Defendant Officers"), Defendant Deputy Chief of Police Ray Schultz, and

Defendant Gonzales were part of the APD's response to the anti-war protest.

        In Count IX of their First Amended Complaint, Plaintiffs assert their claims for

"Supervisory Liability and Municipal Liability for Violations of Constitutional Rights under 42

U.S.C. § 1983" against the City of Albuquerque and Defendants Chavez and Schultz (collectively,

the "City Defendants"), and Defendant Gonzales.  The City Defendants and Defendant Gonzales

seek summary judgment on these claims.


**II.     FACTUAL BACKGROUND**

The facts of this case are set out in full in the Court's April 11, 2007 Memorandum

Opinion and Order and need not be recited at length in this opinion.  The following facts are

central to Plaintiffs' supervisory and municipal claims and have been established by admissible

evidence.[2]

**A.      Training**

The APD maintains a policy regarding its officers' use of force.  *See* Defs.' MPSJ No. III

(Doc. No. 109), Ex. K.  Prior to working as non-probationary officers, all of the Defendant

Officers received training on this policy.  Defs.' MPSJ No. I (Doc. No. 107), Ex. A at ¶ 103;

Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶ 104 and Ex. B. at ¶ 109.  In addition, the APD

provided the Defendant Officers with specialized training regarding the limits placed on their

authority by the First and Fourth Amendments.  Defs.' MPSJ No. I (Doc. No. 107), Ex. A at

¶ 104; Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶ 105 and Ex. B. at ¶ 110.

A number of APD divisions and certain APD officers also received additional specialized

training.  In October 2001, Emergency Response Team ("ERT") officers attended a class on field

---

[2] These background facts are taken from the undisputed material facts set forth in Defendants' Motion for Partial Summary Judgment No. I ("Defendants' MPSJ No. I"), Defendants' Motion for Partial Summary Judgment No. II ("Defendants' MPSJ No. II"), Defendants' MPSJ No. III, Defendant Gonzales' MSJ, the parties' briefs responding to each others' undisputed material facts, and the exhibits attached to the parties' motions and other briefs.

force concepts and riot control.  Pls.' Undisputed Fact 18.[3]  In response to a number of protests that took place in Albuquerque during the build up to the Iraq war, officers in the ERT, the Special Weapons and Tactics ("SWAT") team, the K-9 Unit, the horse-mounted unit, and the Special Investigations Bureau participated in crowd control-related training.  Ray Schultz Dep. at 20-21 (Pls.' Ex. 47).[4]  Non-defendant officers Gregory Cunningham and Danny Garcia, who were part of the APD's response to the anti-war protest, received on-the-job training in crowd surveillance through their dignitary protection work with the Secret Service.  Gregory Cunningham Dep. at 125-27 (Mem. in Supp. of Def. Gonzales' MSJ (Doc. No. 114), Ex. E); Danny Garcia Dep. at 32 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. F).  Officer Cunningham received further training in crowd surveillance through a class given by the Navy Seals. Cunningham Dep. at 125-27 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. E).  Defendant Officer Hancock received SWAT and ERT training in crowd control.  Allen Hancock Dep. at 33 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. C).

###    B.    The March 20, 2003 Demonstration

Prior to March 20, 2003 the city administration did not give the APD any directives on how to handle the demonstration.  John Gonzales Dep. at 66-70 (Pls.' Ex. 29).  As a result, there was confusion within the APD about the management of the demonstration and the overall plan for the response.  Robert Huntsman Dep. at 9:12-20 (Pls.' Ex. 38).  Though the APD has Standard Operating Procedures ("SOP's") which act as guidelines for officers to follow, not all of

----

[3] The Court's references to "Pls.' Undisputed Fact __" refer to undisputed facts set forth in Plaintiffs' Statement of Undisputed Material Facts (Doc. No. 134).

[4] The Court's references to "Pls. Ex. __" refer to the consolidated exhibits contained in Plaintiffs' Exhibits in Support of Pleadings Doc: 125, 126, 127, 128, 129, 130 (Doc No. 133).

the SOP's were up to date.  Gonzales Dep. at 24 (Pls.' Ex. 29).

At the time of the demonstration, Defendant Schultz was Defendant Gonzales' direct supervisor.  Pls.' Undisputed Fact 13, 184.  Defendants Schultz and Gonzales briefed then-Chief of Police Gilbert Gallegos on their plans for handling the demonstration.  Gilbert Gallegos Dep. at 50-52 (Pls.' Ex. 28).  Chief Gallegos understood that APD officers had agreed on a plan to close a lane of Central Avenue for the protest, *id.* at 54-56, and approved of Defendants Gonzales and Schultz's plan.  Pls.' Undisputed Fact 185.

At the time of the protest, Defendant Gonzales was the captain of the Metro Division of the police, which included the air unit, bomb squad, SWAT team, K-9 division, horse unit, and traffic-related operations.  Pls.' Undisputed Fact 65.  On March 20, 2003 Defendant Gonzales was the incident commander in charge of the APD's response to the demonstration.  Gonzales Dep. at 22 (Pls.' Ex. 29); Huntsman Dep. at 17 (Pls.' Ex. 38).  In that position, Defendant Gonzales was the point of contact and immediate supervisor of all police officers assigned to duty at the demonstration, *see* Gonzales Dep. at 22, 116 (Pls.' Ex. 29), and was in control of all decisions made and acted upon.  Pls.' Undisputed Fact 96.  Defendant Gonzales did not want the officers under his authority to take independent action.  Gonzales Dep. at 104 (Pls.' Ex. 29).  They were to use force only by direction from a superior officer or if there was fear for the safety of another person.  *Id.*  Generally, in regard to any large-scale demonstration, a decision to use force is made by the supervisor.  *See* Schultz Dep. at 67 (Pls.' Ex. 48).  Officers usually do not use force or make arrests unless they are directed to do so by a superior.  Pls.' Undisputed Fact 216.

Most of the officers at the demonstration were equipped with riot gear (gas masks,

external vests, riot batons) and did not wear name badges, making it difficult to identify them. *See* Schultz Dep. at 45-47 (Pls.' Ex. 48); Pls.' Undisputed Fact 112; Defs.' MPSJ No. I (Doc. No. 107), Ex. A-10 at 3.  At the time of the protest, officers were not required to wear name plates or designators.  Pls.' Undisputed Fact 209.  After the protest, the APD instituted a new policy requiring all officers to display name tags even when dressed in riot gear.  Schultz Dep. at 46 (Pls.' Ex. 48).

At approximately 5:00 p.m. on March 20, 2003, the demonstration commenced in front of the UNM Bookstore located at the intersection of Central and Cornell Avenues.  Defs.' Undisputed Fact 2.[5]  When approximately 150-200 protestors had gathered at the UNM Bookstore, the police decided to close Central Avenue to traffic.  *See* Pls.' Ex. 71 at 14-15.  As the protestors marched on the streets, Defendant Gonzales followed the crowd by car as well as on foot.  Gonzales Dep. at 128 (Pls.' Ex. 29).  He kept track of the protestors' activities by maintaining communication with other officers, including officers in the crowd and the horse-mounted unit.  *See id.*

As part of the APD's attempts to direct the procession, Defendant Gonzales authorized the use of chemical munitions, pepper ball rounds, sting balls, and beanbag rounds against protestors who did not comply with the APD's commands.  Pls.' Ex. 71 at 34-36, 40-41, 43, 51; Pls.' Ex. 72 at 4; Gonzales Dep. at 158 (Pls.' Ex. 29).  After giving a verbal warning that chemical agents would be used against them, Defendant Gonzales personally dispensed pepper spray to move the crowd.  Gonzales Dep. at 144, 183 (Pls.' Ex. 29).  In addition, Defendant Gonzales

---

[5] The Court's references to "Defs.' Undisputed Fact __" refer to undisputed facts set forth in the Memorandum in Support of Defendant Gonzales' MSJ (Doc. No. 114).

ordered the arrest and removal of provocateurs in the crowd who had been identified by officers in the horse-mounted unit.  Pls.' Undisputed Facts 106-07.  Likewise, Defendant Gonzales ordered the confiscation of protestors' drums because the drums were drowning out communication.  Gonzales Dep. at 170-71 (Pls.' Ex. 29); Pls.' Ex. 72 at 4.  He told his officers to arrest the protestors with drums if need be.  Gonzales Dep. at 171 (Pls.' Ex. 29).

        After the march concluded near the UNM Bookstore, APD officers gave orders over a public address system to clear the streets.  Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶ 92. Defendant Gonzales personally participated in deploying two volleys of rubber coated tear gas canisters into the crowd in order to disperse the protestors.  Gonzales Dep. at 176-77 (Pls.' Ex. 29); Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶¶ 94-95.  Besides ordering officers to fire additional non-lethal ammunition rounds at the crowd, Defendant Gonzales also authorized the use of force to "sweep the people from the sidewalk of the Frontier [restaurant]."  Pls.' Ex. 72 at 12-13.  By 7:45 p.m., the crowd had largely dispersed and the protest came to a close.  Defs.' Undisputed Fact 2.

        Though Defendant Schultz was present at the March 20, 2003 protest, he did not arrive until some time after the march had begun.  Schultz Dep. at 13-14, 26-27 (Pls.' Ex. 48).  His role that evening was as a senior advisor.  *Id.* at 83.  He spoke with Defendant Gonzales about the events that occurred during the course of the demonstration and was involved in the decision-making behind the APD's response.  *Id.* at 83-84; Pls.' Undisputed Fact 54.  During the protest, Defendant Schultz updated Chief Gallegos on current developments.  Pls.' Undisputed Fact 53. Chief Gallegos spoke to Defendant Gonzales during the demonstration and monitored his actions during most of the protest from his police car.  Pls.' Undisputed Fact 190, 195.  Had Chief

Gallegos disagreed with anything that Defendant Gonzales did as incident commander that evening, Chief Gallegos could have exercised his authority to stop Defendant Gonzales.  Pls.' Undisputed Fact 191.  Chief Gallegos called Nick Bakas to inform him about the initial stages of the demonstration.  Bakas Dep. at 47-50 (Pls.' Ex. 19).  Bakas in turn called Defendant Chavez to report that the demonstration had begun.  *Id*. at 53.  Later, Chief Gallegos briefed Defendant Chavez about what had occurred during the demonstration.  Gallegos Dep. at 132 (Pls.' Ex. 28).  Defendant Chavez did not take issue with how the APD had handled the protest.  *Id.*

C.     **The City's Post-Demonstration "Rally to Support our Troops"**

On March 28, 2003 the City of Albuquerque ("Defendant City") sponsored a "Rally to Support Our Troops" at the Civic Plaza in downtown Albuquerque.  Aff. of Frank Zoretich at 1 (Pls.' Ex. 56).  City Councilor Sally Mayer suggested sponsoring the rally, which was unanimously approved by the entire City Council.  *Id.*  As part of the event, the City handed out hundreds of hand-held American flags and the right haunch of each of the police horses on duty bore the shaved letters "USA."  *Id.* at 1-2.  When Defendant Chavez addressed the attendees, he stated that the City had been accused of showing favoritism by providing access to the City-owned Civic Plaza for the rally after forbidding antiwar protestors from stepping onto Central Avenue near UNM.  *Id.*  Defendant Chavez went on to state, "There absolutely is favoritism here today.  Favoritism to honor the men and women who have given their lives for us."  *Id.* Nevertheless, Defendant Chavez said that he was speaking neither in favor of nor against the Iraq war.  Pls.' Ex. 64 at 2.

Six anti-war protestors arrived at Civic Plaza approximately half an hour after the rally had begun.  Zoretich Aff. at 2 (Pls.' Ex. 56); Pls.' Ex. 64 at 2.  Displaying signs that read "Dissent is

Patriotic" and "Support Our Troops -- Not the War," the protestors attempted to move toward the edge of the bandstand, but were pushed back by a group of veterans.  Pls.' Ex. 64 at 2.  Nick Bakas and several police officers placed themselves between the protestors and the rally participants and escorted the protestors back toward the edge of the plaza.  *Id.*

## III.    JURISDICTION

Defendant Officers Michael Fisher, Allen S. Hancock, Steven Hill, Charles Lopez, and James Perdue, along with Defendant Gonzales, filed notices of appeal following the Court's denial of these Defendants' qualified immunity defenses in its April 11, 2007 Memorandum Opinion and Order.  In general, following a timely notice of appeal in accordance with Fed. R. App. P. 3, the case is transferred from the district court to the court of appeals, thus divesting the district court of jurisdiction.  *Stewart v. Donges,* 915 F.2d 572, 577 (10th Cir. 1990); *Garcia v. Burlington Northern R. Co.*, 818 F.2d 713, 721 (10th Cir. 1987).  However, when an interlocutory appeal is taken, the district court retains jurisdiction to proceed with matters not involved in that appeal.  *Garcia,* 818 F.2d at 721.  Because the qualified immunity questions now on appeal do not encompass the issues raised in Defendants' MPSJ No. III, and because the Tenth Circuit's ultimate disposition on the qualified immunity issues will not impact the Court's rulings on Defendants' MPSJ No. III or the reserved issue in Defendant Gonzales' MSJ, the Court has retained jurisdiction over Plaintiffs' municipal and supervisory claims.

## IV.    STANDARD: Motion for Summary Judgment

Summary judgment is appropriate only if there is no genuine issue as to any material fact

9

and the moving party is entitled to judgment as a matter of law.[6]  *Santana v. City and County of Denver*, -- F.3d --, 2007 WL 1502264, *2 (10th Cir. 2007) (citing Fed. R. Civ. P. 56(c)).  The court must examine the record and draw reasonable inferences therefrom in the light most favorable to the non-moving party.  *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000); *Bisbee v. Bey*, 39 F.3d 1096, 1100 (10th Cir. 1994).  Summary judgment is proper where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).


## V.  DISCUSSION

In their MPSJ No. III, the City Defendants assert that they are entitled to summary judgment on Plaintiffs' municipal liability claims, failure to train claims, supervisory liability claims, and claims for injunctive relief.  In Defendant Gonzales' MSJ, Defendant Gonzales requests that the Court grant his motion as to Plaintiffs' claims that his actions created municipal liability.

---

[6] In their response brief, Plaintiffs request that the Court *sua sponte* grant them summary judgment on their municipal and supervisory liability claims even though they did not file a formal cross-motion.  Pls.' Response at 13 n.5.  While "a *sua sponte* grant of summary judgment although not encouraged, is permissible, provided that the losing party was put on notice to come forward with all its evidence," *Holmes v. Utah, Dept. of Workforce Services*, 483 F.3d 1057, 1067 (10th Cir. 2007) (citation omitted), the Court concludes that the record presents an insufficient basis on which to grant Plaintiffs summary judgment.  Therefore, the Court denies Plaintiffs' request for a *sua sponte* grant of summary judgment.

A.      **Federal Constitutional Claims under 42 U.S.C. § 1983**

1.      **Claims Concerning Municipal Policies, Customs, Patterns, and Practices**

In Count IX of their First Amended Complaint, Plaintiffs claim that Defendant City established an official policy, followed an unwritten custom, or knew of a pattern or practice which allegedly caused the Defendant Officers to violate Plaintiffs' constitutional rights.  The City Defendants and Defendant Gonzales contend that Plaintiffs have not put forth any evidence showing any such policy or custom.

In *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691 (1978), the Supreme Court held that municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory for merely employing a tortfeasor.  Rather, municipalities are subject to Section 1983 liability only for their official policies or customs, the execution of which causes a plaintiff's injuries.  *Id*. at 694; *Johnson v. Johnson*, 466 F.3d 1213, 1215 (10th Cir. 2006); *see also Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405 (1997) (the municipal action must be "the moving force behind the injury of which the plaintiff complains").  A municipal policy can take the form of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers," whereas a municipal custom includes "persistent and widespread . . . practices of . . . officials."  *Monell*, 436 U.S. at 690-91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).  However, only those municipal officials who have "final policymaking authority" may by their actions subject a municipality to Section 1983 liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  Though the responsibility for making policy may be delegated to officials

11

whose acts in turn become the acts of the government, the mere exercise of discretion by an official is not sufficient, by itself, to give rise to municipal liability. *Pembaur*, 475 U.S. at 480-83. Only acts which the municipality has officially sanctioned or ordered can therefore generate liability.

### a.   Official Pre-existing Policy

While Plaintiffs have not directly asserted that the APD's official policies in effect during the March 20, 2003 demonstration provide a basis for Defendant City's Section 1983 liability, they have alluded to certain facts to that effect. Even when seen in the light most favorable to Plaintiffs, however, these facts do not bolster Plaintiffs' claims. As a preliminary matter, the City Defendants have submitted the APD's written use of force policy which covers the primary claims in this case, and which Plaintiffs do not contest as failing to pass constitutional muster. *See* Defendants' MPSJ No. III, Ex. K; Plaintiffs' Rebuttal to Defendants' Statement of Undisputed Facts in Support of MPSJ No. III, Docket No. 109 at ¶ 11 (Doc. No. 134). Nonetheless, Plaintiffs continue to assert that the APD maintained a policy of violating protestors' constitutional rights. The only evidence proffered by Plaintiffs comes in the form of testimony from their police procedures expert Lou Reiter. Mr. Reiter, however, states repeatedly that he only analyzed the facts in this case, and did not look at the APD's practices and patterns of conduct over time. Lou Reiter Dep. at 91 (Defs.' MPSJ No. III, Ex. J). Moreover, though Mr. Reiter opined that he believed that the Defendant Officers and Defendant Gonzales did not adhere to the APD's written policies and procedures, he confirmed his belief that those policies and procedures "are consistent with generally accepted practices in law enforcement." *Id*. at 94. Given this admission, there is no evidence in the record

showing that any of the APD's official policies provide a basis for the City's Section 1983 liability.[7]

      **b.**      **Official Policy Promulgated During the March 20, 2003 Demonstration**

The main thrust of Plaintiffs' argument lies in the contention that Defendant City's Section 1983 liability may be predicated on official policy promulgated during the course of the March 20, 2003 demonstration. Underlying this contention is Plaintiffs' assertion that Defendant Chavez, as the Mayor of the City of Albuquerque, possesses final policymaking authority with regard to the APD, and that he or his designated subordinates adopted policies which in turn became the official policies of Defendant City. Plaintiffs extend two theories. First, they allege that Defendant Chavez' policymaking authority was delegated to Defendant Gonzales, thereby making Defendant Gonzales' actions the official policies of the City. Second, they contend that Defendant Chavez ratified Defendant Gonzales' actions and adopted Defendant Gonzales' actions as the policies of the City. Neither of these theories is persuasive.

As a starting point to this analysis, it bears mentioning that Defendant Gonzales was appointed the *incident* commander for the demonstration, Gonzales Dep. at 22 (Pls.' Ex. 29), and Plaintiffs have not presented any evidence showing that Defendant Gonzales was authorized to establish policies for the APD in general. Indeed, Plaintiffs' own evidence is to the contrary. Mr. Reiter testified in his deposition that Defendant Gonzales' actions at the demonstration were a departure from the APD's official policies. *See* Reiter Dep. at 94 (Defs.' MPSJ No. III, Ex. J). Thus, according to Plaintiffs' own expert, Defendant Gonzales' actions were by definition

---

[7] Plaintiffs also alleged that the APD had a policy of not requiring ERT and SWAT officers to wear name plates or designators in order to prevent their identification. Mr. Reiter again testified that he was unaware of any such decision, and that he did not have an opinion on whether the APD made a conscious decision to obscure these officers' identification. Reiter Dep. at 90 (Defs.' MPSJ No. III, Ex. J).

discretionary since they represented a divergence from the policies established by the City's final policymakers. *See Praprotnik*, 485 U.S. at 127 ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality"). Because Defendant Gonzales was only authorized to exercise his discretion in responding to the March 20, 2003 demonstration, his actions could not establish municipal liability. *See Pembaur*, 475 U.S. at 481-82.

Furthermore, Plaintiffs have not presented any evidence showing that Defendant Chavez delegated policymaking authority to Defendant Gonzales. At most, Defendant Chavez seems to have agreed with Defendant Gonzales' handling of the demonstration, but "[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Praprotnik*, 485 U.S. at 130. The Court concludes that Defendant Chavez did not delegate his final policymaking authority to Defendant Gonzales and that Defendant Gonzales' actions therefore cannot be attributed to the City.

Plaintiffs' ratification argument fails on similar grounds. While it is true that municipal liability may flow from a final policymaking official's adoption of a subordinate's conduct, *see e.g., Melton v. City of Oklahoma City*, 879 F.2d 706, 724-25 (10th Cir. 1989), Plaintiffs have not put forth the requisite showing that Defendant Chavez ratified Defendant Gonzales' conduct. "The final policymaker must not only approve the decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation." *Dempsey v. City of Baldwin*, 143 F. App'x. 976, 986 (10th Cir. 2005) (citing *Paprotnik*). As evidence of the ratification, Plaintiffs cite an excerpt from Defendant Chavez' deposition in which he stated that the APD "did a good job" under the circumstances, Martin Chavez Dep. at 23 (Pls.

14

Ex. 21), and present an affidavit from another witness, Eric Sirotkin, in which Mr. Sirotkin states

that in response to a reporter's question at a press conference, Defendant Chavez said that he

supported the actions the police had taken.  Sirotkin Aff. at ¶ 32 (Pls.' Ex. 53).  These generic

affirmations of support for the APD fall short of actual ratification, as Defendant Chavez can not

be said to have specifically approved of Defendant Gonzales' decisions or adopted Defendant

Gonzales' basis for his actions.  *See Praprotnik*, 485 U.S. at 130 (ratification of a subordinate's

action requires the express approval of a particular decision made by a subordinate).

       Even if the Court assumes that Defendant Chavez acquiesced to Defendant Gonzales'

actions, "mere acquiescence in a single discretionary decision by a subordinate is not sufficient to

show ratification." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) (citing

*Paprotnik*).  To find otherwise would subject municipalities to liability for all of the discretionary

decisions of their employees, leading to a result indistinguishable from *respondeat superior*

liability. *Id.*; *see also Milam v. City of San Antonio*, 113 F. App'x. 622, 626-27 (5th Cir. 2004)

("It is important to recognize that the ratification theory, in whatever context it arises, is

necessarily cabined in several ways . . . Such limitations on municipal liability are necessary to

prevent the ratification theory from becoming a theory of *respondeat superior*, which theory

*Monell* does not countenance") (quoting *Praprotnik*); *Gillette v. Delmore*, 979 F.2d 1342, 1348

(9th Cir. 1992) ("[t]o hold cities liable under section 1983 whenever policymakers fail to overrule

the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior*

liability into section 1983 law . . .").  As mentioned above, merely going along with a subordinate's

decisions or failing to investigate the basis of a subordinate's discretionary decisions does not

necessarily qualify as ratification of such decisions.  *Praprotnik*, 485 U.S. at 130.  Thus, because

15

Defendant Chavez only spoke generally about the APD's actions and did not expressly approve of Defendant Gonzales' decisions, he did not ratify any of the alleged violations and make them the acts of the City.

In the alternative, Plaintiffs argue that Defendant Chavez' ratification of Defendant Gonzales' actions may be demonstrated by Defendant Chavez' failure to take disciplinary action against the Defendant Officers. This contention is unavailing. As discussed earlier, failure to investigate the basis of a subordinate's discretionary decisions does not necessarily qualify as ratification. *Melton*, 879 F.2d at 724-25. In addition, the Tenth Circuit stated in *Butler v. City of Norman* that it "cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under *Monell*." *Butler*, 992 F.2d 1053, 1056 (10th Cir. 1993). Despite information that at least eight other anti-war demonstrations had taken place in Albuquerque within six months of the March 20, 2003 demonstration, Plaintiffs provided no evidence that the APD violated any protestors' rights at these other demonstrations. Pls.' Undisputed Fact 254. Thus, the incidents which are alleged to have occurred on the night of the demonstration are not sufficient to impose liability on the City unless there is proof that the incident "was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Butler*, 992 F.2d at 1055 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)). Here, there is no such proof. Because "an isolated incident even coupled with a failure to discipline is inadequate to support a finding of an affirmative link" between the actions of the Defendant Officers and Defendant Gonzales on the one hand, and Defendant Chavez on the other, the Court concludes that the evidence, even when seen in the light most favorable to Plaintiffs, does not suggest that there is an affirmative link between Defendant

16

Chavez and the alleged violations.  *Butler*, 992 F.2d at 1056.  Therefore, there can be no municipal

liability on the part of the City.  Indeed, even the authority cited by Plaintiffs requires the same

conclusion.  *See Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980) ("a policy cannot be inferred

from the failure of those in charge to discipline a single police officer for a single incident of

illegality . . . absent more evidence of supervisory indifference, such as acquiescence in a prior

pattern of conduct, a policy could not ordinarily be inferred from a single incident of illegality such

as a first arrest without probable cause or with excessive use of force").

### c.      Municipal Custom

Plaintiffs have also argued that the APD maintains a custom of violating protestors' rights.

In order to prove the existence of such a practice, Plaintiffs must demonstrate that the APD has

engaged in a pattern of violating constitutional rights that is widespread and "so permanent and

well settled as to constitute a 'custom or usage' with the force of law."  *Praprotnik*, 485 U.S. at

127 (quoting *Adickes*, 398 U.S. at 167-168).  As mentioned previously, Plaintiffs have not

proffered any evidence of other instances in which the APD violated the constitutional rights of

protestors.  Without such evidence, there can be no municipal custom.  *See e.g., Barney v.*

*Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) (without evidence of prior acts of misconduct, a

pattern of violations did not exist to put the county on notice that its training program was

deficient); *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (an official without prior

knowledge of or involvement in the violations could not be the source of municipal liability).

Because Plaintiffs failed to show that the City had an existing policy or custom of violating

protestors' rights or adopted such a policy on the evening of the demonstration, and because

Defendant Gonzales is not a final policymaker, Plaintiffs have not established a basis for municipal

liability under Section 1983 and Defendants' MPSJ No. III and Defendant Gonzales' MSJ will be granted as to these claims.

### 2.   Claims Concerning the APD's Failure to Train its Officers

All of the Plaintiffs have alleged that the City failed to properly and adequately train its police force in how to handle demonstrations, resulting in constitutional violations by the Defendant Officers at the March 20, 2003 demonstration.  Defendant City asserts that it is entitled to summary judgment because the Defendant Officers' training was not deliberately indifferent to and did not cause the violation of Plaintiffs' constitutional rights.

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Whether the policymakers of the city can reasonably be said to have been deliberately indifferent to the need for additional training can be demonstrated by showing that the need for more or different training was obvious and that the inadequacy would likely result in the violation of constitutional rights.  *Id.* at 390; *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Harris*).  In such a case, "the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."  *Harris*, 489 U.S. at 390.

To establish a city's liability under 42 U.S.C. § 1983 for the inadequate training of its police officers, a plaintiff must show that:

(1) the officers exceeded constitutional limitations . . .;
(2) the [constitutional deprivation] arose under circumstances that constitute a usual and recurring situation with which police officers must deal;

(3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact; and
(4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen v. Muskogee, Okl.*, 119 F.3d 837, 841-42 (10th Cir. 1997) (citation omitted).        While "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability," Plaintiffs have not presented sufficient evidence of the City's failure to train its police officers to survive summary judgment. *Id*. at 842 (citing *Board of County Com'rs v. Brown*, 520 U.S. 397 (1997)).  Because the third of the *Allen* elements is not satisfied in this case, the Court limits its analysis to this dispositive factor.

The evidence in the record concerning the training received by the Defendant Officers is uniformly supportive of Defendants, even when seen in the light most favorable to Plaintiffs.  All of the Defendant Officers were trained in the APD's policies regarding the use of force and the limits placed on their authority by the First and Fourth Amendments.  Defs.' MPSJ No. I (Doc. No. 107), Ex. A at ¶¶ 103-104; Defs.' MPSJ No. II (Doc. No. 108), Ex. A at ¶¶ 104-105 and Ex. B. at ¶ 109-110.  Moreover, a number of APD divisions including the ERT, the SWAT team, the K-9 Unit, the horse-mounted unit, and the Special Investigations Bureau, all received specialized training in addition to crowd control-related training.  *See* Pls.' Undisputed Fact 18; Schultz Dep. at 20-21 (Pls.' Ex. 47).  Plaintiffs' unsupported assertion that "the City did nothing to train the officers" lacks merit, as does their contention that the City failed in its discovery obligations to produce any materials related to the Defendant Officers' training.  Pls.' Response at 24.  As the Defendant Officers have noted, they offered to "make available for inspection and copying their

basic academy and advance training class records" in their Fed. R. Civ. P. 26 initial disclosures, Defs.' Response to Pls.' Statement of Undisputed Material Facts, Ex. G at ¶ 65 (Doc. No 150), and identified the relevant training courses each of the Defendant Officers had received, along with another offer to schedule a time for reviewing the records.  *See e.g., id.*, Ex. H (Doc. No 150). Plaintiffs did not avail themselves of this opportunity to review the Defendant Officers' training records despite learning from Defendant Officer Hancock, the single Defendant Officer who was deposed, that he had received SWAT and ERT training in crowd control.  Allen Hancock Dep. at 33 (Mem. in Supp. of Def. Gonzales' MSJ, Ex. C).  By not drawing these documents into the record, Plaintiffs have at best generated "some metaphysical doubt" as to the contents of the training records, but this does not create a genuine issue of material fact.  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006).  Combined with the fact that Plaintiffs' expert did not conduct an examination of the quality of the APD's training programs and stated that he could not give an opinion on the subject, Reiter Dep. at 13-14 (Defs.' MPSJ No. III, Ex. J (Doc. No. 109)), there is little, if anything, to suggest that the City failed to train the Defendant Officers in all areas relevant to Plaintiffs' claims or that the City was deliberately indifferent to the need for such training.  Accordingly, the City Defendants' MPSJ No. III will be granted as to these claims.

> ### 3.    Claims for Supervisory Liability against Defendants Chavez and Schultz

In Count IX of their First Amended Complaint, Plaintiffs contend that Defendants Chavez and Schultz are liable in their supervisory capacity for the actions of their subordinates.[8]

---

[8] The supervisory liability claims against Defendant Gonzales were addressed in the Court's April 11, 2007 Memorandum Opinion and Order.

Defendants Chavez and Schultz assert that there are no affirmative links between themselves and the alleged constitutional violations that could give rise to supervisory liability.

"Though state actors who participate in a violation in a supervisory role may incur liability, there is no concept of strict supervisor liability under section 1983. In other words, it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation." *Jenkins*, 81 F.3d at 994 (internal quotation marks and citation omitted). As with any individual defendant, the plaintiff must establish "a deliberate, intentional act by the supervisor to violate constitutional rights." *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir.1992) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)); *Winters v. Board of County Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993). "A plaintiff may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." *Jenkins*, 81 F.3d at 995 (citation omitted); *Winters,* 4 F.3d at 855.

A plaintiff may show that an affirmative link exists between the constitutional violation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise. *Holland v. Overdorff*, 268 F.3d 1179, 1187 (10th Cir. 2001). An official can also be held liable if the official set in motion a series of events that the defendant knew or reasonably should have known would cause others to violate a citizen's constitutional rights. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (citing *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)). "Because mere negligence is not enough to hold a supervisor liable under § 1983, a plaintiff must establish that the supervisor acted knowingly or with deliberate indifference that a constitutional violation would occur." *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146,

1151 (10th Cir. 2006) (internal quotations omitted).

It is undisputed that Defendant Chavez was not present at the demonstration.  Indeed, the only evidence tying Defendant Chavez to the demonstration was a single phone call from Nick Bakas to Defendant Chavez reporting that the demonstration had begun, Bakas Dep. at 53 (Pls.' Ex. 19), and a post-demonstration briefing by Chief Gallegos.  Gallegos Dep. at 132 (Pls.' Ex. 28). Seen in the light most favorable to Plaintiffs, these facts fail to establish any affirmative link between Defendant Chavez and the alleged constitutional violations.  Thus, the Court will grant Defendants' MPSJ No. III as to Plaintiffs' supervisory liability claims against Defendant Chavez.

Defendant Schultz was present at the demonstration, though he did not arrive until some time after the march had begun.  Acting as a senior advisor, Defendant Schultz spoke with Defendant Gonzales about the events that occurred during the course of the demonstration and was involved in the decision-making behind the APD's response.  Nonetheless, Plaintiffs have failed to demonstrate an affirmative link between Defendant Schultz and the alleged constitutional violations.  Plaintiffs have not presented any evidence that Defendant Schultz actively participated in or directed any of the alleged violations, and so the only question before the Court is whether Defendant Schultz had actual knowledge of any of the constitutional violations of which Plaintiffs' complain, and then acquiesced in their continuance.  Plaintiffs have argued that Defendant Schultz was aware that an officer had deployed a tear gas canister which struck a protestor in the head, and that another officer had fired a bean bag round at a different protestor.  Pls.' Undisputed Facts 38, 40.  Neither of these claims, however, is before the Court because none  of the Plaintiffs have alleged that they were involved in these incidents.  Because there is no evidence that Defendant Schultz had actual knowledge of any constitutional violations involving Plaintiffs, there is no

22

affirmative link between Defendant Schultz and Plaintiffs' alleged constitutional violations.

Similarly, any contention that Defendant Schultz failed to supervise the Defendant Officers also fails for the simple fact that nothing in the record suggests that Defendant Schultz was expected to supervise them, either directly or indirectly.  The Tenth Circuit has held that "failure to supervise is only actionable under § 1983 against a defendant who had a duty to supervise." *Serna*, 455 F.3d at 1154 (citation omitted).  Here, there is no evidence which suggests that Defendant Schultz had any duty to supervise the Defendant Officers' activities.  To the contrary, there was a separate incident commander, Defendant Gonzales, who was tasked with supervising the police officers on duty that evening.  While Defendant Schultz was Defendant Gonzales' supervisor, Plaintiffs have not shown any affirmative link between Defendant Schultz and the constitutional violations allegedly committed by Defendant Gonzales.  Plaintiffs also contend that Defendant Schultz failed to train the Defendant Officers on proper gas canister deployment, but they fail to cite any evidence that suggests Defendant Schultz was responsible for such training. There is nothing in the record that would establish that Defendant Schultz failed to perform some supervisory duty.  Thus, summary judgment is proper on this claim.  *See Serna*, 455 F.3d at 1154.

Likewise, Plaintiffs have not presented sufficient evidence to demonstrate deliberate indifference on the part of Defendant Schultz.  Deliberate indifference requires that the official "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003).  Plaintiffs must therefore point to evidence that would establish that Defendant Schultz knew he was creating a situation that involved a substantial risk of constitutional harm.  Because Plaintiffs have failed to present any such evidence and likewise did not offer any evidence that

23

Defendant Schultz had actual knowledge of a pattern or practice of constitutional abuses by his subordinates on prior occasions, there are no facts from which a jury could infer that Defendant Schultz was aware of a substantial risk of constitutional harm during the demonstration. Accordingly, summary judgment is appropriate for Defendant Schultz on Plaintiffs' Section 1983 supervisory liability claims.

### B.    State Law Claims

#### 1.    *Respondeat Superior* Claims Against Defendant City

In Counts I - III of their First Amended Complaint, Plaintiffs assert that Defendant City bears *respondeat superior* liability for the torts of the Defendant Officers and Defendant Gonzales. Defendant City contends that because *respondeat superior* liability is derivative, it is entitled to summary judgment on Plaintiffs' claims because Plaintiffs can not establish that the Defendant Officers, with the exception of Defendant Officer Fisher, caused any of the alleged torts in the underlying claims.

The New Mexico Tort Claims Act ("NMTCA") provides for *respondeat superior* liability. *Silva v. State*, 106 N.M. 472, 477, 745 P.2d 380, 385 (N.M. 1987) ("A governmental entity is not immune from liability for any tort of its employee acting within the scope of duties for which immunity is waived") (citing NMSA 1978, § 41-4-4). Nonetheless, because the government's liability in such a case is derivative, dismissal of the underlying claim against the employee will also release the employer. *See Kinetics, Inc. v. El Paso Products Co.*, 99 N.M. 22, 27, 653 P.2d 522, 527 (N.M. Ct. App. 1982). This standard, however, is complicated by the New Mexico Court of Appeals' decision in *Baer v. Regents of University of California*, 118 N.M. 685, 884 P.2d 841 (N.M. Ct. App. 1994). There, the court held that a plaintiff was not required to name or join an

employee as a defendant in a *respondeat superior* case.  The court recently reaffirmed this principle by holding that *"a named public employee is not a necessary party to a [Tort Claims Act] claim that is based on the doctrine of *respondeat superior*."*  *Lopez, Sr. v. Las Cruces Police Dept.*, 139 N.M. 730, 737, 137 P.3d 670, 678 (N.M. Ct. App. 2006); *cf. Perez v. City of Huntington Park*, 9 Cal. Rptr. 2d 258, 260 (Cal. Ct. App. 1992) (plaintiff's inability to identify which municipal employee committed the alleged tort was not necessarily fatal to his claim for *respondeat superior* liability).  Thus, regardless of whether Plaintiffs are able to trace individual liability to any particular Defendant Officer, New Mexico law allows them to pursue their tort claims against Defendant City so long as they can demonstrate that a municipal employee was responsible for an underlying tort.

While the Court granted summary judgment to the Defendant Officers on Plaintiffs' Count I false imprisonment claims and their Count III malicious prosecution claims in its April 11, 2007 Memorandum Opinion and Order, the Court's decision was based on Plaintiffs' inability to tie any of the Defendant Officers to the torts in question.  Though there was no evidence linking any particular Defendant Officer to Plaintiffs' false imprisonment or malicious prosecution claims, Plaintiffs did present evidence that some Albuquerque police officers caused these torts. Combined with the Court's denial of summary judgment to certain Defendant Officers on Plaintiffs' Count II battery claims and to Defendant Gonzales on Plaintiffs' Count III malicious prosecution claims, Plaintiffs' evidence is sufficient to support their *respondeat superior* claims in Counts I - III of their First Amended Complaint against Defendant City.  Therefore, the Court will deny Defendants' MPSJ No. III as to Plaintiffs' Counts I, II, and III claims against Defendant City.

2.        **Claims for State Law Failure to Train and Supervise**

In addition to their federal constitutional claims for failure to train and supervise, Plaintiffs have raised identical claims under state law.  Defendants Chavez and Schultz contend that there is no evidence demonstrating that their training or supervision of the Defendant Officers caused the Defendant Officers to commit any of the alleged torts.

The NMTCA does not grant immunity to supervisory law enforcement officers whose negligent training or supervision of subordinates is a proximate cause of a tort.  *Ortiz v. New Mexico State Police*, 112 N.M. 249, 250, 814 P.2d 117, 118 (N.M. Ct. App. 1991).  However, "immunity is not waived for negligent training and supervision standing alone; such negligence must cause a specified tort or violation of rights."  *McDermitt v. Corrections Corp. of America*, 112 N.M. 247, 248, 814 P.2d 115, 116 (N.M. Ct. App. 1991).

As discussed above in the Court's analysis of Plaintiffs' constitutional claims for failure to train and supervise, there is simply no evidence in the record showing that any of the City Defendants failed to train or negligently trained the Defendant Officers in all areas relevant to Plaintiffs' claims.  Likewise, there is no evidence demonstrating a link between any alleged failure to train and the torts enumerated in Plaintiffs' First Amended Complaint.  Furthermore, there is no evidence showing that any of the City Defendants failed to supervise subordinate officers, or that the alleged failure to supervise was the cause of any torts.  For these reasons, the City Defendants' MPSJ No. III will be granted as to these claims.

C.        **Claims for Injunctive Relief**

In Count IX of their First Amended Complaint, Plaintiffs request injunctive relief against the City Defendants and Defendant Gonzales "to ensure there are no further violations of civil

rights of this nature by the defendants." The City Defendants and Defendant Gonzales contend that Plaintiffs lack standing to seek such injunctive relief.

In order to establish standing for asserting a claim for injunctive relief, Plaintiffs must demonstrate a "personal stake in the outcome." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). However, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Plaintiffs must demonstrate a sufficient likelihood that they will again be harmed in a similar manner. *See Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen . . . and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional"); *F.E.R. v. Valdez*, 58 F.3d 1530, 1534 (10th Cir. 1995) (approving district court's dismissal of plaintiffs' claims for injunctive relief where plaintiffs failed to allege a realistic threat that they would again experience injury as a result of the complained of conduct).

Plaintiffs did not contest this argument in their response brief and otherwise have not presented any evidence which demonstrates that there is a sufficient likelihood that the City Defendants, Defendant Gonzales, or the Defendant Officers will violate their constitutional rights if Plaintiffs participate in another protest. Therefore, the Court concludes that Plaintiffs lack standing to seek injunctive relief and will grant Defendants' MPSJ No. III as to these claims.

**IT IS THEREFORE ORDERED** that:

I.    Defendants' Motion for Partial Summary Judgment No. III is **GRANTED** in part as to:
      1)    Count IX: Plaintiffs' claims for Supervisory Liability and Municipal Liability for
            Violations of Constitutional Rights under 42 U.S.C. § 1983 against Defendant City
            and Defendants Chavez and Schultz;

II.   Defendants' Motion for Partial Summary Judgment No. III is **DENIED** in part as to:
      1)    Count I: Plaintiffs' claims for False Imprisonment against Defendant City;
      2)    Count II: Plaintiffs' claims for Battery against Defendant City;
      3)    Count III: Plaintiffs' claims for Malicious Prosecution against Defendant City;

III.  Defendant Gonzales' Motion for Summary Judgment is **GRANTED** in part as to:
      1)    Count IX: Plaintiffs' claims for Municipal Liability for Violations of Constitutional
            Rights under 42 U.S.C. § 1983 against Defendant Gonzales;

IV.   Plaintiffs' request for injunctive relief is **DENIED**;

V.    Plaintiffs' request for *sua sponte* entry of summary judgment is **DENIED**.


_____
SENIOR UNITED STATES DISTRICT JUDGE

28